IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSE E. GONZALES, PETER E. GOMEZ,
EMELINA GRANT, TERESITA GARCIA
MARTINEZ and MARIA ERNESTINA
MONTOYA,

        Plaintiffs,

      v.                                        No. 00-CV-60 WPJ/RS  ACE

UNITED STATES OF AMERICA, and
BILL RICHARDSON, Secretary of the
DEPARTMENT OF ENERGY,

        Defendants.

_____

PAJARITO PLATEAU HOMESTEADERS, INC.,

        Plaintiffs,

      v.                                        No. 01-CV-588 MCA/RLP ACE

UNITED STATES OF AMERICA, et al.,

        Defendants.

**CLASS COUNSEL KMK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW WITH RESPECT TO
FORMER COUNSEL'S APPLICATION FOR FEES AND COSTS**

      Class Counsel KMK, pursuant to Court's request during the October 6, 2005 conference

call, submits proposed Findings of Fact and Conclusions of Law in advance of the October 13,

2005 hearing.  Class Counsel KMK respectfully reserve the right to submit additional findings, if

necessary, following the October 13, 2005 hearing.

## FINDINGS OF FACT

### The Litigation

1.  The Court adopts and incorporates by reference the Findings of Fact already recorded as part of its approval of the Statement of Terms of Voluntary Dismissal.

2.  Attorneys Gallegos and Gross filed the initial lawsuit on behalf of heirs of Pajarito Plateau Homesteaders in January of 2000.  (T.d. 1; *Gross Aff. at ¶6*).  This lawsuit was the result of over four months of pre-filing investigation and analysis by Attorneys Gallegos and Gross, which included interviews with family members and the retention of a genealogist to prepare family genealogies.

3.  Attorneys Gallegos and Gross withdrew from representation of the Homesteaders Association in July of 2000 but continued to represent individual descendents in the litigation.  On October 5, 2000, over the objection of the President of the Homesteaders Association, the Court certified a class of all former owners and all descendents and heirs of former owners of land on the Pajarito Plateau and named Attorneys Gallegos and Gross class counsel for the certified class.  (T.d. 41; *Gallegos Aff. at ¶¶11-13*).  The Homesteaders Association was dismissed from the case for failure to obtain new counsel.  (T.d. 37; *Gross Aff. at ¶15*).  This class certification served as the basis for resolution of the litigation through the Legislation.

4.  Ms. Mackell and Mr. McCallion were retained by Pajarito Homesteaders, Inc. on or about October 12, 2000.  Pursuant to the retainer agreement, Attorneys Mackell and McCallion were required to have individuals sign Agreement and Ratification forms for representation of individuals.  (*Mackell Aff. at Ex. A, ¶1*).  No Agreement and Ratification forms signed by individuals have been presented to the Court.

5.  Ms. Mackell and Mr. McCallion filed a separate, parallel lawsuit in May of 2001.  At the time of the filing of the lawsuit, the original litigation was already certified as a class action.  The claims in this new lawsuit mirrored the claims already being pursued by Class Counsel Gallegos and Gross in the class litigation.  The lawsuit was therefore duplicative.  At best, Ms. Mackell and Mr. McCallion represented individuals who purportedly were attempting to opt out of the class litigation in tag-along litigation.

6.  When Ms. Mackell and Mr. McCallion filed the separate lawsuit in May of 2001, the class action litigation had already been stayed because Class Counsel Gallegos and Gross were pursuing a legislative resolution, further evidencing the role of Class Counsel Gallegos and Gross as the initiating force in the legislative process.

7.  Ms. Mackell and Mr. McCallion also apparently filed a separate "slavery" lawsuit, which was of questionable merit.  The Court has previously commented on the rather outlandish allegations in the complaint.  The lawsuit was ultimately dismissed when the district court granted the United States' motion to dismiss, and the Tenth Circuit affirmed.  The

pursuit of the "slavery" lawsuit created tension in the negotiations with the Senators and impeded progress on a legislative resolution.

