IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

--------------------------------------------------------------x

JOSE E. GONZALES, PETER E. GOMEZ,            :
EMELINA GRANT, TERESITA GARCIA               :
MARTINEZ and MARIA ERNESTINA                 :
MONTOYA,                                      :
                                              :
                         Plaintiffs,          :
                                              :   No. 00-CV-60 WPJ/RS ACE
vs.                                           :
                                              :
UNITED STATES OF AMERICA, and                 :
BILL RICHARDSON, Secretary of the             :
DEPARTMENT OF ENERGY,                         :
                                              :
                         Defendants.          :
--------------------------------------------------------------x
                                              :
PAJARITO PLATEAU HOMESTEADERS,                :
INC., ET AL,                                  :
                         Plaintiffs,          :
                                              :
vs.                                           :   No. 01-CV-588 MCA/RLP ACE
                                              :
UNITED STATES OF AMERICA, et al.              :
                                              :
                         Defendants.          :
                                              :
                                              :
--------------------------------------------------------------x

## FORMER PLAINTIFFS' COUNSEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR ATTORNEYS' FEES APPLICATION

Former Plaintiffs' Counsel, McCallion & Associates LLP, Cheryl Hamer

Mackell, Esq., Catron, Catron & Pottow, P.A., and Sawtell, Wirth & Biedscheid P.C.

(collectively referred to as "Former Counsel"), hereby submit the following Proposed

Findings of Fact and Conclusions of Law in support of their application for attorneys'

fees:

1.      The Gallegos Law Firm entered into a representation agreement with the

        Pajarito Plateau Homesteaders, Inc. ("Homesteaders") on November 15, 1999.

The agreement provided for an attorneys lien for fees in the event of their withdrawal or discharge.

2.   Gonzales et al v United States et al (00CV0060) was filed on January 14, 2000 by the Gallegos Law Firm.

3.   Mr. Gallegos (Gallegos Law Firm) and Michael Gross (M. Gross & Associates P.C.) confirmed their resignation as counsel to the Homesteaders by letter of April 11, 2000, noting as follows:

> i.   Should you succeed in winning the law suit and achieving a recovery, we will be entitled to an equitable fee based on our previous agreement and the relative contribution of our efforts to the final outcome.  We are entitled to petition the Court for receipt from any funds recovered in the litigation for… the reasonable value of our services as legal counsel prior to termination as determined by the Court.  **We believe we are entitled under New Mexico law to place a lien on the recovery to ensure that our interests are safeguarded**.
> (Reference: Former Counsel's ("F.C.") Exhibit No. 2.)[1]

4.   Mr. Gallegos ("Gallegos") and Mr. Gross ("Gross") filed their Motion to Withdraw on May 4, 2000 (00CV0060) (Doc. 16) because of differences of opinion between the named representatives and the Board of Directors of the Homesteaders ("Homesteaders Board"), and between the Homesteaders Board and the Gallegos Law Firm.  See (00CV0060) (Doc. 29) attachment.

5.   On June 13, 2000, Magistrate Judge Leslie C. Smith granted the Gallegos and Gross motion to withdraw (Doc. 23).

6.   On August 3, 2000, Gallegos and Gross reentered an appearance for the individual plaintiffs only (Doc. 24).

---

[1] Former Counsel's Exhibits shall be presented to the Court at the hearing scheduled for November 13, 2003.

7.   On August 9, 2000, while the Homesteaders were unrepresented by counsel, the Gallegos Law Firm filed a Motion to Certify the Class (Docket 00CV0060) (Doc. 25).

8.   On August 23, 2000, AUSA Andrew Smith noted his appearance on behalf of defendants.

9.   The Homesteaders approached Cheryl H. Mackell ("Mackell") during September 2000 regarding representation.

10.  By letter of October 2, 2000, Gallegos and Gross withdrew their charging lien for attorneys' fees as against the Homesteaders, explaining that when they withdrew, they "did not expect to have further involvement in the case". (Reference: F.C. Ex. 3).

11.  On October 3, 2000, the Homesteaders were dismissed <u>sua sponte</u> by the Court because they had no counsel; however, they were given 90 days to secure replacement counsel. (Doc. 36 and 37).

12.  Two days later, on October 5, 2000 while the Homesteaders was unrepresented by counsel (Doc. 41), Judge Smith granted Plaintiffs' motion filed by Gallegos and Gross to certify the case as a class action, and notification to the class was approved on January 30, 2001 (Doc. 52).

