IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

```
-----------------------------------------------------------------x
JOSE E. GONZALES, PETER E. GOMEZ,              :
EMELINA GRANT, TERESITA GARCIA                 :
MARTINEZ and MARIA ERNESTINA                   :
MONTOYA,                                       :
                                               :
                    Plaintiffs,                :
                                               :     No. 00-CV-60 WPJ/RS ACE
vs.                                            :
                                               :
UNITED STATES OF AMERICA, and                  :
BILL RICHARDSON, Secretary of the              :
DEPARTMENT OF ENERGY,                          :
                                               :
                    Defendants.                :
-----------------------------------------------------------------x
                                               :
PAJARITO PLATEAU HOMESTEADERS,                 :
INC.,                                          :
                    Plaintiffs,                :
                                               :
vs.                                            :     No. 01-CV-588 MCA/RLP ACE
                                               :
UNITED STATES OF AMERICA, et al.               :
                                               :
                    Defendants.                :
                                               :
                                               :
-----------------------------------------------------------------x
```

## FORMER PLAINTIFFS' COUNSEL'S POST HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR ATTORNEYS' FEES APPLICATION

Former Plaintiffs' Counsel, McCallion & Associates LLP and Cheryl Hamer

Mackell, Esq., hereby submit the following Post Hearing Proposed Findings of Fact and

Conclusions of Law, and Affidavit of Susan Wallace Hynes (Exhibit A), in support of

their application for attorneys' fees:

## I.    PROPOSED FINDING OF FACT

**A.    The Retainer agreements of Both Former Counsel and Present Counsel Provide for A Charging Lien for Reasonable Value of Services**

1.    The Gallegos Law Firm entered into a representation agreement with the Pajarito Plateau Homesteaders, Inc. ("Homesteaders") on November 15, 1999. The agreement provided for an attorneys lien for fees in the event of their withdrawal or discharge.

2.    Gonzales et al v United States et al (00CV0060) was filed on January 14, 2000 by the Gallegos Law Firm. On May 4, 2000  Mr. Gallegos ("Gallegos") and Mr. Gross ("Gross") filed their Motion to Withdraw (00CV0060) (Doc. 16) citing differences of opinion between the named representatives and the Board of Directors of the Homesteaders ("Homesteaders Board"), and between the Homesteaders Board and the Gallegos Law Firm.  See (00CV0060) (Doc. 29). On June 13, 2000 the motion to withdraw was granted. (Doc. 23).

3.    Mr. Gallegos (Gallegos Law Firm) and Michael Gross (M. Gross & Associates P.C.) confirmed their resignation as counsel to the Homesteaders by letter of April 11, 2000, noting as follows:

> Should you succeed in winning the law suit and achieving a recovery, we will be entitled to an equitable fee based on our previous agreement and the relative contribution of our efforts to the final outcome.  **We are entitled to petition the Court for receipt from any funds recovered in the litigation for… the reasonable value of our services as legal counsel prior to termination as determined by the Court.  We believe we are entitled under New Mexico law to place a lien on the recovery to ensure that our interests are safeguarded**.

Reference: Former Counsel's ("F.C.") Exhibit No. 2.[1]

4.   On August 3, 2000, Gallegos and Gross reentered an appearance for the individual plaintiffs only (Doc. 24). On August 9, 2000, while the Homesteaders were unrepresented by counsel, the Gallegos Law Firm filed a Motion to Certify the Class (Docket 00CV0060) (Doc. 25).

5.   During September 2000, members of the Homesteaders Board approached Cheryl Hamer Mackell ("Mackell") regarding representation.

6.   By letter of October 2, 2000, Gallegos and Gross withdrew their charging lien for attorneys' fees as against the Homesteaders, explaining that when they withdrew, they "did not expect to have further involvement in the case." (Reference: F.C. Ex. 3).

7.   On October 3, 2000, the Homesteaders were dismissed sua sponte by the Court because they had no counsel; however, they were given 90 days to secure replacement counsel. (Doc. 36 and 37). Two days later, on October 5, 2000 while the Homesteaders was unrepresented by counsel (Doc. 41), Judge Smith granted Plaintiffs' motion filed by Gallegos and Gross to certify the case as a class action, and notification to the class was approved on January 30, 2001 (Doc. 52).

8.   On October 9, 2000, Mackell and Kenneth F. McCallion ("McCallion") began providing legal services.  The Retainer Agreement provides, in part, that "should the Attorneys be terminated or withdraw, they shall retain their full rights to payment based on the value of their services in proposition to all services which result in recovery for the Clients, or for the reasonable value of their services on

---

[1] Copies of Former Counsel's Exhibits were submitted to the Court at the time of the Hearing on October 13, 2005.

an hourly basis, whichever is greater, and shall have an equitable interest in and a

charging lien against any recovery and upon the case files." The Agreement

further provides: "In such event [of withdrawal], Attorneys shall remain entitled

to their equitable interest in earned fees…." (emphasis added) (F.C. Ex. 42).

(Mackell's billing records F.C. Ex. 43 and Billing Records; of McCallion &

Associates LLP; F.C. Exhibit 44).

9.   During October 2000, Mackell and McCallion had a telephone conference

with the Homesteaders Board and reviewed documents and pleadings.  Mackell

also compiled documents and forwarded a list to Judy Espinoza, and she also met

with certain Homesteader Board members on October 27, 2000.  (Mackell's

billing records are attached as F.C. Ex. 43; and Billing Records of McCallion &

Associates LLP ("M&A") are attached as F.C. Exhibit 44).

**B.    WORK PERFORMED BY FORMER COUNSEL ON
         GENEALOGIES/FAMILY TREES**

10. Mackell testified that, in consultation with members of the Homesteader

organization, she determined that reliable family trees for each of the tracts of

land were required in order to successfully prosecute either the litigation or

settlement options. The family trees would initially be used to determine the

names of the plaintiffs in case number 01cv 588, and ultimately to determine legal

heirs to each tract of land. (Testimony of Mackell).

11. Despite the testimony of Beth Gonzales that Mackell played little or no role in

the development of the genealogies the record is clear that Mackell played a

significant oversight role in setting the guidelines, reviewing the work product,

and organizing the family histories as part of the legal submissions in this case.

4

Although there were undoubtedly changes in the family histories and genealogies after Former Counsel withdrew from the case, this legal and factual research was of a continual and ongoing nature, and there can be no serious question that Former Counsel contributed to the "work in progress" being done in this area during the time period that they were counsel. On November 13, 2000, Beth Gonzales (Homesteaders Board member) wrote to the other Homesteaders Board members regarding her meeting with Cheryl Mackell to establish guidelines for gathering information on each family and documenting family histories (F.C. Ex. 4).

12. On November 20, 2000, Mackell, McCallion and Judy Espinoza (Homesteaders Board member) had a telephone conference in connection with the review of documents and factual research regarding land claims. Ms. Espinoza testified that the Homesteader Board was not given a full accounting by their counsel of the validity of their land claims and an evaluation of the legal processes by which the government acquired those lands until after the KMK firm was retained. However, it appears that Former Counsel took various steps as part of the discovery process to obtain voluminous records relevant to these issues, but that the government had not yet provided substantial amounts of this data as of the time that Former Counsel withdrew from the case.

13. On November 27, 2000, Mackell attended a Homesteader's Board meeting, and discussed the type and extent of information she wished to receive from the membership.  Mackell emphasized the importance of personal interviews in order to collect information and evaluate the strength of the claims.  The minutes of the meeting also reflect that the President of the Homesteaders "anticipated spending

more time in trying to get the Gallegos Law Firm from being involved in the case" and had spent "a great deal of time in the preceding months in communicating with the courts" regarding complaints about the Gallegos Law Firm (F.C. Ex. 5).