8.  Ms. Mackell and Mr. McCallion refused to cooperate with Class Counsel Gallegos and Gross, which created added burden and expense to Class Counsel Gallegos and Gross in the representation of the class. Ms. Mackell and Mr. McCallion refused to cooperate in the litigation and impeded Class Counsel's investigation into the facts of the litigation. The efforts of Ms. Mackell and Mr. McCallion, and later Mr. Biedscheid, appear to be essentially duplicative and unnecessary if a cooperative relationship had been forged. These former counsel cannot identify any portion of their work or effort that actually created tangible benefit to the class or advanced the claims of the class; to the contrary, it appears that the work and effort of these former counsel, including work on the "slavery" lawsuit actually hindered the class and was intended to thwart or impede the class litigation.

9.  Ms. Mackell and Mr. McCallion filed a motion to withdraw from representation of the Pajarito Homesteaders, Inc. on September 13, 2002, which was granted on October 7, 2002. (*Mackell Aff. at ¶10*).

10. Ms. Mackell and Mr. McCallion were never appointed class counsel in any litigation. They never sought nor obtained certification of any class. They never sought to intervene in the existing class litigation. They never obtained a judgment, settlement, congressional or executive action or any remedy or reparation in resolution of any claim that they pursued. They created no monetary recovery for either the certified class or the individual clients they purported to represent.

11. Ms. Mackell has not presented any evidence of an actual billing rate during the time she claims to have performed work for the Association, and she has not presented any actual contemporaneous billing records that would confirm that the work was performed.

<u>The Legislation</u>

12. The class faced significant factual and legal hurdles, including but not limited to the United States' motion for summary judgment on the basis of statute of limitations. The Court has previously held that but for the Legislation, the class may not have received any recovery in this litigation.

13. The first efforts toward a legislative resolution were in January of 2000, when Gene Gallegos and Senator Domenici spoke and discussed a possible resolution of the homesteader's grievances. (*Gallegos Aff. at ¶8; Gross Aff. at ¶8*).

14. Gallegos and Senator Domenici met on February 14, 2000 and discussed a monetary settlement of the litigation. (*Gallegos Aff. at ¶10; Gross Aff. at ¶8*). There was ongoing communication throughout 2000 and early 2001.

15. Gallegos and Gross began drafting legislative proposals in 2000-01 and began drafting the Legislation as early as March of 2001. The drafts were exchanged with staffs for Senators Domenici and Bingaman and there were periodic communications between

Gallegos, Gross, and senator staff members throughout the Spring and Summer of 2001. On June 6, 2001, Gallegos met with Senator Domenici, Pete Lyons, and members of the staff of Senators Domenici and Bingaman to discuss the legislative proposal and to confirm the proposed Legislation was to be the joint product of both New Mexico Senators. (*Gallegos Aff. at ¶¶14-15*).

16.     The first substantive movement made toward resolving the claims through legislation occurred on February 14, 2001 in Senator Domenici's Albuquerque office, where Senator Domenici, Pete Lyons, Veronica Rodriguez, and Gene Gallegos met and first discussed a potential legislative resolution.  (*Lyons Aff. at ¶5*).

17.     When the New Mexico Senators learned of Mr. McCallion and Ms. Mackell's representation of the Association, they requested that Class Counsel Gallegos and Gross and Mr. McCallion and Ms. Mackell work together so that any legislation would provide complete resolution and be accepted by all counsel involved.  Class Counsel Gallegos and Gross made numerous attempts to seek the joint cooperation of Mr. McCallion and Ms. Mackell, and all attempts were rebuffed.  Mr. McCallion and Ms. Mackell refused to cooperate with Class Counsel Gallegos and Gross and insisted on separately pursuing a legislative remedy, despite the requests of the Senators.  Due to the refusal of Mr. McCallion and Ms. Mackell to cooperate, regardless of whether this conduct was at the request of their client or not, the legislative resolution efforts were effectively stalled. Mr. McCallion and Ms. Mackell made no progress on separately pursuing a legislative remedy, and effectively impeded the work and progress previously undertaken and achieved by Class Counsel Gallegos and Gross.

18.     KMK and Attorneys Utter and Buck entered their appearance in the litigation on December 4, 2002.  KMK was appointed as co-lead Class Counsel on February 1, 2005.