13.  On October 9, 2000, Mackell and Kenneth F. McCallion ("McCallion") began providing legal services. The Retainer Agreement provided in part, that "should the Attorneys be terminated or withdraw, they shall retain their full rights to payment based on the value of their services in proposition to all services which result in recovery for the Clients, or for the reasonable value of their services on an hourly basis, whichever is greater, and shall have an equitable interest in and a charging lien against any recovery and upon the

3

case files." The Agreement further provides: "In such event [of withdrawal], Attorneys shall remain entitled to their equitable interest in earned fees...." (F.C. Ex. 42). During October 2000, Mackell and McCallion had a telephone conference with the Homesteaders Board and reviewed documents and pleadings. Mackell also compiled documents and forwarded a list to Judy Espinoza, and she also met with certain Homesteader Board members on October 27, 2000. (Mackell's billing records are attached as F.C. Ex. 43 and Billing Records of McCallion & Associates LLP ("M&A") are attached as F.C. Exhibit 44).

14.     On November 3, 2000, Mackell had a telephone conference with Senator Domenici's office regarding the status of the land claims, and on the same day attended a Pajarito Board meeting. She also conducted numerous telephone calls and meetings with the clients and researched various legal issues during the period from November 6 through November 13, 2000 (F.C. Ex. 43).

15.     On November 13, 2000, Beth Gonzales (Homesteaders Board member) wrote to the other Homesteaders Board members regarding her meeting with Cheryl Mackell to establish guidelines for gathering information on each family and documenting family histories (F.C. Ex. 4).

16.     On November 20, 2000, Mackell, McCallion and Judy Espinoza (Homesteaders Board member) had a telephone conference in connection with the review of documents and factual research regarding land claims.

17.     On November 27, 2000, Mackell attended a Homesteader's Board meeting, and discussed the type and extent of information she wished to receive from the membership. Mackell emphasized the importance of personal interviews in order to collect information and evaluate the strength of the claims. The

minutes of the meeting also reflect that the President of the Homesteaders "anticipated spending more time in trying to get the Gallegos Law Firm from being involved in the case" and had spent "a great deal of time in the preceding months in communicating with the courts" regarding complaints about the Gallegos Law Firm (F.C. Ex. 5).

18.   During December 2000, Mackell had a number of telephone conferences with Board members and McCallion, and both Mackell and McCallion conducted legal and factual research regarding the clients' land claims (F.C. Ex. 43 and 44).

19.   During January 2001, Mackell researched certain legal and factual issues and organized documents relating to the land claims for forwarding to Mr. McCallion (F.C. Ex. 43).

20.   On January 16, 2001, a Homesteaders Board member sent Mackell a memo (which was also forwarded to McCallion) discussing "Congressional Actions Unfavorable to Private Land Owners" and the "unfavorable political bent of Senator Peter Domenici towards protecting private property rights." This information was sent "as a means to learn what can be expected if in fact negotiations for a settlement were initiated on behalf of the Pajarito Homesteaders" (F.C. Ex. 6).

21.   During February, 2001, McCallion and Mackell reviewed client histories and records, and conducted factual research regarding historical files relevant to the land claims.  Mackell also had numerous meetings with clients (F.C. Es. 43 and 44).

22.   On February 20, 2001, approximately 107 potential class members filed notice to the court of intent to opt out of the class in case 00CV0060 (Doc. 54-64).

23. During March and April, 2001, Mackell continued to conduct legal and historical research regarding the clients' land claims, and to meet with clients (F.C. Ex. 43).

24. During March and April most of the remainder of the potential class members opted out. (Doc. 73-91), and by August 2001, over 300 potential class members had opted out.

25. On April 25, 2001 a stay was entered "pending a potential settlement avenue in the legislative process." (00CV0060)(Doc. 101).

26. During May 2001, McCallion and one of his associates (Mr. Sharma) conducted legal research and drafted the complaint captioned in <u>Pajarito Plateau Homesteaders, Inc. et al. v. United States</u> (01CV588), an action brought on behalf of Homesteader and 131 individual members of Homesteaders. (F.C. Ex. 6A). The complaint was reviewed and filed by Mackell on May 23, 2001. The case was reassigned to Chief Judge James A. Parker and referred to Magistrate Judge Richard L. Puglisi for discovery purposes (Case 588, Docket 3). The case was later transferred to Judge Armija (F.C. Ex. 43 and 44).

27. McCallion and Mackell filed Notices of Appearance and also filed a Motion for change of venue to Santa Fe on May 29, 2001 (Case 588; Docket 4 and 5).