14. During December 2000, Mackell had a number of telephone conferences with Board members and McCallion, and both Mackell and McCallion conducted legal and factual research regarding the clients' land claims (F.C. Ex. 43 and 44). Mackell drafted a "Pajarito Plateau Homesteaders, Inc. v. U.S." Member Questionnaire (Member Questionnaires)   (see F.C. Ex. 23 for samples of said Member Questionnaires), which was distributed to members of the Homesteaders Association by members of the Homesteaders Board.  The Member Questionnaire stated "Please provide the following information and return to me no later than December 8, 2000. On December 8th at 9:00 a.m. I will be at the Community Center to assist you with any questions you may have regarding the information requested and will collect any questionnaires that you have not mailed to her office." Instructions were provided and the Member Questionnaires concluded by stating "If you have any questions, please contact me: Cheryl Hamer Mackell, Esq., 530-B Harkle Road, Santa Fe, NM 87505. Telephone: (505) 955-0719. Fax: (505) 955-0921." Some Member Questionnaires were (1) dropped of at Mackell's office, (2) mailed directly to Mackell, (3) faxed to Mackell's office, (4) filled out on December 8th at the Community Center, (5) filled out at Mackell's office, (6) given to Mackell during her interviews with members of the Homesteaders Association. Those that were given to a member of the Homesteaders Board by a member of the Homesteaders Association were to be delivered to Mackell's

office. (FC Ex. 23; Mackell testimony) This process continued through 2001. (Mackell testimony; see also, Mackell billing F.C. Ex 43).

15. Mackell's billing records reflect that during January 2001, Mackell researched certain legal and factual issues and organized documents relating to the land claims for forwarding to Mr. McCallion (F.C. Ex. 43).

16. Former Counsel's billing records further reflect that, during February, 2001, McCallion and Mackell reviewed client histories and records, and conducted factual research regarding historical files relevant to the land claims.  Mackell also had numerous meetings with clients (F.C. E. 43 and 44).

17. On February 20, 2001, approximately 107 potential class members filed notice to the court of intent to opt out of the class in case 00CV0060 (Doc. 54-64).

18. During March and April, 2001, Mackell continued to conduct legal and historical research regarding the clients' land claims, and to meet with clients (F.C. Ex. 43).

19. During March and April, most of the remainder of the potential class members opted out.  (Doc. 73-91).

20. During June and July 2001, Mackell continued to work on family histories and genealogies in coordination with the clients (F.C. Ex. 43).

21. Mackell testified that she had an "open door" policy which many Homesteader members and board members took advantage of.

22. On March 5, 2002, Bryan P. Biedscheid (Biedscheid) and W. Anthony Sawtell noticed their appearance in Case No. 588 (Docket 20). Biedscheid testified that he inherited the "open door' policy after Mackell closed her office in New Mexico and moved to Washington, D.C.

23. Beth Gonzales testified that she had forwarded family tree information to Mackell as requested by Mackell on several occasions (Gonzales testimony).

24. On July 3, 2002, Mackell filed an affidavit in Case 00CV060 identifying 29 land tracts and genealogical information regarding Homesteaders claims, based upon interviews and written documentation (F.C. Ex. 22).  Part of the supporting documentation reviewed by Mackell consisted of Member Questionnaires (F.C. Ex. 23).

25. Beth Gonzales testified that as a board member she had been provided with and reviewed all documents filed with the Court. She testified that she has reviewed Mackell's affidavit dated July 2002, with attached schedule of 29 land tracks and family history. (FC Ex 22). Mackell fully set forth in FC Ex 22 the work she had performed in order to identify the ownership of lands taken by the Los Alamos Project, including interviews with family members, reviewing information provided by the Homesteaders Association and family members. Gonzales was also informed of the conclusions drawn by Mackell as set forth in Exhibit A to FC Ex 22. (Gonzales testimony). As a Board, member Judy Espinosa would also have been provided with the Mackell's affidavit and familiar with its contents. There was no testimony that at any time prior to Former Counsel's request for attorneys fees, did any Board member disagree with the contents of Mackell's affidavit (F.C. 22).

26. Mackell testified that after requesting that Gonzales be relieved of her assignment to assist Mackell with genealogies/family trees, Gonzales was replaced by Homesteaders board member Johnny Martinez. Mackell testified that she met with Martinez on numerous occasions and cited as examples for the

following dates following Gonzales' replacement: March 1, 2 and 8, 2001, April 25 & 29, 2001, May 30 & 31, 2001, June 7, 13, 15, 18 & 24, 2001, etc. No testimony was presented by Johnny Martinez to rebut Mackell's testimony.

27. In Beth Gonzales' affidavit (Doc. 282, Exhibit C) Gonzales took full and sole responsibility for creating all genealogies/family trees. For example, Gonzales states in paragraph 7 of her Affidavit, "I collected all information that came in regarding family members for each tact. I took this information and, with the aid of a computer program the Homesteader's Board acquired, I, and only I, created family trees for each tract of land. For Ms. Mackell to claim she created these genealogies is simply wrong." Despite the substantial work that Ms. Gonzales and other Board members undoubtedly performed relating to these genealogies, Mackell also undoubtedly performed certain legal oversight and review duties as reflected in her time records. This false statement was rebutted by Mackell's affidavits, Mackell's testimony, Gonzales letter (FC Ex. 4), F.C. Ex. 23 and Gonzales own testimony before the Court.

28. Compiling and verifying information for the genealogies/family trees was very labor intensive and time intensive. (Mackell testimony; see Mackell and McCallion billing). This process included obtaining information as to grazing rights and personal property (livestock, buildings, crops, farming tools, etc.) for each family and each tract of land. (F.C. Ex. 23).

**C.      FORMER COUNSEL ADVANCED THE PROPOSED LEGISLATION AND THE LITIGATION.**

29. On November 3, 2000, Mackell had a telephone conference with Senator Domenici's office regarding the status of the land claims, and on the same day

attended a Pajarito Board meeting. She also conducted numerous telephone calls and meetings with the clients and researched various legal issues during the period from November 6 through November 13, 2000 (F.C. Ex. 43).

30. On January 16, 2001, a Homesteaders Board member sent Mackell a memo (which was also forwarded to McCallion) discussing "Congressional Actions Unfavorable to Private Land Owners" and the "unfavorable political bent of Senator Peter Domenici towards protecting private property rights." This information was sent "as a means to learn what can be expected if in fact negotiations for a settlement were initiated on behalf of the Pajarito Homesteaders" (F.C. Ex. 6).

31. On April 25, 2001 a stay was entered "pending a potential settlement avenue in the legislative process." (00CV0060)(Doc. 101).

32. During May 2001, McCallion and one of his associates (Mr. Sharma) conducted legal research and drafted the complaint captioned in <u>Pajarito Plateau Homesteaders, Inc. et al. v. United States</u> (01CV588), an action brought on behalf of Homesteader and 131 individual members of Homesteaders. (F.C. Ex. 6A). The complaint was reviewed and filed by Mackell on May 23, 2001. The case was reassigned to Chief Judge James A. Parker and referred to Magistrate Judge Richard L. Puglisi for discovery purposes (Case 588, Docket 3). The case was later transferred to Judge Armija (F.C. Ex. 43 and 44).

33. McCallion and Mackell filed Notices of Appearance and also filed a Motion for change of venue to Santa Fe on May 29, 2001 (Case 588; Docket 4 and 5).