19.     Shortly after entering their appearance, Utter and Buck spoke with Gallegos and Gross and agreed to cooperate and resume the currently stalled efforts with the New Mexico Senators. (*Gallegos Aff. at ¶23*).  These communications led to a Joint Prosecution Agreement between Class Counsel Gallegos and Gross and KMK.

20.     On March 7, 2003, members of the staff of New Mexico Senators Domenici and Bingaman met with Mike Gross, Greg Utter and Matt Buck.  This meeting marked the first progress toward a legislative resolution with the unified effort of Attorneys Gallegos and Gross and KMK.  Negotiations continued for the next twenty months until the Legislation was finalized, introduced, passed by Congress, and became law in December of 2004.  (*Lyons Aff. at ¶¶14-21*).

21.     The Court previously found that as result of the unity among Class Counsel Gallegos and Gross and KMK and the potential plaintiffs and claimants, the legislative process was revived and resulted in the Legislation.  But for the cooperation among Class Counsel Gallegos and Gross and KMK, the Legislation would not have been passed.

22.     Mr. McCallion and Ms. Mackell had one meeting with Senator Domenici's staff and were involved in a few phone calls and/or emails, but these former counsel played no

actual role in the meetings, negotiations, or rewrites that led to the Legislation. (*Lyons Aff. at ¶¶10-11, 21*). They did not assist in any meaningful way in the passage of the Legislation, and their efforts actually hindered and delayed passage of the Legislation. According to Pete Lyons, who served on Senator Domenici's staff as the point person on the Legislation and who had conversations and discussions with all counsel involved at one point or another, neither McCallion nor any other attorney other than Class Counsel Gallegos, Gross and KMK played any role in the meetings, negotiations or rewrites that led to the final legislative package that was acceptable to the Homesteaders, the Senators, the U.S. Senate Armed Services Committee, the U.S. Senate, and finally the Congress of the United States. (*Lyons Aff. at ¶21*).

23.     The Legislation created a Fund dedicated to the settlement of the two lawsuits before the Court. The amount of the Fund ($10,000,000) was based on extensive negotiations and eventually the result of the Senators' acceptance of an amended report prepared by Class Counsel's retained expert (Exhibit 1 at the April 25, 2005 Hearing) and the award of attorneys fees to Class Counsel. The Court previously approved the Legislation and found that the Legislation and the Fund were fair and reasonable because class members had the potential to recover more than 90% of the present value of the land taken according the best-case scenario of Class Counsel's expert.

24.     Nothing in the Legislation or legislative history suggests that the provision for payment of attorneys fees was intended to compensate counsel for individual plaintiffs as no other attorneys played any role in the negotiations leading to passage of the Legislation.

The Genealogies

25.     Former counsel Ms. Mackell claims to have spent extensive time preparing genealogies for the benefit of the class. There is no evidence before the Court that these genealogies actually provided tangible benefit to the class.

26.     While Ms. Mackell billed considerable time to the creation of genealogies, Ms. Beth Gonzalez did most of the initial work and input with respect to the genealogies submitted by Ms. Mackell.

27.     Whatever the stage of work performed on the genealogies when Ms. Mackell withdrew in October of 2002, most of the significant work on the genealogies was performed after October of 2002. The number of individuals reflected on the genealogies substantially increased after October of 2002 due to the work of Ms. Judy Espinosa, Ms. Beth Gonzalez, and Class Counsel.

28.     While the final genealogies aided in providing notice to the class, according to the testimony of Special Master Caldwell, the claim forms and the information contained in the claim forms was more important in his decision making process. The genealogies were essentially hearsay. The genealogies were not the basis for dividing the Fund.

29. The Court finds that these former counsel had notice of the Legislation and the April 25, 2005 hearing, and made no filing with the Court indicating their intent to seek fees from the Legislative Fund.