28. AUSA Andrew Smith and John Zavitz filed a Notice of Appearance in Case 01 CV 588 on June 12, 2001.

29. During June and July 2001, McCallion, Sharma and Ms. Susan Hynes (Executive Director of McCallion & Associates LLP) ("Hynes") continued to conduct legal and factual research, reviewed defendant's answer to the

complaint and other pleadings, and prepared for the trip to New Mexico to meet with AUSA Andrew Smith and the clients (F.C. Ex. 43).

30.     During June and July 2001, Mackell continued to work on family histories and genealogies in coordination with the clients (F.C. Ex. 43).

31.     On August 1, 2001, McCallion had a telephone conference with AUSA Andrew Smith regarding the status of the two cases (060 and 588) and the possibility of a legislative solution (F.C. Ex. 44).

32.     On August 3, 2001, McCallion, Mackell and Hynes (of McCallion & Associates) met with AUSA Andrew Smith at the U.S. Attorneys' Office (F.C. 43 and 44), where it was agreed that Counsel for the Homesteaders and the class action opt outs (McCallion and Mackell) would strongly recommend that their clients pursue a legislative remedy.

33.     On August 4, 2001, McCallion, Mackell and Hynes attended the annual meeting of the Homesteaders at Los Alamos and discussed the status of the litigation and possible legislation with the Board members and Association membership.

34.     The Initial Scheduling Order in Case 588 was issued on August 29, 2001 (Docket 16) (F.C. Ex. 43 and 44).

35.     Upon returning to New York, McCallion and Hynes continued to coordinate during September 2001 with Mackell and AUSA Andrew Smith regarding the status of the litigation and potential legislative remedies (F.C. Ex. 43 and 44).

36.     On September 5, 2001, Mackell met with Bernard R. Toon and Libby Rodke of Senator Bingaman's staff regarding the status of the litigation and representation of 132 named plaintiffs and the Homesteaders in Case No. 588. Mackell followed up with letters to these staff members dated September 10,

2001 noting that "we very much want to be kept current, to participate, and to

give our input in any proposed legislation.". See F.C. Ex. 8 and 9.

37.    On September 4, 2001, McCallion had a telephone conference with Michael

Gross (F.C. Ex.44) regarding a possible agreement to consolidate the two

cases (060 and 588) and the coordination of legislative initiatives.  McCallion

recommended to the Homesteaders Board that the two cases be consolidated

and the legislative initiative be coordinated with Gallegos and Gross.  This

recommendation was rejected by the Board.

38.    On September 6, 2001, McCallion and AUSA Andrew Smith had a telephone

conference regarding the Stipulation to stay the Rule 16 proceedings pending

settlement and legislative discussions. The Stipulated Order for a temporary

stay of Case 588 was signed by Magistrate Judge Puglisi on September 13,

2001 (Case 588 Docket, No. 17) and on Case 060. The case was referred to

Magistrate Judge Puglisi for settlement and discovery purposes on September

14, 2001 (Case 060; Docket No. 112).

39.    On October 3, 2001, McCallion and Sharma attended a status conference by

telephone with Magistrate Judge Puglisi (Case 588; Docket 18).

40.    On October 15, 2001, at the annual meeting of the Homesteaders, the

President noted that "the group stands united and resolute in litigating...."

F.C. Ex. 9. The President (Chair) further "explained that he continues to

encourage counsel to move forward towards litigation. However, he stated

that the Gallegos Law Firm "stands resolute in trying to pursue a legislative

remedy."  Counsel were cautioned about "not being diverted by the tactics of

pursuing a legislative remedy."

41.   During February 2002, McCallion and Mackell continued to conduct factual and documentary research, and on February 15, 2002, Mackell discussed the status of the case with AUSA Andrew Smith (F.C. Ex. 43 and 44).

42.   On February 21, 2002, McCallion wrote to the Homesteaders Board, reporting as follows:

> i.   <u>Senators Domenici and Bingaman have expressed an interest in jointly sponsoring legislation to compensate the owners and heirs of the expropriated lands and other property rights in Los Alamos County which were taken without fair compensation for the Manhattan Project. **We believe that it is appropriate to pursue this legislative remedy while, at the same time attempting to advance the litigation."** (Emphasis added).</u>   (See F.C. Ex. 10).

43.   In his February 21, 2002 letter to the Homesteaders, McCallion outlined the legislative plan:

> i.   [W]e intend to explore with the Senators and their staffs the outline of a bill that would (1) provide for the creation of a fund to be divided among the victims and their families on a pro rata basis according to the acreage taken and other property interests (e.g. grazing rights), and (2) provide for the creation of an additional fund for educational, cultural and historical purposes relating to the Pajarito Homesteaders. This would include the possibility of establishing a museum and/or periodic conferences and educational programs as your organization deems appropriate (See F.C. Ex. 10).