34. During June and July 2001, McCallion, Sharma and Ms. Susan Hynes (Executive Director of McCallion & Associates LLP) ("Hynes") continued to

conduct legal and factual research, reviewed defendant's answer to the complaint and other pleadings, and prepared for the trip to New Mexico to meet with AUSA Andrew Smith and the clients (F.C. Ex. 43).

35. On August 1, 2001, McCallion had a telephone conference with AUSA Andrew Smith regarding the status of the two cases (060 and 588) and the possibility of a legislative solution (F.C. Ex. 44). Testimony and Affidavits of Mr. McCallion.

36. On August 3, 2001, McCallion, Mackell and Hynes (of McCallion & Associates) met with AUSA Andrew Smith at the U.S. Attorneys' Office (F.C. 43 and 44), where it was agreed that Counsel for the Homesteaders and the class action opt outs (McCallion and Mackell) would strongly recommend that their clients pursue a legislative remedy. F.C. 44. Testimony and Affidavits of Mr. McCallion.

37. On August 4, 2001, McCallion, Mackell and Hynes attended a meeting of the Homesteaders at Los Alamos and discussed the status of the litigation and possible legislation with the Board members and Association membership.  F.C. 49 and Testimony and Affidavits of Mr. McCallion; Affidavit of Susan Hynes.

38. The Initial Scheduling Order in Case 588 was issued on August 29, 2001 (Docket 16) (F.C. Ex. 43 and 44).

39. Upon returning to New York, McCallion and Hynes continued to coordinate during September 2001 with Mackell and AUSA Andrew Smith regarding the status of the litigation and potential legislative remedies (F.C. Ex. 43 and 44).

40. On September 5, 2001, Mackell met with Bernard R. Toon and Libby Rodke of Senator Bingaman's staff regarding the status of the litigation and

representation of 132 named plaintiffs and the Homesteaders in Case No. 588.

Mackell followed up with letters to these staff members dated September 10,

2001 noting that "we very much want to be kept current, to participate, and to

give our input in any proposed legislation."  See F.C. Ex. 8 and 9.

41. On September 4, 2001, McCallion had a telephone conference with Michael

Gross (F.C. Ex.44) regarding a possible agreement to consolidate the two cases

(060 and 588) and the coordination of legislative initiatives.  McCallion

recommended to the Homesteaders Board that the two cases be consolidated and

the legislative initiative be coordinated with Gallegos and Gross. This

recommendation was rejected by the Board. Testimony and Affidavits of Mr.

McCallion.

42. On September 6, 2001, McCallion and AUSA Andrew Smith had a telephone

conference regarding the Stipulation to stay the Rule 16 proceedings pending

settlement and legislative discussions. The Stipulated Order for a temporary stay

of Case 588 was signed by Magistrate Judge Puglisi on September 13, 2001 (Case

588 Docket, No. 17) and on Case 060. The case was referred to Magistrate Judge

Puglisi for settlement and discovery purposes on September 14, 2001 (Case 060;

Docket No. 112).

43. On October 3, 2001, McCallion and Sharma attended a status conference by

telephone with Magistrate Judge Puglisi (Case 588; Docket 18).

44. On October 15, 2001, at the annual meeting of the Homesteaders, the

President of the Homesteaders expressed his opposition to or, at the very least

deep suspicion of the legislative proposals, and, restricted Former Counsel's

ability to pursue the settlement option. He noted that "the group stands united and

resolute in litigating….” F.C. Ex. 9. The President (Chair) further “explained that

he continues to encourage counsel to move forward towards litigation. However,

he stated that the Gallegos Law Firm “stands resolute in trying to pursue a

legislative remedy.”  Counsel were cautioned about “not being diverted by the

tactics of pursuing a legislative remedy.”

45. During February 2002, McCallion and Mackell continued to conduct factual

and documentary research, and on February 15, 2002, Mackell discussed the

status of the case with AUSA Andrew Smith (F.C. Ex. 43 and 44).

46. On February 21, 2002, McCallion wrote to the Homesteaders Board, strongly

recommending that the legislative remedy be pursued:

> Senators Domenici and Bingaman have expressed an interest in jointly
> sponsoring legislation to compensate the owners and heirs of the
> expropriated lands and other property rights in Los Alamos County which
> were taken without fair compensation for the Manhattan Project. <u>We
> believe that it is appropriate to pursue this legislative remedy while, at the
> same time attempting to advance the litigation.”</u> (Emphasis added).

See F.C. Ex. 10.

47. In his February 21, 2002 letter to the Homesteaders, McCallion outlined the

legislative plan:

> [W]e intend to explore with the Senators and their staffs the outline of a
> bill that would (1) provide for the creation of a fund to be divided among
> the victims and their families on a pro rata basis according to the acreage
> taken and other property interests (e.g. grazing rights), and (2) provide for
> the creation of an additional fund for educational, cultural and historical
> purposes relating to the Pajarito Homesteaders. This would include the
> possibility of establishing a museum and/or periodic conferences and
> educational programs as your organization deems appropriate.

See F.C. Ex. 10.

48. In the February 21, 2002 letter McCallion acknowledged that although he was obligated to follow the explicit instructions from the Homesteaders Board, no progress could be made without cooperation with the "Gallegos group":

> We have already left phone messages with both Senators' offices requesting that they contact us directly. We have made it clear to the Gallegos Law Firm that we will be dealing with the Senators and their staff directly, not through them. However, **it is clear, before the Senators will sponsor and introduce any legislation, it will have to be "signed off" on by both (a) you and your group, and (b) Gallegos' group.**

See F.C. Ex. 10.

49. McCallion notified Gross that the "clients had authorized [him] to deal separately with the Senators, to lend what we take is only limited support to a legislative solution (i.e. not to endorse a bill until they see its final form) and to proceed simultaneously with vigorous prosecution of their lawsuit." See Letter from Michael Gross dated February 28, 2002 (F.C. Ex. 11).

50. During February 2002, in phone conversations with Gross, McCallion expressed the view that the $6.7 million compensation proposed by the Gallegos Law Firm was inadequate and that he favored an "enhanced" bill that provided for "greater than $6.7 million compensation for owners and heirs of lands expropriated for the Manhattan Project and a cultural component" in the bill. (F.C. Ex. 11 at page 2).  Gross confirmed in his February 28, 2002 letter: "Neither Gene [Gallegos] nor I expressed any particular disagreement with these objectives." (F.C. Ex. 11).

51. On March 11, 2002, McCallion, Mackell and Hynes met with staff members of Senators Domenici and Bingaman (Pete Lyons, Bernard Toon and Libby Rodke) in Washington, DC and made an "enhanced legislative proposal involving

14

additional funding over and above the $6.7 million land appraisal proposed by the Gallegos Law Firm and a cultural/historical component. Counsel was advised that a legislative package in the $60 million range consistent with the calculations of counsel's land valuation expert (Dr. Stan Smith) was not politically acceptable. **However, when former counsel suggested that their clients might agree to a $10-12 million appropriation, the Senate staff members advised that legislative proposals of "up to $10 million" would be carefully considered.** Testimony and Affidavits of McCallion; Affidavit of Susan Hynes.

52. On March 12, 2002 and thereafter, McCallion and Hynes, in consultation with and direction of the Homesteader Board, drafted a proposed legislative bill for $10 million modeled on the prior draft by the Gallegos Law Firm ($6.7 million) and the White Sands compensation legislation (PL 105.119). See F.C. Exhibit 13A.  Testimony and Affidavits of McCallion; Hynes Affidavit. They also coordinated with Mackell.