<u>CONCLUSIONS OF LAW</u>

30. The accepted basis for an award of attorneys fees in class action litigation in the Tenth Circuit is the common fund doctrine as explained in *Brown v. Phillips Petroleum Co.,* 838 F.2d 451 (10th Cir. 1988); *see also Uselton v. Eason,* ( f.3d 849 (10th Cir. 1993); *In re Copley Pharmaceutical, Inc. "Albuterol" Prod. Liab. Litig*., 2000 U.S. App. Lexis 25245 (10th Cir. 2000); *Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091 (D.N.M. 1999); Ramah *Navajo Chapter v. Norton,* 250 F. Supp. 2d 1303 (D.N.M. 2002); *In re Horizon/CMS Healthcare Corp. Sec. Litig.,* 3 F. Supp. 2d 1208 (D.N.M. 1998). Attorneys who represent a class through to conclusion of the litigation and create a common fund are entitled to a portion of the fund as compensation for fees and costs incurred in the representation. *See Ramah Navajo,* 250 F. Supp. 2d at 1316 (citing *Brown v. Van Gemert*). The Tenth Circuit has made clear that only attorneys who actually contribute to the creation of a common fund in class actions are entitled to recover from the common fund. *See Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir. 1988); *Uselton v. Eason*, 9 F.3d 849 (10th Cir. 1993); *see also Boeing v. Van Gemert*, 444 US. 472 (1980). "The law is well settled that a court should only credit attorneys in class actions for those hours that yield some tangible benefit to the class." *In re Copley, 50 F. Supp. 2d at 1154.*

31. While the division of fees among class counsel is also in the discretion of the Court, the Tenth Circuit has explicitly ruled that the proposed allocation of attorneys fees among counsel by Class Counsel in a common fund class action is entitled to "substantial deference." In *In re Copley Pharmaceuticals, Inc.*, 50 F. Supp. 2d 1141 (D. Col. 1999), Lead Counsel made a proposal for unequal distribution of the fee award to several attorneys, generating numerous objections. The district court, citing the Manual for Complex Litigation, Section 20.22 at 27 (3d ed. 1995), concluded that "substantial deference" to Lead Counsel's proposed allocation was necessary. *Id. at 1149*. Substantial deference was appropriate because Lead Counsel was in a unique position to weigh the respective contributions of counsel to the litigation. *Id.* There was a finite amount of money to distribute and awarding money to one firm meant taking money from another, and Class Counsel and not the Court was in the best position to make those determinations. *Id. at 1149-50.* In fact, and of particular importance and relevance to this case, the Court affirmed Class Counsel's decision to penalize one attorney (Mr. Rheingold) whose conduct negatively affected the class when he opposed class certification early in the litigation and opposed Lead Counsel's request for a continuance. The Court held that attorneys were only entitled to be paid for "tangible benefit to the class" and held that it was appropriate for Lead Counsel to devalue this attorney's contribution because of the negative effect on the class. *Id. at 1154.* The Tenth Circuit affirmed the district court's determination of attorneys fees based on the recommendation of Lead Counsel, agreeing that "substantial deference" to the allocation of fees by lead counsel is necessary and appropriate. In re *Copley Pharmaceutical, Inc.,* 232 F.3d 900 (10th Cir. 2000).

32.     The Tenth Circuit's "substantial deference" analysis is consistent with the Manual for Complex Litigation and with numerous courts that have addressed the issue. *In re Diet Drugs Prod. Liab. Litig.*, 2003 WL 21641958, *6 (E.D. Pa. May 15, 2003) (district court gave "substantial deference to the recommendations of the Committee" because they were in a better position than the Court to decide the weight and merit of respective contributions) (citing *Copley*, 50 F. Supp. 2d at 1149 and *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 730 (3d Cir. 2001)); *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992) (Fifth Circuit affirmed a district court's adoption of a fee allocation that completely excluded the appellant, ruling that the apportionment of the fee award among the larger firms to the exclusion of the smaller firm based on the collective efforts in obtaining the fund was appropriate); *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998) (court deferred to lead counsel to determine the respective contribution of counsel and divide the attorney award "according to the discretion of lead counsel"); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 397-400 (D.D.C. 1978) (district court deferred decisions regarding fee allocation to the decision of the lead committee, recognizing that lead counsel were in the best position to determine the appropriate contribution of counsel); *In re Magic Marker Sec. Litig.*, 1979 WL 1248, *1 (E.D. Pa. 1979) (assessing worth of services from respective law firms was Herculean task and the Class Counsel was in the best position to make the determination); *see also In re Auction Houses Antitrust Litig.*, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001) (denying fee application from non-lead counsel firms).