44.   In the February 21, 2002 letter McCallion acknowledged the explicit instructions from the Homesteaders Board:

> i.   We have already left phone messages with both Senators' offices requesting that they contact us directly. We have made it clear to the Gallegos Law Firm that we will be dealing with the Senators and their staff directly, not through them. However, **it is clear, before the Senators will sponsor and introduce any legislation, it will have to be "signed off" on by both (a) you and your group, and (b) Gallegos' group** (See F.C. Ex. 10).

45.   McCallion notified Gross that the "clients had authorized [him] to deal separately with the Senators, to lend what we take is only limited support to a

legislative solution (i.e. not to endorse a bill until they see its final form) and

to proceed simultaneously with vigorous prosecution of their lawsuit." See

Letter from Michael Gross dated February 28, 2002 (F.C. Ex. 11).

46. **During February 2002, in phone conversations with Gross, McCallion**
**expressed the view that the $6.7 million compensation proposed by the**
**Gallegos Law Firm was inadequate and that he favored an "enhanced"**
**bill that provided for "greater than $6.7 million compensation for owners**
**and heirs of lands expropriated for the Manhattan Project and a cultural**
**component" in the bill. (F.C. Ex. 11 at page 2).**  Gross confirmed in his
February 28, 2002 letter: "Neither Gene [Gallegos] nor I expressed any
particular disagreement with these objectives." (F.C. Ex. 11).

47. On March 5, 2002, Bryan P. Biedscheid ("Biedscheid") and W. Anthony
Sawtell noticed their entry of appearance in Case No. 588 (Docket 20).

48. **On March 11, 2002, McCallion, Mackell and Hynes met with staff**
**members of Senators Domenici and Bingaman (Pete Lyons, Bernard**
**Toon and Libby Rodke) in Washington, DC and made an "enhanced**
**legislative proposal involving additional funding over and above the $6.7**
**million land appraisal** proposed by the Gallegos Law Firm and a cultural
historical component.  Counsel were advised that a legislative package in the
$60 million range consistent with the calculations of counsel's land valuation
expert (Dr. Stan Smith) was not politically acceptable. **The Senate staff**
**members advised that legislative proposals of "up to $10 million" would**
**be carefully considered.**

49. On March 12, 2002 and thereafter, McCallion and Hynes, in consultation with
and direction of the Homesteader Board, drafted a proposed legislative bill for

$10 million modeled on the prior draft by the Gallegos Law Firm ($6.7

million) and the White Sands compensation legislation (PL 105.119). See F.C.

Exhibit 13A.  They also coordinated with Mackell.

50.  **The Homesteaders Board sent comments on the draft legislation for $10**

**million to McCallion and Mackell on March 22, 2002 (F.C. Ex. 13B), as**

**well as a memo dated March 19, 2002 regarding the legislation, thanking**

**counsel "for all your excellent effort, hopefully this will being to open the**

**door for timely and productive discussions between the Senators and the**

**Board."  (F.C. Ex. 13).**

51.  On March 21, 2002, Libby Rodke of Senator Bingaman's Office sent an e-

mail to all counsel confirming that "we had the opportunity to speak with both

sets of attorneys representing the Pajarito Plateau Homesteaders in two

different cases pending before the federal court in New Mexico" and

emphasizing the importance that we all "work together."  (F.C. Ex. 14).

52.  On March 22, 2002, the Gallegos Law Firm wrote to Mr. McCallion and Ms.

Mackell, referring to the $6.7 million Blatnick appraisal supporting the

appropriation amount in their draft bill, and requesting a written agreement

"committing all parties to mutual objectives and mutual support to achieve

those objectives" (F.C. Ex. 15).  McCallion and Mackell communicated this

request for a "written agreement" to the Homesteaders Board, which was

rejected.

53.  On March 27, 2002, McCallion, Mackell and Gallegos had a conference call

to discuss the proposed legislation (F.C. Ex. 44).

54.  **By cover letter dated April 2, 2002, Mr. McCallion forwarded the draft**

**legislative proposal approved by the Homesteader Board with the $10**

**million appropriation figure to Pete Lyons and Libby Rodke of Senators Domenici and Bingaman's offices.** On specific instructions from the Homesteaders Board, the draft legislation was not forwarded to the Gallegos Law Firm (F.C. Ex. 16).

55. On April 9, 2002, Gross sent a letter to McCallion and Mackell referring to the desire of the two Senators for a joint legislative proposal and requesting a meeting in DC. (F.C. Ex. 17). McCallion and Mackell communicated these requests to the Homesteader Board, but were denied authority to either submit a joint legislative proposal or meet with other counsel.