53. The Homesteaders Board sent comments on the draft legislation to McCallion and Mackell on March 22, 2002 (F.C. Ex. 13B), as well as a memo dated March 19, 2002 regarding the legislation, thanking counsel "for all your excellent effort, hopefully this will being to open the door for timely and productive discussions between the Senators and the Board." (F.C. Ex. 13)

54. On March 21, 2002, Libby Rodke of Senator Bingaman's Office sent an e-mail to all counsel confirming that "we had the opportunity to speak with both sets of attorneys representing the Pajarito Plateau Homesteaders in two different cases pending before the federal court in New Mexico" and emphasizing the importance that we all "work together." (F.C. Ex. 14)

55. On March 22, 2002, the Gallegos Law Firm wrote to Mr. McCallion and Ms. Mackell, referring to the $6.7 million Blatnick appraisal supporting the appropriation amount in their draft bill, and requesting a written agreement "committing all parties to mutual objectives and mutual support to achieve those objectives" (F.C. Ex. 15). McCallion and Mackell communicated this request for a "written agreement" to the Homesteaders Board, which was rejected. Testimony of McCallion.

56. On March 27, 2002, McCallion, Mackell and Gallegos had a conference call to discuss the proposed legislation (F.C. Ex. 44). McCallion and Mackell advised that the clients had seriously restricted their ability to coordinate with Gallegos given the friction between Mr. Guttierez and Mr. Gallegos. Testimony of McCallion. Mr. Gallegos acknowledged the continuing problem and expressed his "lack of surprise" that McCallion and Mackell were running into the same difficulties that he had experienced regarding the lack of authority to pursue the settlement/legislative option. See Cross-Examination testimony of Mr. Gallegos.

57. By cover letter dated April 2, 2002, Mr. McCallion forwarded the draft legislative proposal approved by the Homesteader Board with the $10 million appropriation figure to Pete Lyons and Libby Rodke of Senators Domenici and Bingaman's offices**.** This was the first legislative draft received by the Senators' staffs containing the $10 million appropriation figure which is precisely the amount in the legislation finally enacted. On specific instructions from the Homesteaders Board, the draft legislation was not forwarded to the Gallegos Law Firm (F.C. Ex. 16). However, Mr. Gallegos acknowledged in his Cross-

Examination at the Hearing that the legislation appropriation was raised to $10 million during this time period.

58. On April 9, 2002, Gross sent a letter to McCallion and Mackell referring to the desire of the two Senators for a joint legislative proposal and requesting a meeting in DC. (F.C. Ex. 17). McCallion and Mackell communicated these requests to the Homesteaders Board, but were denied authority to either submit a joint legislative proposal or meet with other counsel. Testimony and Affidavits of McCallion.

59. On April 10, 2002, McCallion and Mackell received a memo from the Homesteaders Board again attempting to slow the legislative initiative; asserting that the recent discussions between the Gallegos Law Firm and the Senators' staff "has interfered with plaintiffs' attempt at availing themselves of their right to pursue their case in Federal District Court." The memo further states: "I don't want this tension between pursuing litigation vs. legislation to lead us to end up in the same situation as I did with Gene Gallegos two years ago." (F.C. Ex. 18).

60. On April 14, 2002, McCallion sent a letter to the Homesteaders Board stating (at p.2) that the Board's new proposal for a $20 million settlement of only Case 01CV588 was unrealistic:

> 2. It is unlikely (indeed impossible) that the Senators or the U.S. Government would sponsor legislation that did not resolve the two Homesteader cases pending before the district court. In our view, this will never happen.
>
> 3. As we have mentioned it is important to the Senators that both our group and the Gallegos "group" (even though small) agree on legislation before it is introduced. As per your instructions, I have advised the Senate staffers (and the Gallegos Law Firm) that we are not authorized to coordinate or otherwise cooperate with the Gallegos group. Unless I hear from you otherwise, I will confirm with Lyons and Rodke that we are not

> coordinating with Gallegos, and that if they want to discuss any legislative
> proposal with Gallegos, they will have to do so themselves. However, just
> so you know and it is perfectly clear, we are of the opinion that there is no
> possibility that any legislation will proceed as long as you object to any
> draft bill that includes a provision recognizing that the Fund is a settlement
> of both cases (not just yours).

See F.C. Ex. 19.

61. On May 2, 2002, Dr. Stan V. Smith of the Corporate Financial Group, Ltd.
forwarded to Mr. McCallion his economic analysis of land valuation losses of $58
million and other losses suffered by the Homesteaders (F.C. Ex.20). Preliminary
figures on the land valuation losses had previously been provided to Mr.
McCallion in advance of the March 11th meeting with the Senators' staff.  On
June 12, 2002, Mackell and Gross had a telephone call where it was agreed that
both sets of counsel would continue to explore a legislative solution.  They also
discussed the possibility of Gross and Gallegos resigning as class counsel so that
progress could be made.  See F.C. Ex. 43 and paragraph 11 of Mackell's
Supplemental Affidavit.  Thereafter, Mackell then called McCallion on the same
day to relay her conversation with Gross (F.C. Ex. 43).

62. On July 1, 2002, Mackell, McCallion and Biedscheid sent a letter directly to
all the Homesteader plaintiffs, enclosing a copy of the proposed legislation for the
$10 million appropriation, and strongly endorsing a legislative solution, stating:

> It has been our opinion that a successful legislatives solution would
> remove the element of risk as well as the high costs associated with a trial,
> guarantee compensation to you and be resolved sooner than if a judicial
> remedy is pursued. However, since you all have not agreed as to material
> terms in the proposed legislation and to the procedure for going forward,
> our efforts have ceased.

See F.C. Ex. 21.

63. On July 16, 2002, Mackell sent letters to clients regarding the upcoming depositions, reminding them to contact counsel to arrange for a meeting to prepare for the depositions. (F.C. Ex. 26).

64. On July 18, 2002, McCallion sent a letter to AUSA Hamilton regarding discovery issues (F.C. Ex. 28).

65. On August 6 and 7, 2002, certain Homesteader members were deposed in case No. 1166, with much of the questioning dealing with the expropriation of Homesteader lands and other issues relating to Cases 00CV060 and 01CV588 (F.C. Ex. 30-31).  The depositions were defended by Mackell and Biedscheid, who forwarded discovery materials largely dealing with land claim and related documentation provided by various clients (F.C. Ex. 32-33).  Ms. Espinosa and Ms. Gonzales certified that most of the documentation had been turned over to attorneys or the Homesteaders' President (F.C. Ex. 30 and 31).

66. **On August 15, 2002, McCallion, Mackell and Biedscheid sent a letter to the Homesteaders Board renewing a request "for authorization to proceed with a legislative option" on behalf of the Homesteaders, with a $10 million settlement figure as set forth in the draft legislation.** Since the Homesteaders Board had prohibited counsel from speaking directly plaintiffs, counsel further noted:

> We also indicated at the meeting that, as attorneys, we have an obligation to communicate directly with the plaintiffs…" See F.C. Ex. 34.

67. On August 22, 2002, Ms. Mackell wrote to the Homesteaders Board stressing the "extremely urgent need" to respond to counsel's August 15th letter.  See F.C. Ex. 35.

68. On September 5, 2002, the Homesteaders Board wrote to Mackell (copies to other counsel) stating "The membership and the board stand resolute in once again, emphasizing the need to continue to pursue obtaining a solution through a judicial finding." The Board also set the following conditions:

> Therefore before plaintiffs can enter into settlement discussions, defendants most rescind and void all title search reports…In addition, the land transfer pending must be suspended…"

See F.C. Ex. 36.