33.     In this case, Class Counsel have decided not to award any portion of the fee recovery from the Fund to these former counsel, concluding that they did not help to create the Fund, provided no tangible benefit to the class, and that their conduct actually hindered and injured the class. This determination is entitled to substantial deference. The Court has given these former counsel an opportunity to submit an application, present affidavits, and present testimony and argument at hearing on this issue to refute the decision of Class Counsel. The Court has accepted and reviewed the affidavits, testimony and argument of former counsel and Class Counsel in support the respective positions. Considering all the evidence before the Court, former counsel have not presented any credible evidence to establish that they provided any tangible benefit to the class or in any way contributed to the creation of the Legislation and the Fund, and in fact the evidence is to the contrary. These former counsel have not presented any evidence upon which this Court can overcome the "substantial deference" that is required to be given to Class Counsel's division of fees under the circumstances.

34.     The Court finds that the Legislation does not provide a mechanism to award fees to counsel for individual plaintiffs. These former counsel were never Class Counsel, and in fact impeded the efforts of Class Counsel. The intent of the Legislation is clear. Opening the fee award process to attorneys for individual class members would be counterproductive and inappropriate under the Legislation and applicable Tenth Circuit caselaw.

35.     The Court finds that the Legislation was the sole basis for providing a recovery for the class members in this Litigation, and that these former counsel did not meaningfully contribute to the passage of the Legislation in any manner that would constitute providing

a tangible benefit to the class or creation of the Fund.  The efforts to pursue a legislative solution were initiated by Class Counsel Gallegos and Gross, not former counsel, and they had progressed significantly at the time former counsel appeared.  When former counsel filed their parallel litigation, the class litigation was stayed in light of progress made on the legislative solution by Class Counsel Gallegos and Gross.  While former counsel claim to have made some calls and participated in one meeting with certain Senator's staff members, the affidavit of Pete Lyons is unrefuted and confirms that these efforts by former counsel played no role in the passage of the Legislation.  If anything, the conduct of these former counsel, whatever the reasons, actually hindered and delayed a legislative resolution to the detriment and not the benefit of the class.  The Legislation only became a reality after these former counsel withdrew and Class Counsel KMK appeared in the litigation.  The Legislation is the result of the cooperative efforts of Class Counsel Gallegos, Gross, and KMK.

36.   The work of former counsel on purported genealogies did not provide a tangible benefit to the class.  The genealogies appear to be the work primarily of individual Association members rather than counsel.  Furthermore, the work on genealogies by former counsel appears to be duplicative of work that was already being undertaken by Class Counsel Gallegos and Gross; rather than cooperate to reduce costs and work, these former counsel refused to cooperate and increased the burden and expense associated with genealogy work to the detriment of the class.  The Court further finds that regardless of the work performed by these former counsel on the genealogies at the beginning of the case, the genealogies were substantially edited and modified long after former counsel withdrew making the initial work less valuable.  Furthermore, the claims procedure was established as the mechanism for class members to establish entitlement to the Legislative Fund, and according to the testimony of Special Master Judge Caldwell, the genealogies played no significant role in the Special Master's determination in the claims procedure.  The Court finds that the work on the genealogies does not justify an award of the fees from the Legislation.

37.   The Court further finds that the remaining work of former counsel appears to be duplicative or unnecessary.  They filed a parallel, competing, disruptive complaint on behalf of individuals, most of which were already represented by Class Counsel by virtue of the class certification.  While these former counsel claim that many of the individuals opted out, the Court has already previously rejected this position, finding that only 40 individuals properly opted out of the class action litigation (and all 40 opted back in to the class litigation at a later date).  The depositions appear to be more relevant to the "slavery" lawsuit rather than the takings lawsuit, and these former counsel have not identified any tangible benefit to the class resulting from these depositions or the "slavery" lawsuit, which was actually a detriment to the class.  In addition, included in the application is time for the filing of their motion to withdraw as counsel for the Association, which clearly provided no tangible benefit to the class and cannot form the basis of any form of fee award.  In short, these former counsel cannot identify any tangible benefit to the class that resulted from their work and effort.