56. On April 10, 2002, McCallion and Mackell received a memo from the Homesteaders Board asserting that the recent discussions between the Gallegos Law Firm and the Senators' staff "has interfered with plaintiffs' attempt at availing themselves of their right to pursue their case in Federal District Court." The memo further states: "I don't want this tension between pursuing litigation vs. legislation to lead us to end up in the same situation as I did with Gene Gallegos two years ago." (F.C. Ex. 18).

57. On April 14, 2002, McCallion sent a letter to the Homesteaders Board stating (at p.2) that the Board's new proposal for a $20 million settlement of only Case 01CV588 was unrealistic:

> i. It is unlikely (indeed impossible) that the Senators or the U.S. Government would sponsor legislation that did not resolve the two Homesteader cases pending before the district court. In our view, this will never happen.

> ii. **As we have mentioned it is important to the Senators that both our group and the Gallegos "group" (even though small) agree on legislation before it is introduced.** As per your instructions, I have advised the Senate staffers (and the Gallegos Law Firm) that we are not authorized to coordinate or otherwise cooperate with the Gallegos group. Unless I hear from you otherwise, I will confirm

with Lyons and Rodke that we are not coordinating with Gallegos, and that if they want to discuss any legislative proposal with Gallegos, they will have to do so themselves. However, just so you know and it is perfectly clear, **we are of the opinion that there is no possibility that any legislation will proceed as long as you object to any draft bill that includes a provision recognizing that the Fund is a settlement of both cases (not just yours).** (See F.C. Ex. 19).

58. **On May 2, 2002, Dr. Stan V. Smith of the Corporate Financial Group, Ltd. forwarded to Mr. McCallion, his economic analysis of land valuation losses of $58 million and other losses suffered by the Homesteaders (F.C. Ex.20).** Preliminary figures on the land valuation losses had previously been provided to Mr. McCallion in advance of the March 11th meeting with the Senators' staff. On June 12, 2002, Mackell and Gross had a telephone call where it was agreed that both sets of counsel would continue to explore a legislative solution. They also discussed the possibility of Gross and Gallegos resigning as class counsel so that progress could be made. See F.C. Ex. 43 and paragraph 11 of Mackell's Supplemental Affidavit. Thereafter, Mackell then called McCallion on the same day to relay her conversation with Gross (F.C. Ex. 43).

59. On July 1, 2002, Mackell, McCallion and Biedscheid sent a letter directly to the Homesteader plaintiffs, enclosing a copy of the proposed legislation for the $10 million appropriation stating:

> i. **It has been our opinion that a successful legislatives solution would remove the element of risk as well as the high costs associated with a trial, guarantee compensation to you and be resolved sooner than if a judicial remedy is pursued.** However, since you all have not agreed as to material terms in the proposed legislation and to the procedure for going forward, our efforts have ceased (See F.C. Ex. 21).

60.  On July 3, 2002, Mackell filed an affidavit in Case 00CV060 identifying 29 land tracts and genealogical information regarding Homesteaders claims, based upon interviews of written documentation (F.C. Ex. 22). Part of the supporting documentation reviewed by Mackell was Member Questionnaires (F.C. Ex. 23).

61.  On July 16, 2002, Mackell sent letters to clients regarding the upcoming depositions (F.C. Ex. 26).

62.  On July 18, 2002, McCallion sent a letter to AUSA Hamilton regarding discovery issues (F.C. Ex. 28).

63.  On August 6 and 7, 2002, certain Homesteader members were deposed in case No. 1166, with much of the questioning dealing with the expropriation of Homesteader lands and other issues relating to Cases 00CV060 and 01CV588 (F.C. Ex. 30-31). The depositions were defended by Mackell and Biedscheid, who forwarded discovery materials largely dealing with land claim and related documentation provided by various clients (F.C. Ex. 32-33). Ms. Espinosa and Ms. Gonzales certified that most of the documentation had been turned over to attorneys or the Homesteaders' President (F.C. Ex. 30 and 31).

64.  **On August 15, 2002, McCallion, Mackell and Biedscheid sent a letter to the Homesteader Board renewing a request "for authorization to proceed with a legislative option" on behalf of the Homesteaders, with a $10 million settlement figure as set forth in the draft legislation.** Since the Homesteaders Board had prohibited counsel from speaking directly plaintiffs, counsel further noted:

  i.  We also indicated at the meeting that, as attorneys, we have an obligation to communicate directly with the plaintiffs..." (F.C. Ex. 34).