69. On September 10, 2002, McCallion, Mackell and Biedscheid sent a letter to the Homesteaders Board notifying it of counsels' intent to withdraw on the grounds that the Board had decided to give counsel authority to engage in court ordered settlement discussions. The letter further notes (a) the Board's demand that counsel focus on "issues of ethical [misconduct] and wrongdoing by the government simply cannot be properly addressed in a litigation forum", and (b) that the demand that the government "void all title search reports as a precondition to settlement discussions" was unlikely to be viewed by the Court as a good-faith basis for discussions. Counsel further noted that they could not ethically continue to represent individual plaintiffs without communicating directly with them. Finally, counsel noted:

> We believe that it is particularly unfortunate that you have rejected any legislative initiatives that would have afforded you and the other plaintiffs a forum to articulate your views and objectives that are not readily amendable to a judicial forum.

See F.C. Ex. 37.

70. On September 13, 2002 M&A, Mackell and Catron, Catron & Sawtell filed their Motion to Withdraw, citing (at p. 6):

> **[P]laintiffs have refused to give counsel any authority to engage in good faith settlement discussions or to pursue a legislative remedy.** Most significantly, counsel has been unable to communicate directly with the individual plaintiffs, and the Pajarito Board has interfered with counsel's efforts to do so." See F.C. Ex. 38.

71. On September 19, 2002, McCallion sent a letter to Honorable Don J. Svet, U.S. Magistrate Judge, advising the Court that counsel have filed a motion to withdraw and requesting to be relieved of the current scheduling order.   The primary grounds for withdrawal were lack of communication with clients and a refusal to give counsel any authority to discuss settlement (F.C. Ex. 39).

72. On September 19, 2002, McCallion sent a letter to Honorable Don J. Svet, advising the Court that counsel; (1) have no authority to engage in settlement discussions, and (2) have been directed to terminate all discussions with the staff members of the two Senators from New Mexico regarding a legislative appropriation to pay plaintiffs' land claims.   **"Counsel have recommended that, in view of the weakness of the case and the lapse of time, the settlement be pursued, including a possible Congressional appropriation, but have not been given the authority to proceed either with a legislative or judicial settlement" (F.C. Ex. 41).**

73. On October 7, 2002, Magistrate Judge Richard L. Puglisi granted plaintiff's counsel's motion to allow withdrawal (Doc. 157).

74. On October 18, 2002, Keating, Muething & Klekamp LLP ("KMK") began billing for Homesteaders (see Affidavit of Gregory Utter and attached time-sheets) (F.C Ex. 48).

75. On November 25, 2002, KMK signed a Representation and Fee Agreement with the Homesteaders, relating, among other things:

> "Pajarito further agrees that it and its individual members shall be solely responsible for the payment of all attorneys' fees, costs and any other changes to which any prior attorneys, law firms, representatives or agents may be entitled as a result of said individuals' or entities' efforts associated  with seeking compensation for Pajarito's claims or litigation against the United States of America and any associated parties, and any such amount shall not, in any way affect any compensation to which [KMK] is entitled" .

Doc. 248, Exhibit A.

76. On March 18, 2003, the Board of Directors of the Homesteaders informed the two Senators that they had removed the President of the Homesteaders from his position for conduct "inappropriate and contrary to the Board's decision to pursue and support a legislative resolution in the case." (F.C. Exhibit 41).

77. KMK, by sworn affidavit, concedes the direct causal connection between Mr. Guttierez's removal from the Board and the ability of the legislative option to get back on track. Affidavit of Utter in Support of KMK's fee application.

78. On May 5, 2003, the Gallegos law Firm and KNK enter into a "50/50" fee sharing agreement, with responsibility for all fees awarded to former counsel to be assumed by KMK (Doc. 248 ¶ 6).

79. On April 11, 2005, Utter (KMK) submits fee application in the amount of $297,081.65 and expenses of $33,256.03 through March 31, 2005. No hourly rates are listed. Utter estimates that "we expect to incur an additional $50,000-$100,000 in attorney and paralegal time in this endeavor."  Utter Affidavit, 4/11/2005 at paragraph 14-15. However, no additional time sheets are submitted by KMK in support of the Court's Order granting $500,000 in fees (approximately a 66 2/3% over lodestar), and no timesheets in support of its application for an additional $500,000 in fees based solely upon (a) its "50/50"

agreement with The Gallegos Firm and (b) the fact that the legislation provided for attorneys fees up to $2 million.

80. On December 8, 2004, the Pajarito Plateau Homesteaders Compensation Act was enacted, including a $10 million appropriation.

81. At the Court conference of April 25, 2005, Utter incorrectly represents that KMK has: "expended over $700,000 in attorney time, $80,000 in out-of-pocket expenses." Clerk's Minutes of Hearing, 4/25/05 at p. 3 (Doc. 265).

82. Mr. Utter's Affidavit of April 11, 2005 represents that KMK's billing statement does not include any time spent on the related litigation (01CV1166). Nevertheless KMK's billing records reflect that on December 10, 2002, MKB revised affidavit for inclusion in motion"; and JXM "reviewed and edited Matt Buck's Affidavit in Case No. 1166. Moreover, on December 10 and 12, 2002, KMK billed for matters relating to Katie Kelly Moreau, which relate to 01CV1166 (Doc. 54, footnote 6), (Plaintiffs' Motion to Continue Trial 01CV1166 and Reopen Discovery).

83. On December 11 and 18, 2002, Mr. Buck (KMK) billed for "telephone call to Maureen Sanders regarding hearing in both cases." The Court filed its Order of Dismissal in Case 01CV1166 on that date (12/18/02). (01CV1166, Doc. 56).

84. On November 25, 2002, Mr. Buck bills for telephone calls with Ken McCallion and Cheryl Mackell.

85. On December 3, 2002, Mr. Buck bills for reviewing correspondence received from Ken McCallion.

86. On December 5, 2002, Utter and Buck (KMK) enter their appearance. (Doc. 163). KMK's billing reflects 191.75 hours billed prior to filing Notice of Appearance.

87. On December 9, 2002, Mr. Buck bills for review of documents delivered by Ken McCallion.

88. On December 10, 2002, Mr. Buck bills for conversation with Mackell and on December 11, 2002, he reviews correspondence from Mackell.

89. On December 17 and 18, 2002 Mr. Buck bills for review of documents sent by former counsel, and begins summary of key deposition defended by former counsel "in land case," (which KMK now refers to as "the slavery case").

90. On December 26, 27, and 29, Mr. Buck continued to review documents and deposition received from former counsel.

**D.     KMK BILLS FOR TIME SPENT ON DR. STAN SMITH'S REPORT PREPARED BY McCALLION**

91. On January 29, 2003, Mr. Buck bills for sending Dr. Stan V. Smith's report (prepared for McCallion and forwarded to KMK) to Mike Gross, etc. (4.25 hours)

92. On January 30, 2003 Utter reviews Stan Smith's report, etc. (1.00 hours)

93. On February 4, 2003 Buck reviews Stan Smith report to allow further discussion with Gene Gallegos, etc. (3.25 hours).

94. On February 6, 2003, Buck bills for call to Stan Smith's office regarding back-up information for Smith's report to McCallion, etc. (6.00 hours)

95. On February 6, 2003, MAF of KMK prepares first draft of Expert Witness Disclosure for Stan Smith originally retained by McCallion. (1.0 hours)

96. On February 7, 2003, Mr. Buck finalizes Expert Disclosure Review based on information on Stan Smith forwarded by McCallion, etc. (4.75 hours).