38.   The Court further finds that rather than provide tangible benefit to the class, the conduct of these former counsel, whether at the request of the Homesteaders Association and

individual clients or not, actually harmed the class.  These former counsel filed a separate, competing, parallel lawsuit that increased the costs and expense of the class litigation.  These former counsel refused to cooperate with Class Counsel Gallegos and Gross and actually hindered their efforts.  These former counsel refused to cooperate on a legislative solution, despite knowing that the staffs of the New Mexico Senators specifically requested cooperation before any further discussions regarding a legislative solution would be pursued.  These former counsel filed a "slavery lawsuit" against the United States which was of questionable merit and prevented progress of a legislative solution. Rather than provide tangible benefit, these former counsel provided tangible harm and delay, further evidencing why they are not entitled to an award of attorneys fees from the Legislative Fund.

39.     The Court further finds that these former counsel withdrew from representation of individual plaintiffs more than two years before the Legislation was finalized.  They were not involved in any of the discussions or negotiations involving the Legislation.  They were not involved in preparing the Statement of Terms and Conditions of Voluntary Dismissal and were not involved in any of the claims procedure.  They made no appearance in the litigation and made no filings to preserve any fee recovery until after the Court entered its April 29, 2005 Order, and have offered no credible explanation why these former counsel made no measurable effort to preserve their claim against the Legislative Fund prior to May of 2005 if they actually believed they were entitled to a portion of the Legislative Fund.

40.     Separately and in addition, the Court finds that the affidavit of former counsel Cheryl Hamer Mackell is insufficient and cannot form the basis for an award of fees under any circumstances.  Ms. Mackell has failed to provide any credible evidence of an actual billing rate disclosed to her clients at the time the representation and fee agreement was signed, and the Court cannot use current billing rates or hypothetical rates as a basis for any form of fee award.  Furthermore, Ms. Mackell has not provided appropriate billings records and documentation to support her claim, and the submission of generic, after-the fact documentation prepared from alleged notes without the submission of the notes themselves and an appropriate explanation for this method of time recordation is inappropriate.  The Court finds that the application of Ms. Mackell is deficient and that her application is rejected as deficient.  *See, e.g., New York State Ass'n v. Carey*, 711 F.2d 1136 (2d Cir. 1983) (fee application must be supported by contemporaneous time records); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) (rejecting time based upon insufficient descriptions of work); *Maywalt v. Parker & Parsley Petroleum Co*., 1997 U.S. Dist. Lexis 97, *16-18 (S.D.N.Y. Jan. 6, 1997) (fee application denied where contemporaneous time records are not provided or listing represented to be from contemporaneous records is not provided; "burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required").

41.     The Court finds that these former counsel provided no tangible benefit to the class and did not participate in the creation of the Legislation and the Fund, and that there is no evidence upon which it can base a decision to overcome the "substantial deference" that is required to be given to Class Counsel on this matter.

Respectfully submitted,

/s/ Gregory M. Utter
Gregory M. Utter
Joseph M. Callow, Jr.
Matthew K. Buck
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
(513) 579-6540
Class Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing Class Counsel KMK's Proposed Findings of Fact and Conclusions of Law With Respect to Former Counsel's Application for Fees and Costs is to be served by U.S. Mail on this 11th day of October, 2005, to the following counsel of record:

J. E. Gallegos
Gallegos Law Firm, P.C.
460 St. Michael's Drive
Bldg. 300
Santa Fe, New Mexico 87505

Michael P. Gross
M.P. Gross & Associates, P.C.
460 St. Michael's Drive, Bldg. 401
Santa Fe, New Mexico 87505

Mr. Raymond Hamilton
Assistant U.S. Attorney
Ms. Pamela Arias-Ortega
Special Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 607
Albuquerque, New Mexico 87103-0607

Mr. Kenneth F. McCallion
McCallion & Associates, LLP
24 West 40th Street
New York, NY  10018

Ms. Cheryl Mackell
Pomerantz Haudek Block Grossman & Gross
1025 Connecticut Ave., N.W.
Washington, DC  20036-5405

Mr. Bryan P. Biedscheid
Sawtell, Wirth & Biedscheid, P.C.
708 Paseo de Peralta
Santa Fe, NM  87501

/s/ Gregory M. Utter
Gregory M. Utter

1521107.1