65.   On August 22, 2002, Ms. Mackell wrote to the Homesteaders Board stressing the "extremely urgent need" to respond to counsel's August 15th letter (F.C. Ex. 35).

66.   On September 5, 2002, the Homesteaders Board wrote to Mackell (copies to other counsel) stating "The membership and the board stand resolute in once again, emphasizing the need to continue to pursue obtaining a solution through a judicial finding." The Board also set the following conditions:

   i.   Therefore before plaintiffs can enter into settlement discussions, defendants most rescind and void all title search reports…In addition, the land transfer pending must be suspended…" (See F.C. Ex. 36.)

67.   On September 10, 2002, McCallion, Mackell and Biedscheid sent a letter to the Homesteaders Board notifying it of counsels' intent to withdraw on the grounds that the Board had decided to give counsel authority to engage in court ordered settlement discussions. The letter further notes (a) the Board's demand that counsel focus on "issues of ethical [misconduct] and wrongdoing by the government simply cannot be properly addressed in a litigation forum", and (b) that the demand that the government "void all title search reports as a precondition to settlement discussions" was unlikely to be viewed by the Court as a good-faith basis for discussions. Counsel further noted that they could not ethically continue to represent individual plaintiffs without communicating directly with them. Finally, counsel noted:

   i.   **We believe that it is particularly unfortunate that you have rejected any legislative initiatives that would have afforded you and the other plaintiffs a forum to articulate your views and objectives that are not readily amendable to a judicial forum.** (See F.C. Ex. 37).

68.     On September 13, 2002 M&A, Mackell and Catron, Catron & Sawtell filed

their Motion to Withdraw, citing (at p. 6):

> i.   **[P]laintiffs have refused to give counsel any authority to
>      engage in good faith settlement discussions or to pursue a
>      legislative remedy.** Most significantly, counsel has been unable to
>      communicate directly with the individual plaintiffs, and the
>      Pajarito Board has interfered with counsel's efforts to do so." (See
>      F.C. Ex. 38).

69.     On September 19, 2002, McCallion sent a letter to Honorable Don J. Svet,

U.S. Magistrate Judge, advising the Court that counsel have filed a motion to

withdraw and requesting to be relieved of the current scheduling order.   The

primary grounds for withdrawal were lack of communication with clients and

a refusal to give counsel any authority to discuss settlement (F.C. Ex. 39).

70.     On September 19, 2002, McCallion sent a letter to Honorable Don J. Svet,

advising the Court that counsel; (1) have no authority to engage in settlement

discussions, and (2) have been directed to terminate all discussions with the

staff members of the two Senators from New Mexico regarding a legislative

appropriation to pay plaintiffs' land claims.  **"Counsel have recommended**

**that, in view of the weakness of the case and the lapse of time, the**

**settlement be pursued, including a possible Congressional appropriation,**

**but have not been given the authority to proceed either with a legislative**

**or judicial settlement" (F.C. Ex. 41).**

71.     On October 7, 2002, Magistrate Judge Richard L. Puglisi granted plaintiff's

counsel's motion to allow withdrawal (Doc. 157).

72.     On October 18, 2002, Keating, Muething & Klekamp LLP ("KMK") began

billing for Homesteaders (see Affidavit of Gregory Utter and attached time-

sheets) (F.C Ex. 48).

73.    On November 25, 2002, KMK signed a Representation and Fee Agreement

with the Homesteaders, relating, among other things:

   i.   "Pajarito further agrees that it and its individual members shall be
        solely responsible for the payment of all attorneys' fees, costs and
        any other changes to which any prior attorneys, law firms,
        representatives or agents may be entitled as a result of said
        individuals' or entities' efforts associated with seeking
        compensation for Pajarito's claims or litigation against the United
        States of America and any associated parties, and any such amount
        shall not, in any way affect any compensation to which [KMK] is
        entitled" . (Doc. 248, Exhibit A.)

74.    On December 2, 2002, McCallion wrote to KMK regarding the transfer of

files, and provided notice that former counsel were asserting a charging lien

(F.C. Ex. 45)

75.    On March 18, 2003, the Board of Directors of the Homesteaders informed the

two Senators that they had removed the President of the Homesteaders from

his position for conduct "inappropriate and contrary to the Board's decision to

pursue and support a legislative resolution in the case." (F.C. Exhibit 41).

76.    On May 5, 2003, the Gallegos law Firm and KNK enter into a "50/50" fee

sharing agreement, with responsibility for all fees awarded to former counsel

to be assumed by KMK (Doc. 248 ¶ 6).