97. On February 14, 2003, Buck bills for again reviewing Stan Smith's report to McCallion.

98. On February 19, 2003, Buck bills for "outline of area to cover with Stan Smith", etc. (7.00 hours)

99. On February 20, 2003, Buck bills again for "review of Stan Smith's report" and "conference call with Stan Smith", etc.(6.5 hours)

100.    On February 26, 2003, Buck bills for "telephone conference with Stan Smith's office regarding report and trial dates", etc. (3.75 hours)

101.    On March 5, 2003, Mr. Buck reviews "updated Stan Smith report" (revising land damage figures from $58 million to approx. $62 million), "telephone conference with Stan Smith's office" etc. (6.0 hours)

102.    On March 6, 2003, Buck bills for review of Stan Smith's report; finalize documents for presentations to Senators, etc. (8.00 hours) and Utter bills for "telephone conference with Stan Smith regarding economic issue" etc. (6.00).

103.    On March 7, 2003, Gallegos, Gross and KMK meet with Senators staff in Washington, D.C. (Doc. 246, ¶ 6).

104.    On March 8, 2003, opinion piece by Homesteaders' President is published in the New Mexican. (Doc. 248, ¶ 6).

105.    On March 10, 2003, Utter bills for meeting Buck, etc. (1.00 hour), and on March 11, 2003, Buck bills for "multiple strategy meetings with Greg Utter, etc." (4.00 hours)

106.     On March 20, 2003, Buck bills for review Stan Smith's report, and on March 21, 2003, Buck bills for "preparing for Stan Smith's report for transmittal to Senators, etc." (1.5 hours)

107.     On March 25, 2003, Utter bills for review of Stan Smith's report and related documents. (.50 hours).

108.     On September 30, 2003, utter bills for review of Stan Smith's report (previously prepared for McCallion).

109.     On January 21, 2004, Buck bills for telephone conference with Stan Smith's office, etc. (.50 hours).

110.     Between February 2003 and June 2004, KMK had 29 billing entries for "joint prosecution agreement" and fee related matters.

### E.     SUMMARY OF PROPOSED FINDINGS OF FACT

111.     The Gallegos Law Firm ("Gallegos") and M. Gross & Associates PC ("Gross") filed a Motion to Withdraw as counsel for the Homesteaders Association on May 4, 2000 (Doc. 16) citing, among other things, differences of opinion between the Homesteaders Board and counsel (Doc. 29). On June 13, 2000, their motion was granted (Doc. 23).

112.     At the time of their resignation, Gallegos and Gross reminded the clients in writing that, under New Mexico law, a withdrawing or discharged attorney has a charging lien against any funds recovered in the litigation for the reasonable value of the services rendered prior to termination as determined by the Court (F.C. Ex.2). This is a correct statement of the law.

26

113.     The Retainer Agreement that Mackell and McCallion entered into with the

Homesteaders on or about October 12, 2000 is virtually identical to that

previously entered into by Gallegos and Gross, recognizing a charging lien, in the

event of termination or withdrawal, for the reasonable value of counsel's services

against any recovery (F.C. Ex.42).

114.     At the time that McCallion and Mackell were retained, there appears to

have been a continuing deep-seated distrust and even animosity that the then-

President of the Homesteaders Association still harbored against their prior

counsel, Gallegos and Gross, particularly over what the then-Board President

perceived to be an improper emphasis by Gallegos/Gross on a possible legislative

solution, at the expense of the pending litigation (00CV060).

115.     During the time that McCallion and Mackell served as counsel, they were

under strict instructions from the Homesteaders Board President that they were

not to coordinate their efforts with Gallegos/Gross, and that the primary emphasis

was to be the pursuit of the litigation rather than a legislative solution. These

directions were directly contrary to the advice of counsel (McCallion and

Mackell), namely, that due to the serious legal impediments that the litigation was

and would be facing, the legislative option should be pursued as vigorously as

possible, and that close coordination between and among all the client groups and

their counsel was absolutely critical to the success of the legislative initiative.

116.     In essence, McCallion and Mackell (and later Biedscheid), based upon

their legal and factual analysis of the case, gave the clients the precise same

advice as that previously given by Gallegos and Gross. Moreover, the eventual

Motion to Withdrawal by Former Counsel was precipitated by the same factors

that had previously led Gallegos/Gross to withdraw, namely, the clients' rejection of counsel's legal advice and rejection of counsels' proposed legal strategy which strongly recommended a legislative settlement option.

117.    Since many, if not most, of the individual members of the Homesteaders Association had opted out of the class action (00CV060), McCallion (and his staff) and Mackell spent most of their initial time on this matter researching and verifying the claims of their client group, resulting in the filing of a complaint on behalf of approximately 132 plaintiffs on May 22, 2001 (01CV588). Ms. Mackell logged approximately 403 pre-filing hours and Mr. McCallion approximately 29.7 hours during the seven month period between the date they were retained (Oct. 12, 2000) and the date of filing of the Complaint. This time commitment appears to be reasonable since there seems to be no serious question that the task of researching family histories, genealogies and property records is a laborious and time consuming process, and the initial information provided to counsel was, in many instances, unauthenticated documents, hearsay and other unverified information, requiring detailed research and substantiation (See Testimony and Supplemental Affidavit of Mackell).

118.    Former Counsel set guidelines for the gathering of information (F.C. Ex.4), drafted Member Questionnaires (F.C. Ex.23), and reviewed genealogical charts as they were formulated, culminating in the filing of the Complaint (01CV588) and, later, an affidavit by Mackell (in 00CV060) of land tract and genealogical information (F.C. Ex.22). This time expenditure by Former Counsel on these tasks is in line with the 460 hours of attorney and paralegal time spent by

Gallegos and Gross prior to the filing of the original complaint 00CV060 on January 14, 2000. (See Gallegos Affidavit at Sections 4-9 and 10-14).

119.    In addition to the filing of the Complaint in 01CV588, Former Counsel also appear to have vigorously pursued the litigation, including telephone conferences and meetings in New Mexico with AUSA Andrew Smith (see e.g., time entries for McCallion and Mackell for August 1 and 3, 2001, F.C. Ex.43 and 33) where both the litigation and possible legislative remedies were discussed, and negotiating an Initial Scheduling Order in Case 588 (Docket 16), which was issued on August 29, 2001.

120.    McCallion also discussed and negotiated the Stipulation to Stay the Rule 16 proceedings in Case 588 with AUSA Smith, pending settlement and legislative discussions on September 6, 2001, which was signed by Magistrate Judge Puglisi on September 13, 2001 (Case 588, Docket no. 17) and on Case 00CV060. A status conference on this matter was attended by McCallion and one of his associates on October 3, 2001 with Magistrate Judge Puglisi (Case 588, Docket 18).

121.    Former Counsel also expended considerable time and effort responding to the government's discovery demands relating to plaintiffs' land and title claims, and they also served extensive discovery requests on the government for archived documents, relating to title and notice issues and the legal proceedings relating to the transfer of title to the government. However, due to delays by the government in producing those documents from the archives, much of those materials did not become available until after Former Counsel had withdrawn. Former Counsel

however, diligently reviewed and analyzed all documents made available to them and transferred such documents to successor counsel.