77.    On April 11, 2005, Utter (KMK) submits fee application in the amount of

$297,081.65 and expenses of $33,256.03 through March 31, 2005.  Utter

estimates that "we expect to incur an additional $50,000-$100,000 in attorney

and paralegal time in this endeavor."  Utter Affidavit, 4/11/2005 at paragraph

14-15.

78.    On December 8, 2004, the Pajarito Plateau Homesteaders Compensation Act

was enacted, including a $10 million appropriation.

79.    At the Court conference of April 25, 2005, Utter states: "Has expended over $700,000 in attorney time, $80,000 in out-of-pocket expenses." Utter objects to Courts proposal that former counsel be sent notice informing them that they must, within 30 days make application to the Court for fees, on the grounds that this would encourage former counsel, to "extort current plaintiffs' counsel." Clerk's Minutes of Hearing, 4/25/05 at p. 3 (Doc. 265) (F.C. Ex. 49).

80.    Mr. Utter's Affidavit of April 11, 2005 represents that KMK's billing statement does not include any time spent on the related litigation (01CV1166). Nevertheless KMK's billing records reflect that on December 10, 2002, MKB revised affidavit for inclusion in motion;" and JXM "reviewed and edited Matt Buck's Affidavit in Case No. 1166. Moreover, on December 10 and 12, 2002, KMK billed for matters relating to Katie Kelly Moreau, which relate to 01CV1166 (Doc. 54, footnote 6), (Plaintiffs' Motion to Continue Trial 01CV1166 and Reopen Discovery).

81.    On December 11 and 18, 2002, Mr. Buck (KMK) billed for "telephone call to Maureen Sanders regarding hearing in both cases." The Court filed its Order of Dismissal in Case 01CV1166 on that date (12/18/02). (01CV1166, Doc. 56).

82.    On November 25, 2002, Mr. Buck bills for telephone calls with Ken McCallion and Cheryl Mackell.

83.    On December 3, 2002, Mr. Buck bills for reviewing correspondence received from Ken McCallion.

84.    On December 5, 2002, Utter and Buck (KMK) enter their appearance. (Doc. 163). KMK's billing reflects 191.75 hours billed prior to filing Notice of Appearance.

85.    On December 9, 2002, Mr. Buck bills for review of documents delivered by McCallion.

86.    On December 10, 2002, Mr. Buck bills for conversation with Mackell and on December 11, 2002, he reviews correspondence from Mackell.

87.    On December 17 and 18, 2002 Mr. Buck bills for review of documents sent by former counsel, and begins summary of key deposition defended by former counsel "in land case."

88.    On December 26, 27, and 29, 2002, Mr. Buck continued to review documents and deposition received from former counsel.

89.    On January 29, 2003, Mr. Buck bills for sending Dr. Stan Smith's report (prepared for McCallion and forwarded to KMK) to Mike Gross.

90.    On September 30, 2003, Utter bills for review of Stan Smith's report (previously prepared for McCallion).

91.    On February 14, 2003, Buck bills for again reviewing Stan Smith's report to McCallion.

92.    On February 6, 2003, Buck bills for call to Stan Smith's office regarding back-up information for Smith's report to McCallion.

93.    On February 6, 2003, MAF of KMK prepares first draft of Expert Witness Disclosure for Stan Smith originally retained by McCallion.

94.    On February 7, 2003, Mr. Buck finalizes Expert Disclosure Review based on information on Stan Smith forwarded by McCallion.

95.   On February 19, 2003, Buck bills for "outline of area to cover with Stan Smith."

96.   On February 20, 2003, Buck bills again for "review of Stan Smith's report" and "conference call with Stan Smith."

97.   On February 26, 2003, Buck bills for "telephone conference with Stan Smith's office regarding report and trial dates."

98.   On March 5, 2003, Mr. Buck reviews "updated Stan Smith report" (revising land damage figures from $58 million to approx. $62 million).

99.   On March 6, 2003, Buck bills for review of Stan Smith's report.

100.  On March 7, 2003, Gallegos, Gross and KMK meet with Senators staff in Washington, D.C. (Doc. 246, ¶ 6).

101.  On March 8, 2003, opinion piece by Homesteaders' President is published in the New Mexican. (Doc. 248, ¶ 6).

102.  On March 10, 2003, Utter bills for meetings Buck, and on March 11, 2003, Buck bills for "multiple strategy meetings with Greg Utter."

103.  On March 20, 2003, Buck bills for review Stan Smith's report, and on March 21, 2003, Buck bills for "preparing for Stan Smith's report for transmittal to Senators."  On March 24, 2003, Buck bills for "review entire Stan Smith update and prepare for delivery...".