122.    Former Counsel also appear to have contributed to the advancement of the legislative proposal in several respects. First of all, Former Counsel, both verbally and in writing, strongly and repeatedly recommended that the clients pursue the legislative option as a means of obtaining fair compensation for the lands and property rights that were taken by the government for the Los Alamos project during World War II (See, e.g. F.C. Ex.10). While the clients did not give Former Counsel the full authority to proceed with the legislative option, which necessarily would have included the participation and cooperation between all relevant parties, it is reasonable to assume that Former Counsel's advice and counsel, which was consistent with that of their prior counsel (i.e. Gallegos and Gross), must have contributed to the understanding process by the client group of the importance of pursuing the legislative option.

123.    Moreover, there is no dispute that Former Counsel were the first counsel to include a proposed $10 million appropriation in a draft of the proposed legislation (F.C. Ex.13A), which included sections of the prior Gallegos/Gross draft legislative proposal for $6.7 million, as well as portions of the then-pending White Sands compensation legislative proposal. Mr. Gross may have, as his notes indicate, discussed a figure greater than $6.7 million with the Senate staff but he never included any figure greater than $6.7 million in any of his drafts prior to April 2, 2002, when Former Counsel presented their draft legislative proposal to the Senate staffers (F.C. Ex. 16). Indeed, in correspondence reflecting phone calls between Former Counsel and Gallegos/Gross during February 2002, when

McCallion expressed the view that the $6.7 million compensation previously proposed by Gallegos/Gross was inadequate and required "enhancement" (F.C. Ex.11 at p.2), neither Gallegos nor Gross ever advised McCallion that this issue of an "enhanced" appropriation had ever already been discussed with the Senate staff. (Id.). Instead, Gross wrote to McCallion on February 28, 2002, merely confirming: "Neither Gene [Gallegos] nor I expressed any particular disagreement with these objectives." (Id.)

124.    Former Counsel also met with the Senate staff members on March 11, 2002 regarding proposed legislation and to follow up on a prior meeting with Mackell on September 5, 2001. Former Counsel advised that they had an expert analysis (from Dr. Stan Smith) of the land damages in the range of $60 million, but when advised that an appropriation in this range was not "doable", a tentative agreement was reached to propose legislation in the $10 million range if agreement of all relevant parties could be secured.

125.    Pete Lyons, one of the Senate staff members who met with Former Counsel, had submitted an affidavit to the effect that Former Counsel played no role in the final stages of the legislative process. This is not surprising, since Former Counsel had withdrawn prior to the period when work was done on the final legislation. This, however, in no way detracts from the fact that Former Counsel advanced the legislative proposal by circulating and gaining client approval on draft legislation which included the $10 million appropriation figure, as well as other language, that was carried forward through each future draft of the legislation (F.C. Ex.13 and 13B). Indeed, Former Counsel's draft went through no fewer than 43 revisions (see Supplemental McCallion Affidavit, ¶ 6),

and the clients thanked Former Counsel in writing "for all your excellent effort…" (F.C. Ex.13).

126.    Former Counsel is also entitled to be given credit for securing the first expert appraisal greater than $6.7 million to support the "enhanced" appropriation legislative proposal. Dr. Stan Smith of the Corporate Financial Group submitted a Report to McCallion on May 2, 2002 calculating land damages in the $58 million range (F.C. Ex.60). At the October 13th Hearing, Class Counsel attempted to minimize the relevance of the Smith report, to the legislative process, referring to it as "a joke." However, Class Counsel cannot have it both ways – they cannot both discount the importance of this Report, which KMK and Gallegos both concede was submitted to the Senate and Congressional staffs, and at the same time, support their own fee applications with a multitude of references to this Report and its Supplement, as well as conversations with Dr. Smith and his staff, and conversations with Dr. Smith and his staff, and conversations with the Senate staff about Dr. Smith's report. If KMK thought the Smith Report was of no value, it is difficult to understand why KMK would be including approximately $50,000 in billing, relating to that Report in support of its own fee application, and why they would have submitted the Report or a Supplemental Report to Congress in support of the proposed legislation

127.    Class Counsel has taken the position that Former Counsel actually impeded the settlement process by filing a complaint (Case 1166) seeking compensation for clients who allegedly were forced to work during the construction of the Los Alamos facility for less than prevailing wages, and for a "taking" and deprivation of their property rights under the Fifth and Fourteenth

Amendments. However, the claims set forth in this complaint were never an issue, or even a subject of discussion between Former Counsel and the Senate staff members they were dealing with, or between Former Counsel and Gallegos and Gross. See Hynes Affidavit. Moreover, KMK, presumably after investigating these claims and conducting due diligence, substituted as counsel in this case for Former Counsel, and were counsel of record for plaintiffs at the time this case was dismissed solely on statute of limitations and sovereign immunity grounds.

128.    Moreover, the only depositions of plaintiffs regarding the land claims, were conducted under the caption of this case (Case 1166), and KMK's billing reflects extensive review of these transcripts as part of their investigation of "the land claims." In any event, none of McCallion's nor Mackell's billing records relate to Case 1166, although their work on that case related, in large part, to the land valuation issues

129.    Ms. Beth Gonzales testified at the October 13th Hearing that the legislation was not pursued when the clients were represented by Former Counsel because they did not provide the clients with certain information about their claims that the clients "had requested." However, no documentary evidence or writing was introduced by Class Counsel to support this claim that Former Counsel had failed to respond in a timely manner to requests by the clients for information. None of the extensive correspondence between Former Counsel and their clients introduced into evidence by either side makes reference to any such request or complaint. On the contrary, there is substantial evidence that Former Counsel conducted extensive research on land title issues, as evidenced by a Schedule of

29 land tracts attached to the Affidavit of Cheryl Mackell filed with the Court in July 2002 (F.C. Ex.22).

130.   Moreover, at the time Former Counsel withdrew, there was still considerable outstanding discovery due from the government, regarding the legal proceedings relating to the land claims and it appears that many relevant documents were not received by counsel until either shortly before Former Counsel withdrew, which were forwarded to KMK, or after Former Counsel withdrew, in which case they were not available to Former Counsel so that a final legal analysis could be completed (Testimony of McCallion). Class Counsel also has made no credible showing that Former Counsel did not vigorously pursue those discovery demands with the government or conduct title analysis to the maximum extent possible. In any event, it appears that the "removal" of the Homesteaders president was, by far, the major change of circumstances clearing the path for the legislation. The close causal connection between the removal of the President and the re-start of the legislative process is conceded by Mr. Utter's affidavit of April 11, 2005 (F.C. Ex. 48, ¶ 7). ("A few weeks later [after his removal], the proposal bill was resurrected, finalized, introduced and approved.")

131.   The Court finds that Former Counsel contributed to the process leading to the ultimate settlement of the case both, directly, by drafting legislation proposing the $10 million appropriation eventually agreed upon, and securing an appraisal from Dr. Stan Smith supporting that "enhanced" appropriation, and also indirectly, by vigorously pursuing the litigation, verifying genealogical information supplied by the clients, researching available title information, and making appropriate discovery demands of the government for relevant records

relating to the land claims and prior legal proceedings that contributed to the legal analysis of the plaintiffs' claims.

132.    KMK's allegations that Former Counsel engineered an "opt out campaign" is unsupported by any evidence presented at the Hearing or otherwise. The two Board members who testified at the Hearing made no such assertions, and a review of the opt-out filings in 00CV060 reflect that they were not filed by Former Counsel. None of the correspondence or Board minutes introduced indicates any involvement whatsoever by Foreign Counsel in an "opt-out campaign", and there is no basis to question the veracity of Former Counsel's representations that Case 01CV588 was filed solely for the legitimate legal purpose of providing clients who had already opted out of the class action (00CV060) with an opportunity to appear in a related proceeding through counsel other than through their prior counsel (Gallegos and Gross).