104.  On March 25, 2003, Utter bills for review of Stan Smith's report.

## **Proposed Conclusions of Law**

105.  "Under New Mexico law, an attorney's lien is an equitable remedy originating from the common law." *Albuquerque Technical Vocational Institute v. General Meters Corp.*, 17 Fed. Appx. 870, 874 (10th Cir. 2001) (citing *N.*

*Pueblos Enters. v. Montgomery*, 98 N.M. 47, 644 P.2d 1036, 1038

(N.M.1982).

106.   The attorney's lien protects the attorney's right "to recover his fees and money

expended on behalf of his client from a fund recovered by his efforts. . . ." *N.*

*Pueblos Enters.*, 644 P.2d at 1038 (quoting *Prichard v. Fulmer*, 22 N.M. 134,

159 P. 39, 41 (N.M.1916)).

107.   "[U]nder New Mexico law, a lawyer is not prevented from asserting a lien

against a judgment obtained by a former client, even though the lawyer was

not involved throughout the litigation and other attorneys' efforts contributed

to the recovery." *Id.* at 876.  *See also Robison v. Campbell*, 99 N.M. 579, 661

P.2d 479, 484 (N.M. App. 1983) (attorney entitled to fees under charging lien

as long as firm "contribute[d]" in some manner to the positive outcome

ultimately attained by client).

108.   "Under New Mexico law, four requirements must be met for an attorney to

recover fees under a lien. First, there must be a valid contract between the

attorney and the client. *See Sowder v. Sowder*, 127 N.M. 114, 977 P.2d 1034,

1037 (N.M. App. 1999). Second, the fund to which the lien attaches must have

been recovered in all or in part by the efforts of the attorney. *See id.* Third, the

attorney must give notice to all parties involved in the litigation of the intent

to assert a lien against any judgment. *See id.*  Finally, the assertion of the lien

by the attorney must be timely. See id. at 1038." *Albuquerque Technical,* 17

Fed. Appx. at 874.

109.   As to the first and second requirements, there can be no reasonable dispute

that M&A and Mackell were representing the Homesteaders and 103

individual plaintiffs in the action entitled <u>Pajarito Plateau Homesteaders, Inc.</u>

et al. v. United States (01CV588) (F.C. Ex. 6A), and that the actions of Former Counsel described above contributed to the ultimate positive outcome of the litigation through settlement of that action and the creation of the $10 million fund that was authorized by Congress. Former counsel both vigorously prosecuted the litigation while, at the same time, strongly recommending to the clients that a legislative remedy be pursued.  Moreover, Former Counsel retained and closely worked with the economic expert who produced the expert analysis supporting the creation of a $10 million appropriation fund in settlement of Plaintiffs' claims, and Former Counsel were the original proponents of an "enhanced" $10 million settlement fund, which was ultimately enacted into law, that was $3.3 million greater than the $6.7 million settlement fund originally proposed by Class Counsel. Former counsel also produced the first drafts of the legislation presented to the two Senators for New Mexico that incorporated the $10 million proposed settlement fund.  Former Counsel withdrew as counsel for the Homesteaders only after the Board of Directors of that organization rejected the sound advice of Former Counsel that the legislative remedy be pursued with the full participation of and in coordination with all relevant parties and their counsel, including the former counsel for the Homesteaders who also served as class counsel in this action.  It was only after two sets of attorneys had resigned as counsel to the Homesteaders, including Class Counsel and Former Counsel, that a change of leadership of that organization led to a change of policy and the Homesteaders finally supported a legislative settlement.  It is eminently clear that, had the Homesteaders accepted the sound advice of Former Counsel and agreed to support the legislative remedy prior to the withdrawal

of Former Counsel, then the legislative solution that ultimately took place in this case would have occurred without the necessity of retaining substitute counsel.

110.     As to the third and fourth requirements, this Court has already determined that the liens of Former Counsel were timely filed pursuant to Court order (Doc. 264).

Dated October 11, 2005                    Respectfully Submitted,

                                          McCALLION & ASSOCIATES LLP

                                          _____//s//_____
                                          By: Kenneth F. McCallion
                                              24 West 40th Street, 17 Fl
                                              New York, New York 10018

                                          CHERYL HAMER MACKELL, ESQ.
                                          c/o Pomerantz Haudek Block
                                          1025 Connecticut Avenue NW, Suite 1000
                                          Washington D.C. 20036

                                          SAWTELL, WIRTH & BIEDSCHEID
                                          Bryan P. Biedscheid
                                          708 Paseo de Peralta
                                          Santa Fe, New Mexico 87501-1923