133.    Class Counsel's argument that Dr. Stan V. Smith's Report was "counterproductive" since it elevated unrealistic client expectations is negated by the fact that the proposed legislation with the $10 million appropriation was submitted to the Senate staff on April 2, 2002 with client approval (F.C. Ex. 16).

134.    Ultimately, however, the amount of fees to which Former Counsel are entitled cannot be decided in a vacuum. The time sheets that Former Counsel have submitted are roughly equivalent to time sheets submitted by KMK (although KMK has failed to disclose the relevant billing rates for any of its attorneys or staff). KMK has already received an award of $500,000 in fees, which includes a premium over-and-above the amount of its actual time sheets submitted to the Court. This leaves $500,000 to be allocated among and between KMK and

Former Counsel. The Court finds that the contribution of Former Counsel to the case over the two year period they represented the clients was roughly equivalent to that of KMK and, therefore that Former Counsel is entitled to receive an amount equivalent to that already received by KMK.


## CONCLUSIONS OF LAW

### A.      Applicable Case Law Supports Former Counsel's Application.

The Tenth Circuit provides that attorneys who actually contribute to the creation of a common fund in class actions are entitled to recover from the common fund. *Brown v. Phillips Co.*, 838 F.2d 451 (10th Cir. 1988); *Uselton v. Eason,* 9 F.3d 849 (10th Cir. 1993); *see also Boeing v. Van Germert*, 444 U.S. 472 (1980).

The overriding consideration for the court is reasonableness. *Brown*, 838 F.d. at 454. To guide the reasonableness analysis, the Tenth Circuit has outlines twelve factors, commonly referred to as the "Johnson factors," for the Court to consider: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) any prearranged fee – this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Brown,* 858 F. 2d at 454-455; *Uselton*, 9 F.3d at 8

As fully set forth above, Former Counsel contributed real value and
benefit to the class, advanced the litigation and were involved in, and advanced,
the passage of the litigation.

Based upon the *Johnson* factors, Former Counsel added value and benefit
to the legislative resolution and are entitled to attorney's fees

### B.      Former Counsel Are Entitled To Be Paid Attorneys Fees Pursuant to Rule 23 of the Federal Rules of Civil Procedure

Public Law 108-375(c)(5) requires that the court award compensation for attorneys
fees and expenses from this fund "pursuant to Rule 23 of the Federal Rules of Civil
Procedure" and it does not restrict such an award to counsel of a certified class of
plaintiffs.

Subsection h of Rule 23 of the Federal Rules of Civil Procedure does not restrict the
award of attorneys fees to class counsel. To the contrary, Subsection (h)(1) of Rule 23
contemplates attorneys fees awards other than those made to class counsel when it states

> A claim for an award of attorneys fees and nontaxable costs must be made
> by motion under Rule 54(d)(2), subject to the provisions of this
> subdivision, at a time set by the court. Notice of the motion must be served
> on all parties and, **for motions by class counsel**, directed to class
> members in a reasonable fashion. [emphasis added].

The Advisory Committee Notes explaining Rule 23(h) further clarifies the
fact that attorneys, other than those appointed as class counsel, may be awarded fees
when it states that

> [Rule 23(h)] provides a format for all awards of attorneys fees and
> nontaxable costs in connection with a class action, not only the award to
> class counsel. **In some situations, there may be a basis for making an**

**award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel.** Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

Applicant's efforts on behalf of the Pajarito Plateau Homesteaders, Inc. produced a beneficial result for the Pajarito members and, eventually, the entire class through their communication with their clients about the advantages of the legislative settlement when compared to litigation and their diligent representation of the Pajarito members in the litigation.

### C. Former Counsel Are Entitled To Be Paid Attorneys Fees Under A Charging Lien Which Attaches To The Fund

"Under New Mexico law, an attorney's lien is an equitable remedy originating from the common law." *Albuquerque Technical Vocational Institute v. General Meters Corp.*, 17 Fed. Appx. 870, 874 (10th Cir. 2001) (citing *N. Pueblos Enters. v. Montgomery*, 98 N.M. 47, 644 P.2d 1036, 1038 (N.M.1982).

The attorney's lien protects the attorney's right "to recover his fees and money expended on behalf of his client from a fund recovered by his efforts. . . ." *N. Pueblos Enters.*, 644 P.2d at 1038 (quoting *Prichard v. Fulmer*, 22 N.M. 134, 159 P. 39, 41 (N.M.1916)).

"[U]nder New Mexico law, a lawyer is not prevented from asserting a lien against a judgment obtained by a former client, even though the lawyer was not involved throughout the litigation and other attorneys' efforts contributed to the recovery." *Id.* at 876. *See also Robison v. Campbell*, 99 N.M. 579, 661 P.2d 479, 484 (N.M. App. 1983)

(attorney entitled to fees under charging lien as long as firm "contribute[d]" in some manner to the positive outcome ultimately attained by client).

"Under New Mexico law, four requirements must be met for an attorney to recover fees under a lien. First, there must be a valid contract between the attorney and the client. *See Sowder v. Sowder*, 127 N.M. 114, 977 P.2d 1034, 1037 (N.M. App. 1999). Second, the fund to which the lien attaches must have been recovered by the efforts of the attorney. *See id.* Third, the attorney must give notice to all parties involved in the litigation of the intent to assert a lien against any judgment. *See id.*  Finally, the assertion of the lien by the attorney must be timely. See id. at 1038." *Albuquerque Technical,* 17 Fed. Appx. at 874.

As to the first and second requirements, there can be no reasonable dispute that Former Counsel were representing the plaintiffs in the action entitled <u>Pajarito Plateau Homesteaders, Inc. v. United States</u> (01CV588) (F.C. Ex. 6A), and that the actions M&A and Mackell described above contributed to the settlement of that action and the $10 million fund that was authorized by Congress. As to the third and fourth requirements, this Court has already determined that the fee applications of Former Counsel were timely filed. Court Order of April 29, 2005 (Doc. 264).

**CONCLUSION**

Applicants are entitled to an award of attorneys' fees and costs as requested in their

Applications and Claims for Award of Attorneys' Fees be paid from the fund aside by

Public Law 108-375 for that purpose.

Respectfully Submitted,

Dated October 28, 2005          **McCALLION & ASSOCIATES LLP**

**/s/ Kenneth F. McCallion**
By: Kenneth F. McCallion
    24 West 40th Street, 17 Fl
    New York, New York 10018
    Telephone: 646.366.0880

**CHERYL HAMER MACKELL, ESQ.**
    c/o Pomerantz Haudek Block
    1025 Connecticut Avenue NW
    Suite 1000
    Washington D.C. 20036

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing Post Hearing Brief and Affidavit of Susan Wallace Hynes to be served either by ACE.Notification via electronic mail or by facsimile on this 28th day of October, 2005, to the following counsel of record:


J.E. Gallegos
Gallegos Law Firm, P.C.
460 St. Michael's Drive, Bldg. 300
Santa Fe, New Mexico 87505

Michael P. Gross
M.P. Gross & Associates, P.C.
460 St. Michael's Drive, Bldg. 401
Santa Fe, New Mexico 87505

Raymond Hamilton
Assistant U.S. Attorney
Ms. Pamela Arias-Ortega
Special Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 607
Albuquerque, New Mexico 87103-0607

Greg Utter
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202


/s/ Kenneth F. McCallion
    Kenneth F. McCallion