**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

**JOSE E. GONZALES, PETER J. GOMEZ,**
**EMELINA GRANT, TERESITA GARCIA MARTINEZ**
**and MARIA ERNESTINA MONTOYA,**

                **Plaintiffs,**

**vs.**

                                 **No. 00-CV-60 WPJ/RS ACE**

**UNITED STATES OF AMERICA, et al.,**

                **Defendants.**


**PAJARITO PLATEAU HOMESTEADERS, INC.,**

                **Plaintiffs,**

**vs.**                                 **No. 01-CV-588 MCA/RLP ACE**

**UNITED STATES OF AMERICA, et al.**

                **Defendants.**

**MEMORANDUM OPINION AND ORDER ON FORMER COUNSELS'**
**MOTIONS FOR ATTORNEYS' FEES**

In 1943, the United States Government decided to locate the headquarters for the

Manhattan Project, code name for the secret plan to develop the atomic bomb, on the remote

Pajarito Plateau in north central New Mexico.  This decision is still creating issues the resolution

of which are presently before the Court.  Although the substantive issues between the Plaintiffs

and the United States Government will be resolved as a result of legislation enacted by the

Congress and approved by the President, this class action lawsuit now involves present and

former counsel for Plaintiffs and their competing claims for compensation.  In short, this litigation

has evolved into a fight among lawyers over a pot of money.  Accordingly, this Memorandum

Opinion and Order pertains to the following motions/applications for awards of attorney fees:

!  Former Counsels' Application for Fees, filed May 16, 2005 by Kenneth McCallion,
   McCallion & Associates  ("McCallion") and Cheryl Hamer Mackell ("Mackell")  (**Doc.
   267**).

!  Former Counsels' Application for Fees, filed May 16, 2005 again by McCallion and
   Mackell **(Doc. 268).**

!  Motion by Plaintiffs' Former Counsel for Award of Attorney Fees, filed May 16, 2005 by
   Sawtell, Wirth & Biedscheid (formerly Catron, Catron & Sawtell), for reimbursement of
   Byron Beidscheid's ("Beidscheid") services **(Doc. 269).**

On October 13, 2005, a hearing was held to consider argument and evidence presented in

support of and in opposition to the above-described motions/applications for attorney fees and

additional written argument including requested findings of fact and conclusions of law was

submitted to the Court.  For the reasons set forth in this Memorandum Opinion and Order, those

motions/applications shall be granted in part and denied in part.

## Factual Background

This Class action lawsuit has a complex historical and procedural background, but a

description is necessary and helpful to understand the basis for the Court's ruling.  In putting

together this description, the Court has relied upon various pleadings in the case as well as

testimony from the October 13, 2005 hearing.  The Complaint initiating the above-captioned case

was filed in the United States District Court for the District of New Mexico on January 14, 2000.[1]

The claims in this litigation are based on events that occurred while the United States of America

---

[1] The undersigned judge was not the original presiding judge, but was assigned the case on
September 25, 2002.

("United States" or "Government") was engaged in war against Germany and Japan during World War II.  In 1943, the Government selected the Pajarito Plateau, a remote high desert plateau in north central New Mexico, to be the headquarters for the Manhattan Project.  The Pajarito Plateau and surrounding area eventually became what is now the Las Alamos National Laboratories located in what is now the city and county of Los Alamos, New Mexico.  The lands comprising the Los Alamos National Laboratories are owned by the Government's successor agency, the United States Department of Energy ("DOE"), which contracts out the operation of the Los Alamos National Laboratories.

Prior to 1943, predominantly Hispanic homesteaders from the Espanola Valley had acquired ownership of small family farms and ranches on the Pajarito Plateau.  The Plaintiffs allege that these Hispanic property owners were forcibly removed from their lands during the 1943 to 1944 time period and Plaintiffs allege that many homesteaders were paid for their lands only what amounted to a small percentage of the value of the lands compared to what other Non-Hispanic landowners in the area were paid for their lands.  The Plaintiffs also allege that many of the Hispanic homesteaders were denied due process and just compensation as a result of what they characterize as the Government's illegal and inappropriate takings.  The Government, through the DOE,  has vigorously contested the Plaintiffs' claims and denies that there were any unjust takings or that any of the Hispanic homesteaders were denied due process or just compensation for their lands.

I.      **Initial Litigation Events**

For many years following World War II, the Hispanic homesteaders and their families protested what they considered to be the inappropriate takings and lack of adequate compensation

3

paid by the Government.  In the summer of 1999, a spokesman for the Hispanic homesteaders

wrote a letter to attorney Michael Gross ("Gross") requesting his legal assistance.  Gross

approached attorney Gene Gallegos ("Gallegos") and together, they interviewed former property

owners and their descendants, conducted legal research and investigated similar takings issues

alleged to have occurred in Rocky Flats, Colorado and other locations.  Gallegos and Gross

concluded that there was a legal basis for asserting claims against the United States and in

November of 1999, Gallegos and Gross met with various homesteaders and agreed to represent

them.  Gallegos and Gross helped incorporate the Hispanic homesteaders into the Pajarito Plateau

Homesteaders, Inc. ("Association" or "Homesteaders Association") and then were formally

retained by the Homesteaders' Board ("Board") to represent the Association members and their

descendants against the United States.

Gallegos and Gross formulated a two-prong strategy that included (i) filing of a takings

lawsuit against the Government; and (ii) enlisting the support of the New Mexico Congressional

delegation in pursuit of a legislative resolution to the claims.  Accordingly, on January 14, 2000,

Gallegos and Gross filed the initial complaint against the Government which was docketed in this

Court as Case No. 00-CV-60.

Gallegos and New Mexico's Senior United States Senator, Pete V. Domenici,  have been

friends since they attended college together at the University of New Mexico.  On or about

January 20, 2000, Senator Domenici telephoned Gallegos and expressed concern over the

litigation because Senator Domenici had been working on legislation to have DOE divest itself of

surplus real property in Los Alamos County to allow for private residential and commercial

development.  Senator Domenici expressed concern that the litigation initiated by Gallegos on

behalf of the Association members would complicate plans to have DOE divest itself of surplus lands.

At the October 13, 2005 hearing ("hearing"), Gallegos testified that in his very first conversation with Senator Domenici, Gallegos estimated the amount of damage claims suffered by the Association members to be in the five to ten million dollar range, although Gallegos advised Senator Domenici that this was a preliminary estimate since there were not any formal appraisals or studies regarding damages. Senator Domenici expressed an interest in trying to resolve the Association members' claims and agreed to further discussions and meetings.

Gallegos testified that a subsequent meeting was scheduled with Senator Domenici and then at the Homesteaders' Board meeting which occurred on the Saturday before the scheduled meeting with Senator Domenici, the Board led by Board member Joe Gutierrez ("Gutierrez") advised Gallegos that the Association members wanted land, not money.

The following Monday Gallegos met with Senator Domenici. Gallegos advised Senator Domenici at that time that the Association members wanted land and not money. Senator Domenici indicated that money was something that could be done, but a settlement involving land was not a viable option.

Subsequent to the meeting Gallegos had with Senator Domenici, Gutierrez advised Gallegos that the Board was not interested in any kind of settlement and that the Board wanted to litigate. Gallegos was further instructed that there could be no pleading or correspondence initiated by Gallegos unless Gutierrez reviewed and approved it.

Gallegos testified that he expressed some concerns to Gutierrez that he was not an actual claimant, but rather Gutierrez's mother-in-law and father-in-law were actually the claimants and

5

Gallegos stated that he advised Gutierrez that the actual claimants needed to be consulted. Gallegos testified that Gutierrez was adamant that there would be no communication with anyone but him.  Gallegos and Gross concluded they were in a situation that was intolerable from a professional standpoint and, therefore, they filed a motion to withdraw as counsel for the Homesteaders Association in May of 2000.

After Gallegos and Gross withdrew as counsel for the Association, Jose Gonzales and Teresita Garcia Martinez, who are named Plaintiffs in case 00-CV-60, came to see Gallegos and Gross and stated that they wanted Gallegos and Gross to represent them.  Gallegos and Gross agreed, entered an appearance for these individual plaintiffs in August 2000, and sought to have them named as class representatives.

On October 3, 2000, the Association was dismissed because it had not retained counsel within the time period allowed by the Court.  (Doc. 37).  By Court order entered October 5, 2000, the class was certified and Gallegos and Gross were designated as class counsel.

During the second half of 2000 after Gallegos and Gross had once again become counsel in the litigation, Gallegos re-initiated contact with Senator Domenici's office and in January of 2001, Gallegos met with Pete Lyons, a member of Senator Domenici's staff.  Gallegos and Gross worked with Senator Domenici's staff to draft legislation to compensate the class of members in case number 00-CV-60.  Senator Domenici was of the opinion that New Mexico's other United States Senator, Jeff Bingaman, should be consulted about any proposed legislation.  After Senator Bingaman was consulted and briefed on the litigation, he joined Senator Domenici in supporting the concept of a legislative resolution to this class action lawsuit.

**II.     Events Leading up to Companion Case 01-CV-588**

In October of 2000, the Association retained new counsel: Cheryl Mackell who at that time practiced law in Santa Fe, New Mexico, and Kenneth McCallion from McCallion & Associates (hereinafter, Mackell and McCallion may be collectively referred to as "Former Counsel").  At the hearing, McCallion testified that the Association gave him and Mackell instructions to pursue the case on two tracks, a litigation track and a legislative track.  However, McCallion and Mackell were directed by the Board to deal directly with Senators Domenici and Bingaman and their staffs and not to coordinate efforts with other counsel, specifically Gallegos and Gross.  The first stay of litigation in the case was entered in April of 2001 when a legislative resolution appeared to be a solid option.  TR 210.

Gallegos and Gross started drafting legislation in January 2001.  Gallegos and Gross were working within a five to ten million dollar estimate for a Congressional appropriation range consistent with what Gallegos had advised Senator Domenici from conversations they had in January 2000.  Gallegos and Pete Lyons had also discussed the compensation issues at a subsequent meeting in January 2001, as legislation was being drafted. TR 205-06; Ex. D.  In order to have a rational basis for damages related to Plaintiffs' claims, Gallegos and Gross hired expert John Blatnik to conduct a land appraisal, which Blatnik evaluated at $6.7 million.  This figure was used in the proposed bill drafted by Gallegos and Gross in June 2001.  TR 212.

On May 22, 2001, Mackell and McCallion filed a separate lawsuit on behalf of the Association, docketed in this Court under 01-CV-588.  The claims in 01-CV-588 were very similar to those in 00-CV-60 and were based on issues regarding eminent domain and takings by the Government.   In March 2002, Beidscheid also entered his appearance for the Association,

joining Mackell and McCallion as co-counsel in 01-CV-588.

At the October 13, 2005 hearing, Former Counsel testified that the difficulties they were having regarding the legislative option stemmed from the reluctance of Gutierrez to agree to a legislative settlement.   In addition, the Board's instructions not to coordinate with Gallegos and Gross created monumental problems. Gallegos testified at the hearing that during the early part of 2002 there was no progress made toward a legislative solution because as a precondition for the Senators to push for enactment of legislation to compensate Plaintiffs and the Association, they all had to agree to support a legislative resolution.  TR 217.  In other words, Senators Domenici and Bingaman were not interested in carrying legislation to settle only some of the Plaintiffs' claims while the remaining Plaintiffs litigated their claims against the Government.

During February and March of 2002, Gallegos and Gross and Former Counsel exchanged correspondence in which Gallegos and Gross explored proceeding to a legislative resolution in a joint effort between the groups.  Gallegos provided McCallion with a copy of Blatnik's land appraisal in one of these letters.   TR 219, Ex. 15.  McCallion advised that a cooperative effort would not be possible and that the objective would be to carry out both the litigation in 01-CV-588 and a legislative solution individually and separate from the course Gallegos and Gross were taking in 00-CV-60, notwithstanding the position of Senators Domenici and Bingaman.

Proceeding on their own in 01-CV-588, Former Counsel engaged the services of a damages expert Dr. Stan Smith, in order to obtain an appraisal of Plaintiffs' damage claims.  By springtime of 2002, Dr. Smith had developed a land valuation for the acreage at issue, which was

8

in the $60 million range.[2]   This damage amount was rejected by Senators Domenici and

Bingaman, and instead in March 2002, Former Counsel drafted a proposed legislative bill for a

$10 million amount.  This draft integrated language from the previous June 2001 draft written by

Gallegos and Gross and also the then-pending legislation to compensate former landowners in the

White Sands Missile Range. TR 29-30.[3]  McCallion crossed out the $6.7 million used as the

appropriation amount from the former and inserted a $10 million figure.  Ex. 13A

The Association members signed off on the proposal, but then shortly thereafter informed

Former Counsel that it wanted $20 million instead of $10 million.  The Senate staff members who

were in contact with Former Counsel advised that only a legislative proposal up to $10 million

would be considered.

In May, 2002, the Government filed a motion to consolidate 00-CV-60 and 01-CV-588,

which Gallegos and Gross opposed.  The Court granted the motion to consolidate on August 19,

2002.

On August 15, 2002, Former Counsel sent a letter to the Homesteader Association

renewing a request for authorization to proceed with a legislative option on behalf of the

Association members, with a $10 million settlement figure as set forth in the legislation.

On September 5, 2002, the Board wrote to Mackell (with copies sent to other counsel)

emphasizing a need to continue litigation efforts.  Former Counsel felt that the reluctance of

---

[2]  The basis for the Smith appraisal was a claim for lost rents, as opposed to lost sale
value.  Tr. 93.

[3]   There was reference in witness testimony to the White Sands litigation at the hearing,
but no details were presented.  The Court assumes that counsel are referring to prior
condemnation litigation involving lands in and around the White Sands Missile Range in southern
New Mexico.

Gutierrez to approve the legislative option and the Board's focus on litigation restricted Former Counsel's ability to pursue a legislative resolution.  At the hearing, McCallion stated that the Board's insistence that Former Counsel not communicate directly with the  individual Association members placed Former Counsel in an untenable position, which turned out to be almost identical to the situation confronting Gallegos and Gross two years earlier.

At the hearing, McCallion testified that Gutierrez's departure as Board President was necessary for the legislation to proceed; however, McCallion was reluctant to suggest to the Board members that the Board needed a new president because of ethical constraints, and felt that the matter was best left to the Association members to resolve the issue.  See TR 91.

Former Counsel moved to withdraw as counsel from the 01-CV-588 case in September 2002, basing the request to withdraw on disagreements among the Association members and members of the Board.  The Court granted the motion to withdraw on October 7, 2002.

III.     **New Counsel for 01-CV-588 and Events Leading up to the Final Congressional Legislation**

When Gallegos and Gross became aware of Former Counsel's withdrawal from the case, they notified Pete Lyons of Senator Domenici's staff, optimistic that through new counsel for 01-CV-588, a cooperative effort toward a legislative resolution might become possible.  TR 221. On December 4, 2002, Gregory Utter ("Utter") and John Buck ("Buck") of the firm of Keating, Muething and Klekamp ("KMK") entered their appearance for the Homesteader Association. Thus, the consolidated case ended up with Gallegos and Gross representing all named class representatives, and Utter and Buck representing the Association (hereinafter, Gallegos and Gross, and Utter and Buck are collectively referred to as "Class Counsel").  Individuals who were

initially represented by Former Counsel had the opportunity to opt in after Former Counsel withdrew from the case.

On March 18, 2003, the Homesteader Association informed Senators Domenici and Bingaman that Gutierrez had departed as the Board President.  The details surrounding the change in Board leadership differ slightly with regard to whether Gutierrez resigned or was removed from the position.  These slightly different versions help reveal what was going on in the collective minds of the individual Plaintiffs as well as what could have been affecting the working relationship between the Association members and Former Counsel.

In the beginning of March 2003, Gutierrez had written an unflattering article about Senators Domenici and Bingaman, which the Board considered to be in "complete contravention to [the] unanimous Board resolution to pursue and support the legislative effort."  Ex. 41.[4] According to Utter, he and Buck persuaded the Board to remove Gutierrez after representatives from Senators Domenici and Bingaman informed all counsel that the proposed bill was no longer a viable option in light of the published article and the apparent "resumed disunity and dissatisfaction among the Homesteaders."  Doc. 248 (Utter Aff), Ex. B (Utter Aff.), ¶¶ 6-7.  Then there was testimony at the hearing by Beth Gonzales ("Gonzales") which gives a slightly different slant to the change in leadership.  Gonzales was the secretary for the Association since its incorporation. At the hearing, Gonzales testified that Gutierrez voluntarily resigned after the Senators informed the Board that they would not deal with the group if Gutierrez continued to be a part of the leadership.  Gonzales stated that Gutierrez stepped down to assist in the pursuit of

---

[4]  Exhibits submitted at the hearing by former counsel are numbered; those submitted by Class Counsel are lettered.  Due to the volume of the material, specific references to exhibits will not be cited in the recitation of background events unless quoted.

the legislative resolution.  (TR. 165).

Gonzales testified at the hearing to what she felt was the reason Utter and Buck succeeded in bringing the Board and the individual Homesteader members together and unified in pursuing a legislative end to their claims.  She stated that the Association had requested that Former Counsel complete a legal analysis of the claims raised -- in particular, a legal analysis of the status of the titles of the lands taken by the Government, and an analysis of the claims of the plaintiffs in the White Sands Missile Range litigation who were receiving money for what  Association members believed to be similar claims.  Gonzales remembered that these requests were made at several meetings which Mackell and/or McCallion attended, although Gonzales could not recall whether minutes were taken during these meetings.  Gonzales explained that the Association members were not ready to embrace the legislative option until they first understood what their legal standing was, and that Utter and Buck gave the Association this complete analysis within three months after entering their appearance.  TR 164, 170, 188, 190.   In essence, Utter and Buck, in contrast to Former Counsel, were communicating with their clients in a manner in which the clients understood what their lawyers were saying.

After the change in the Board leadership, Class Counsel moved forward on a legislative resolution of Plaintiffs' claims – work which involved numerous trips to Washington between March 2003 and February 2004 for negotiations relating to not only the passage of the text of the bill but also the passage of the appropriations bill which would provide funding for the legislation. TR 241-42; Ex G (affidavit in support of application for fees), ¶¶ 48-54.  These negotiations between Class Counsel and the Senators' staff  resulted in several drafts of the proposed bill which adjusted for increases in the appropriation amount.  TR 223.  The initial $6.7 million from

the Blatnik appraisal was increased to $8 million to reflect an increase in the acreage figure used

in the original Blatnik appraisal.  This upgrade was the justification and basis for Class Counsel to

change the appropriation amount to $10 million [5] in the proposed bill -- a change that is reflected

in the final legislation.  TR 224; Ex. F.

The Court entered the last stay in the consolidated case on June 25, 2003, after which the

parties filed with the Court several reports advising the status of the legislative efforts being made

to resolve the case.  Finally, on January 24, 2005, Class Counsel moved for an order of

"Preliminary and Final Approval of Resolution of Class Claims Based on Congressional Action

and Issuance of Notice."  Doc. 191.  On February 1, 2005, the Court granted Plaintiffs' motion

for an Order of Preliminary and Final Approval of Resolution of Class Claims based on

Congressional Action and Issuance of Notice (Doc. 193).  The Court's final approval of the

resolution of class claims was entered on April 27, 2005.  Doc. 262.

## IV.    The "Slavery Case"

Part of the procedural tracking of this case must include a reference to another related

case in which Former Counsel rendered legal services, <u>Pajarito Plateau et al., v. U.S.A. et al.</u>,

docketed as 01-CV-1166 (also referred to at the hearing as the "slavery case").  Tr. 138.  Mackell

filed the complaint in that case in October 2001, which seems to have been filed as a result of

dissension among the Plaintiffs regarding the proposed legislative resolution.  Claims in this case

alleged unlawful takings by the Government, but also included spectacular allegations of forced

labor, false imprisonment and torture connected with medical experimentation.  McCallion, as

---

[5]Of the 10 million appropriation in the final version of the legislation approved by the
Congress and signed by the President, two million dollars is set aside for attorney fees and
expenses leaving eight million dollars to compensate the class of Plaintiffs.

13

well as Beidscheid, entered appearances in 01-CV-1166.  In September 2002, Former Counsel

withdrew from this case because of what counsel described as "fundamental breakdown" in

communication with Plaintiffs, a refusal by Plaintiffs to give counsel authority to settle the case,

and "serious conflict and disagreement" regarding strategy and objectives.  See Doc. 41, 01-CV-

1166.  Utter and Buck entered an appearance on the last stretch of this case, which was dismissed

in favor of defendants on December 18, 2002, based on lack of jurisdiction because the statute of

limitations had run.  The District Court's decision was affirmed by the Tenth Circuit Court of

Appeals.  See Pajarito Plateau Homesteaders, Inc. v. U.S., 346 F.3d 983 (10th Cir. 2003).  While

the Tenth Circuit's opinion ended this particular case once and for all, the spectacular and

incredulous allegations about forced labor, false imprisonment and torture connected with medical

experimentation did nothing to help encourage the legislative enactment of the ten million dollar

settlement fund.  Moreover, the Tenth Circuit's opinion was strong precedent that the Plaintiffs

and/or Association members' claims in 00-CV-60 and 01-CV-588 were barred by the statute of

limitations.

## DISCUSSION

When Congress enacted the Pajarito Plateau Homesteaders Act (the "Act"), Congress

authorized up to 20%, or two million dollars of the ten million dollar fund (the "Fund") to be used

for attorney's fees, and up to 2%, or two hundred thousand dollars, to be used for expenses.

Public Law 108-375 states in relevant part:

> The Court may award compensation for the special master and attorney fees and expenses
> from the Fund pursuant to rule 23 of the Federal Rules of Civil Procedure, except that the
> award of **attorney fees may not exceed twenty percent of the Fund and the award of
> expenses may not exceed two percent of the Fund**. Any compensation and attorney fees
> and expenses so paid shall be paid from the Fund by the Court before distribution of the
> amount in the Fund to eligible claimants entitled thereto.

P.L. 108-375, § 3174 (emphasis added).  While this class action case is somewhat unusual in that

14

the settlement occurred as a result of congressional legislation, the law applicable to the Common

Fund Doctrine governs the award of attorney's fees in this case.

Pursuant to the Notice and Order filed by the Court on April 29, 2005 (Doc. 264) advising

all former counsel of the deadline for submitting any requests for attorney's fees to be awarded

out of the Fund, Mackell requests a total award of $283,838.34 ($264,497 plus $19,341.34 gross

receipts tax), McCallion requests an award of $51,534.50 and Biedscheid requests an award of

$17,415.00, plus $240.20 in expenses.

Former Counsel seek this fee award on the basis that they contributed real value and

benefit to the class, advanced the litigation and were involved in, and advanced, the passage of the

Congressional legislation.  As an initial matter, the Court does not agree with Class Counsel that

Former Counsel is precluded from requesting fees from the common fund set aside simply

because they were not certified as counsel for the class of Plaintiffs. Fed.R.Civ.P. 23(h) does not

restrict the award of attorney fees to class counsel, but appears to allow such awards to "other

counsel whose work produced a beneficial result for the class."   This kind of situation was

envisioned in the Joint Prosecution and Fee Agreement between KMK and Gallegos and Gross,

which provided that fees awarded to Former Counsel could be awarded from the Fund, but from

KMK's portion:  "In the event the Court awards any portion of the attorney fee to any former

counsel of the Pajarito Homesteaders, Inc., Gallegos' right to 50% of the attorney fee will not be

reduced in any manner . . . ."  Utter Aff), Ex. B, ¶ 7.  As for the suggestion that an award of fees

from the Fund to former counsel is precluded by the provision for attorneys' fees in the Act, this

argument is not supported by the language in the Act.

The Court recognizes at the outset that the amount set aside in the Act for attorneys' fees

15

(20 percent of the Fund) is fair and reasonable, based on a review of the fee awards granted in other common fund cases, ranging from 20 to 33 percent of the common fund. See Doc. 252 at 10, Class Counsel's Application for an Award of Attorneys' Fees and Costs, (graph listing other cases, including District of New Mexico cases).

Class Counsel urges the Court to give "substantial deference" to lead counsel's proposed allocation of fees among all counsel, relying on In re Copley Pharmaceuticals, Inc., 50 F.Supp.2d 1141, 1149 (D.Colo. 1999). Lead counsel in Copley, however, had undertaken the formidable task, with the presiding judge's approval, of negotiating fee awards with class counsel members based upon suggestions from a steering committee set up for that specific purpose. Lead counsel in that case never suggested a zero sum award for any class counsel member, although lead counsel recommended awards ranging from $15,000.00 to $6,985,000 out of an aggregate amount of $19.5 million set aside from the common fund. 50 F.Supp.2d at 1146. The Copley court found lead counsel's recommended allocations to be fair and reasonable, relying on previous discussions with lead counsel and other class counsel members and its own review of previous submissions of class counsel, and after weighing the "relative responsibilities of class counsel members and their contribution" to the case. 50 F.Supp.2d at 1149.

In this case, Class Counsel has taken the position that Former Counsel is not entitled to any awards at all. There was no steering committee which made this suggestion, and whatever fees are awarded Former Counsel will come directly from KMK's portion alone, under the joint prosecution agreement between KMK and Gallegos and Gross.[6] Allocation of attorneys' fees is

---

[6] The joint prosecution agreement between KMK and Gallegos and Gross assumes that the Court will award 20% of the Fund as attorney fees.

16

left to the discretion of the trial court.  50 F.Supp.2d at 1148.  For the reasons given below, the Court does not agree with Class Counsel that the determination as to allocation of fees from the Fund should be based on deference given to Class Counsel's recommendation especially considering any compensation awarded to Former Counsel reduces KMK's potential for award pursuant to its agreement with Gallegos and Gross.  Instead, the Court will follow the prevailing legal standard and established precedent that governs the award of attorneys' fees from a common fund.

I.     **Legal Standard**

The Common Fund Doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigants' expense."  Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct.  745, 749, 62 L.Ed.2d 676 (1980); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988).   Moreover, common fund fees are based in part on the common law premise that a trustee is entitled to reimbursement from the fund  administered.  Trustees v. Greenough, 105 U.S. (15 Otto) 527, 532, 26L.Ed. 1157 (1881); Brown, 838 F.2d at 454.  Attorney's fees in common fund cases, in contrast to statutory fee cases where there is a shifting of the fees to the losing party, result in a sharing of the fees among those benefitted by the litigation.  Brown, 838 F.2d at 454.

Awards of attorney's fees in common fund cases also must be reasonable and the trial judge must provide specific reasons for any fee award in order to allow appellate review of the reasonableness review of the fee award.  Id.; see also Ramos v. Lamm, 713 F.2d 546, 552 (10th Cir. 1983).   To determine reasonableness of a fee award, federal courts rely heavily on the widely cited factors articulated by the Fifth Circuit Court of Appeals in Johnson v. Georgia Highway

Express, Inc., 488 F.2d 714 (5th Cir. 1974).  See eg., Brown, 838 F.2d at 454-55; Uselton v.

Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 853 (10th Cir. 1993) (reaffirming the

relevance of the twelve factors originally developed for statutory fee determinations); Ramos, 713

F.2d at 552.  What is now commonly referred to as the Johnson factors are:

> (1)     The time and labor involved;
>
> (2)     The novelty and difficulty of the questions;
>
> (3)     The skill requisite to perform the legal service properly;
>
> (4)     The preclusion of other employment by the attorney due to acceptance of the case;
>
> (5)     The customary fee;
>
> (6)     Any pre-arranged fee - - is helpful but not determinative;
>
> (7)     Time limitations imposed by the client or the circumstances;
>
> (8)     The amount involved and the results obtained;
>
> (9)     The experience, reputation and ability of the attorneys;
>
> (10)    The undesirability of the case;
>
> (11)    The nature and length of the professional relationship with the client; and
>
> (12)    Awards in similar cases.

Johnson, 488 F.2d at 717-19.

In Brown, the Tenth Circuit recognized the propriety of awarding attorneys' fees in

common fund cases based on a percentage of the fund, rather than a lodestar approach, finding

either method permissible in common fund cases.  838 F.2d at 454-56, cited in Gottlieb v. Barry,

43 F.3d 474, 483 (10th Cir. 1994).  Whether to use a percentage method or a lodestar method

remains in the discretion of the court, although Uselton implies a preference for the percentage of

the fund method.  Gottlieb, 43 F.3d at 483.[7]   Regardless of which process is used -- percentage

fee or lodestar method -- the court must consider the twelve Johnson factors in assessing

reasonableness of the fee award.  Id.; see In re Horizon/CMS Healthcare Corp. Securities

Litigation, 3 F.Supp.2d 1208, 1211 n.2 (D.N.M.,1998) (a "common benefit" case requires

consideration of the factors enunciated in Johnson).  Thus, use of the Johnson factors in a

percentage fee method has been called a "hybrid" approach because the process combines the

percentage fee method with the specific factors traditionally used to calculate the lodestar.   Id.

I have compared the various reasons to follow both methods, and find that certain

considerations persuade me that the percentage fee method is most appropriate because: (1) it

most closely approximates the contingency fee basis by which Former Counsel (as well as Class

Counsel) were initially retained by both the individual Plaintiffs and the Association; (2) it

provides incentive for counsel to pursue actions such as this one, where litigation at one point was

not expected to be successful but counsel were motivated to veer off course and pursue a

legislative option; (3) it gives primary consideration to the results obtained by counsel, which is

consistent with the weight afforded by the Johnson factors in assessing whether a fee is

reasonable; (4) a lodestar approach, using hourly rates and expenditures as the starting point,

would lead to a spurious result, since there is little correlation in this case between hours spent

and results obtained, or between the quality and effectiveness of representation and the results

obtained.

---

[7]  In Gottlieb, the Tenth Circuit held that the district court abused its discretion in rejecting
the special master's selection of the percentage fee method in favor of the lodestar method, and
approved the 22.5% selected by the master as "well within the range of permissible fee awards,
and . . . reasonable in this case."  43 F.3d at 487-88.

Therefore, recognizing the trend toward use of the percentage fee method in common fund cases, the circumstances unique to this case, and the mandate that awards of attorneys' fees by federal courts in common fund cases be reasonable under the circumstances, I will utilize the percentage fee method based on the <u>Johnson</u> factors (i.e., the "hybrid" approach).

McCallion and Mackell filed a joint application for fees (Doc. 267) which includes affidavits and timesheets for both attorneys.  Mackell also filed a separate application (Doc. 268) which contains the same information contained in Doc. 267.  In addition, McCallion and Mackell jointly filed a post-hearing pleading containing proposed findings of fact and conclusions of law (Doc. 303).  Because these proposed findings and conclusions were submitted jointly, there is no reason to consider Mackell's application separately under the <u>Johnson</u> factors, except where the Court finds separate analysis necessary.  Biedscheid's application will be considered separately.

## I.      Attorney Fee Request of McCallion and Mackell

Neither of the initial fee applications of McCallion and Mackell (Docs. 267 and 268) offered a legal basis under the <u>Johnson</u> factors to support the request for fees.  Within their proposed findings of fact and conclusions of law submitted post-hearing (Doc. 303), McCallion and Mackell have provided some basis on which the Court may consider the appropriateness of a fee award, but the pleading is organized so that the Court is left with the daunting task of determining  which of the 134 proposed findings (on thirty-six pages) corresponds to which of the <u>Johnson</u> factors.[8]

---

[8] For example, under a "summary of proposed finding of fact," former counsel state that they were the first counsel to include a proposed $10 million appropriation in a draft of the proposed legislation.  Doc. 303, Fact No. 123.  The Court is left to figure out which <u>Johnson</u> factor relates to this fact.

A.    First Johnson Factor - Time and Labor Involved

The first Johnson factor is the time and labor required as the Johnson court explained:

> The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities.  If more than one attorney is involved, the possibility of duplication of effort, along with the proper utilization of time should be scrutinized.  The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted.  It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available.  Such non-legal work may command a lesser rate.  Its dollar value is not enhanced just because a lawyer does it.

488 F.2d at 717.

1.    McCallion

McCallion seeks attorneys' fees in the amount of $51,534.50 for 190.35 hours of work, at a $320 hourly rate.  The timesheets include work done by H.Rajan Sharma, a senior associate in the firm, billing at $250/hour, and by Susan Wallace Hynes, Executive Director of the firm who served as senior litigation assistant and researcher.

McCallion contends that he underbilled for his services on this case.  See, Doc. 303 (Former Counsel's Post Hearing Proposed Findings of Fact and Conclusions of Law in Support of Attorneys' Fees Application),Wallace Affidavit.   For example, McCallion claims that his timesheets do not include conversations with Stan Smith and Smith's staff regarding the economic valuation of the acreage allegedly taken from the homesteaders.   The KMK firm, on the other hand, billed a considerable amount of time for review of the Smith report.  See, discussion of the eighth Johnson factor, below.  McCallion claims, through Wallace's Affidavit, that he did not bill for conversations McCallion had with attorneys from KMK during the transition period, or with

other attorneys and staff members at McCallion's firm.  Wallace Aff. at ¶¶ 3-6.[9]   KMK included

these types of conversations and conferences in the timesheets supporting KMK's request for

fees.

McCallion billed for time drafting and revising discovery requests, some legal research,

and telephone conferences with his clients, counsel for the Government and with co-counsel.  This

time appears to have been necessary for the tasks completed and does not reflect unnecessary

duplication among staff or attorneys at McCallion's firm.  In fact, most of the legal research was

done by Mr. Sharma, an associate who was billing at a lower rate than McCallion, although

Sharma's rate of $250.00 per hour is still a very high rate by New Mexico standards.

However, McCallion included time for types of labor that should not be reimbursed

because it was duplicative of efforts that had been expended in the initial case (00-CV-60) that

was filed by Gallegos and Gross.  For instance, McCallion spent over 30 hours drafting the

complaint in 01-CV-588, which was substantially identical to the claims raised in 00-CV-60 which

had been filed by Gallegos and Gross.  Doc. 254, Gross Aff, par. 21.  The Court also agrees with

Class Counsel that McCallion should not expect to be reimbursed for time spent in preparing,

revising and filing the motion to withdraw from 00-CV-588.[10]  McCallion's time submissions are

reasonable in part under the first <u>Johnson</u> factor.

_____

[9]  This representation is not entirely accurate – e.g., entries for 12/12/00 & 8/10/01 are
telephone calls with Mackell.  Doc. 267, McCallion Aff., Ex. C.

[10]  The Court, however, cannot ignore that the Gallegos Law Firm included in their
timesheets the considerable time spent in drafting and revising their own motion to withdraw from
representing the Association.  Doc. 255, Gallegos Aff., Appendix H-2, entries for 4/1/00, 4/19/00,
4/20/00, 4/21/00, 4/25/00, 5/1/00, 5/4/00, 5/5/00, 6/5/00, 6/6/00.

2.    *Mackell*

Mackell seeks court authorization for attorney compensation based on her claim of 896.6 hours at the rate of $295.00 per hour for $264,497.00 in attorney's fees plus $19,341.34 in New Mexico gross receipts tax for a total award of $283,838.34.  See Doc. 267.

Mackell's time records are replete with entries such as research of legal issues, review and organization of documents, research of historical publications, and organization and preparation of genealogies.[11]  While there is no question that a certain amount of attorney time in this type of case is mandated, the Court is of the opinion that a significant amount of time Mackell claims she spent in this case involved investigation, clerical work and compilation of facts that could have been accomplished by non-lawyers at a rate significantly less than $295.00 an hour.  The Court finds the testimony of Gonzales to be very credible on this point.  In addition to serving as secretary for the Homesteader Association, Gonzales is an electrical engineer by professional training with prior work experience as an information systems engineer and an engineer for Sandia National Laboratories.  Gonzales testified that she created a computer data base where there was a family tree for every tract of land involved in this litigation and that the family tree was used to identify family members from the original homesteaders and successive generations as far as information was able to be obtained.  Gonzales also testified about her frustration in having to continually provide Mackell with information that Mackell kept misplacing or losing and the Court finds this testimony to be credible.

The Court finds that under the first Johnson factor (time and labor required), a substantial

_____

[11]  According to Mackell's time records, Mackell devoted almost 150 hours to work related to genealogy research and compilation, and about 130 hours to what appears to be review and organization of records.

amount of time billed at $295.00 an hour could have been performed cheaper and more efficiently

if Gonzales or someone such as a paralegal had performed the work.  At a minimum, the first

<u>Johnson</u> factor requires a significant reduction in the hourly rate charged by Mackell as well as the

amount of time billed by Mackell.

Further, there is some question as to the necessity of the work Mackell did perform.

Mackell testified at the hearing that she received a letter from Gallegos informing her that he had

hired a genealogist for purposes of preparing to send notices to the class members.  (TR.116,

205).  While Mackell speaks of the animosity among the Plaintiff groups (the Association

members, the Board and individual Plaintiffs) which would have prevented cooperation and

sharing of information between Class Counsel and Former Counsel, Mackell did not explain why

she did not respond to Gallegos' letter, or why she did not think it helpful to approach her clients

regarding the financial incentives of sharing at least the genealogy information Gallegos had

initiated.  For this reason, under the first <u>Johnson</u> factor, Mackell is not entitled to reimbursement

for the entire 896.6 hours of work.

B.     <u>The Second Johnson Factor - Novelty & Difficulty of the Questions</u>

Under <u>Johnson</u>, a lawyer should not be penalized for undertaking a case that requires a

greater expenditure of time, even where the lawyer's investment of time could benefit the lawyer

in a subsequent case.  At the April 25, 2005 Fairness Hearing (Doc. 265, Tr. at 29), I stated that I

thought that the Government would have ultimately prevailed on summary judgment on the

statute of limitations defense, especially considering the Tenth Circuit's opinion in <u>Pajarito Plateau</u>

<u>Homesteaders, Inc. v. U.S.</u>, 346 F.3d 983 (10th Cir. 2003).  The difficulty of prevailing in the

case on the merits was only one of the difficulties faced by all counsel in this case.  There were

issues with respect to confirming authenticity of conveyances and ownership which occurred

many years ago.  Moreover, considering that factual allegations giving rise to Plaintiffs' claims

occurred around 1943 and nearly all of the original homesteaders are now deceased, Plaintiffs

were confronted with major problems in terms of proving their claims at trial assuming they

survived summary judgment.  A legislative resolution was a novel approach to resolving Plaintiffs'

claims, but it had its own peculiar complications and required working on another level with

legislative staff to make it work.

The Court recognizes the complexity of the issues related to this case, but also takes into

consideration that much of the legwork and framework for the genealogy product was due to

Gonzales, and not to McCallion or Mackell.  While McCallion and Mackell accepted the

challenge of a novel and difficult case, the majority of the work done on the only viable avenue

(the legislative route) was initiated and completed for the most part by Class Counsel.  For this

reason, the second <u>Johnson</u> factor weighs against awarding the full amount of fees requested by

Mackell and McCallion.

C.      <u>The Third, Ninth and Eleventh Johnson Factors</u>

The Court combines the analysis of the third <u>Johnson</u> factor with the ninth and eleventh

factors:  The skill requisite to perform the legal service properly; the experience, reputation and

ability of the attorneys; and the nature and length of the professional relationship with the client.

As previously noted, in New Mexico the hourly rate of $295.00 which Mackell has

submitted is a high rate and reserved for attorneys who have considerable experience in particular

areas of the law such as civil rights litigation.  Based on the testimony of Mackell at the fee

application hearing, the Court finds that around the time she became involved in this litigation, her

litigation experience was primarily in the area of criminal law.  In answer to the question of Mackell's billing rate back in 2000, she testified that she did not have a specific rate because she was largely doing client development.  When asked about the basis for the $295.00 hourly rate, Mackell examined what Gallegos and other attorneys were charging and arrived at the hourly rate of $295.00.  TR. 126-27.

Mackell also testified that the instant case was her first experience in class action litigation. Considering that the instant case was Mackell's first foray into class action litigation and that prior to Mackell's involvement in the instant case, her litigation experience was in the area of criminal law, and also considering that in 2000 she was primarily doing client development work, $295.00 an hour for Mackell's time is not a reasonable hourly rate considering the third and ninth <u>Johnson</u> factors.  Although the Court is not required to determine a reasonable hourly rate for Mackell when utilizing the percentage method, the Court believes an hourly rate in the range of $100.00 to $125.00 would have been reasonable for Mackell, considering her experience (or lack thereof) in class action litigation.

However, McCallion's ability and experience in the legal areas of land valuation and human rights, including the Exxon Valdez case, would command for McCallion a higher hourly rate than Mackell, and would thus be more reasonable under the same <u>Johnson</u> factors even though higher than the usual customary fee in this locale.  <u>See</u>, TR. 15-17.  Although McCallion did not set forth in detail his prior professional experience, he testified at the hearing regarding his prior professional experience and based on this testimony, I find McCallion's hourly rate of $320.00 to be reasonable.

Regarding the eleventh <u>Johnson</u> factor (nature and length of professional relationship with

26

the client): the dissension among the various Plaintiffs' groups created a rocky road for all counsel involved.  The details of this relationship have been set forth in Former Counsel's briefs and proposed findings, and the Court acknowledges the difficulty McCallion and Mackell experienced during the two years they represented the Homesteaders Association.

D.     Fourth and Fifth Johnson Factors

Neither McCallion nor Mackell has presented the Court with any information regarding whether or how other available business was foreclosed by this case, or how their rate of compensation lines up with rates for similar work in the community.  Since neither McCallion nor Mackell have presented any evidence or offered the Court any guidance on this particular factor, the Court has nothing to consider regarding the fourth and fifth Johnson factors.

E.     Sixth Johnson Factor - Whether Fee is Fixed or Contingent

As evidenced by a retainer agreement between the Homesteader Plaintiffs (Doc. 267 , Mackell Aff., ¶ 5 & Ex. A), McCallion and Mackell initially undertook representation in this matter under a contingent fee arrangement and, therefore, assumed the risks associated with contingency fee cases.  The agreement provides that any attorney compensation shall be equal to 30% of the value of whatever money, property, rights of use and economic benefits of any kind obtained on behalf of clients, plus applicable gross receipts taxes.  Thus, based on this arrangement McCallion and Mackell had the expectation of a fee award greater than what they would be reimbursed on either a fixed rate or a lodestar amount.

F.     Seventh Johnson Factor - Time Limitations Imposed by Client or Circumstances

I make no findings under this factor, with no proposed findings or legal basis for such submitted by McCallion or Mackell.

G.     Eighth Factor: The Amount Involved and the Results Obtained

The ninth Johnson factor - - the amount involved and the results obtained - - may be given

greater weight when the trial judge determines that the recovery was highly contingent and that

the efforts of counsel were instrumental in realizing recovery on behalf of the class." Brown, 838

F.2d at 456.[12]

The Court finds and concludes that the recovery in this case was highly contingent and the

only counsel that should be paid out of the settlement fund should be counsel who were

instrumental in realizing the recovery.

1.     *Results Obtained*

Class Counsel reject the notion that McCallion and Mackell are entitled to any fees

because they did nothing to advance the legislation and even caused delay during the time they

represented the Association.  TR. 226.  The Court has reviewed numerous documents and

pleadings (beginning from the first Class Counsel fee applications, responses; Former Counsel's

applications for fees and Class Counsel's responses to those; pre-hearing proposed findings and

conclusions, post-hearing proposed findings (or trial briefs) from all parties, and exhibits attached

to the same).  The Court finds that former counsel contributed little *directly* to the advancement

of the final legislation.  At the same time, in the interest of fairness the Court believes that Former

Counsel should be reimbursed for what can be recognized as labor invested which ultimately

contributed to the passage of the Act.

Former Counsel attribute much of the difficulties in trying to pursue a legislative

---

[12]   The Court believes the use of the word "ninth" in the quoted portion of the Tenth
Circuit's opinion is a typographical error as the eighth Johnson factor is the amount involved and
the results obtained.  See  Brown, 838 F.2d at 455.

resolution to Gutierrez and his refusal to allow the Board to approve a legislative resolution, as well as the Association members' inability to agree on a common course because of different views and personality issues. McCallion and Mackell point to the fact that only weeks after Gutierrez stepped down as Board President, the proposed bill was finalized, introduced and approved. TR. 241.

Yet Gonzales testified that it wasn't the removal of Gutierrez that caused the Association to agree on a legislative resolution; it was KMK providing the Association members with a full legal analysis of the claims raised in the litigation and answering questions which in turn, caused the Plaintiffs (the Board and Association members) to come together as a group supporting the legislative process.   The Court has no reason to doubt or discount Gonzales' representations and testimony.  At the same time, I find that while Gutierrez' role as Board President may not have been the only cause for delay in progress, it certainly was a significant factor.  Gallegos conceded that he experienced the same difficulties when he and Gross represented the Association in the case and remembered that Gutierrez did not want to follow through with the legislation. Gutierrez' attitude created a condition under which Gallegos and Gross could not operate, and which forced them to withdraw from the case.  TR 201, 227, 228, 29, Ex. G, ¶ 43.

As mentioned above, KMK takes credit for the change in Board leadership, while Gonzales' testimony describes Gutierrez as voluntarily resigning so that the Association members could pursue a legislative resolution.  TR 165.  Class Counsel emphasizes that Gutierrez was not removed *because* he opposed a legislative resolution, and that after Gutierrez stepped down, he assisted in the group effort to obtain a legislative resolution.  However, it is undisputed that before Gutierrez resigned or was removed, he was opposed to a legislative resolution.

Gutierrez's resignation/removal happened as a direct result of his writing the article about the Senators. It cannot be denied that the change in Board leadership was fortuitous for KMK.

Gallegos criticized McCallion and Mackell for remaining in the case almost two years before deciding to request withdrawal, in contrast to the three months it took for Gallegos and Gross to do the same. The Court finds some merit in the contention that McCallion and Mackell remaining as counsel for the Association long after the impasse with Gutierrez and the Board certainly prolonged the process of achieving a legislative resolution given that the litigation strategy was doomed to certain failure. However, I find that it would be unduly harsh to place the entire blame for delay of the legislative process on Former Counsel during the time they represented the Association, given that Gallegos and Gross experienced the same difficulties with Gutierrez and the Association. Moreover, the Court does not view the time period during which Former Counsel represented the Association as a total loss. When KMK entered the case, McCallion and Mackell spent time discussing the case (time which KMK included in their timesheets) and turning over information which they felt would be useful. TR 39.

Class Counsel blames Former Counsel's involvement in the 01-CV-1166 (the "slavery case") for additional delay in the legislative process. This is not altogether accurate, based on the record. It is true that the Senators required all Plaintiffs to agree on a legislative resolution as a condition for carrying legislation to create the Fund. It is also true that Gallegos and Gross withdrew from representing the Association shortly after irreconcilable conflicts arose, while the case languished for approximately two years under Former Counsel's representation until December 2002, when Utter and Buck entered an appearance. However, after 01-CV-1166 was filed in October, 2001, other factors came into play which impeded the case's progress: the

30

aftermath of September 11, 2001, as well as the November 2001 Congressional anthrax scare.

TR. 213-14.  Also, the diminishing interest of the senators to stay involved was due in large part

to Gutierrez' insulting article that was published in the newspaper   Doc. 254, Gross. Aff, ¶ 26.

Former Counsel certainly had no control or involvement with this incident, which happened

during the first few months of KMK's representation.

While I find that McCallion and Mackell are entitled to some reimbursement for the legal

services rendered over a two-year period of representation, I also recognize that the motivation

and momentum for the realization of the Act and ultimately the Fund was the hard work of Class

Counsel, and the relationship Gallegos and Gross had with the Senators, especially Gallegos'

longstanding relationship with Senator Domenici.

McCallion and Mackell did meet with legislative staff several times (e.g., September 5,

2001 and March 11, 2002), but the legislative groundwork had already been laid by Gallegos and

Gross.  Class Counsel (Gallegos in particular) first initiated efforts toward a legislation resolution,

and kept alive the legislative process during the period in which McCallion and Mackell

represented the Association but were not allowed to either cooperate with Gallegos and Gross or

fully pursue the legislative option.  It was also Class Counsel (KMK in particular) who then

moved forward quickly after McCallion and Mackell withdrew representation.  See, Lyons Aff.

(Doc. 266).

Despite the considerable obstacle posed by Gutierrez' reluctance to abandon litigation of

Plaintiffs' claims, Utter and Buck still had to deal with Gutierrez as President for about three

months after KMK began their representation of the Association in December 2002.   The record

indicates that KMK was able to deliver the information that had been requested by the

Association in such a manner, both in terms of timeliness and presentation, which finally

convinced the Plaintiffs to come together on the legislative approach -- information which had not

been provided by McCallion and Mackell.  TR 157-58.[13]  McCallion and Mackell put some of the

blame for their inability to present the Association members with this information on the fact that

the Government had not complied with their discovery requests for certain information until after

they had withdrawn as counsel.  TR. 170-71, 187.  The record does not explain whether the

Government provided responses to discovery requests by sheer coincidence at the exact time

KMK entered an appearance or whether as a result of some action taken by KMK.

       Former Counsel argue that the delay in obtaining discovery information was due to the

fact that much of the requested information was in archives.  Doc. 303, ¶ 121.  McCallion and

Mackell did make discovery requests of the Government which may have been included in the

documents used by KMK for its presentation in Santa Fe to the Association members.  See, Doc.

267 (Former Counsels' Application for Fees, McCallion Aff., Ex. C, entries for 7/17/02 and

7/19/02).  However, it is evident to the Court that KMK's successful presentation of a legal

analysis of the Association members' claims was due to Utter's and Buck's diligent and focused

preparation, long-range planning and intensive research, more than the fortuitous arrival of

archived material.  See, e.g., Utter Aff., Ex. C, Part 2, entries for 8/15/03 to 8/20/03.

---

    [13]  Beth Gonzales testified that within two to three months after coming on board,  KMK
attorneys "were able to identify every single parcel that was transferred to the government, and
they were able to identify that payment was received."   The information was presented to the
Association members at a meeting using an overhead projector and showed the Plaintiffs "why
our case was very different from the White Sands case and why their land was taken in a different
manner and why we couldn't use the same approach."  TR. 171-72.

2.    *Amount Involved*

Former Counsel contend that they were responsible for drafting legislation proposing the $10 million appropriation that was eventually inserted in the Act, and in securing an appraisal from Stan Smith that supported the "enhanced" appropriation.  Former Counsel point to the March 2002 legislative draft that changed the $6.7 million amount proposed by Gallegos and Gross to $10 million.  It is true that the March 2002 legislative draft by McCallion and Mackell was the first draft to contain the $10 million figure.  However, the record is quite clear that Gallegos and Gross envisioned a $5 to $10 million range in their earliest conversations with Senator Domenici in January 2000 and this range was firmed up as a possible working figure in January 2001 based on a conversation between Pete Lyons and Gallegos for a bill that was being drafted for the spring of 2001. (Ex. D, TR 205-07).  Further, the $10 million presented by Former Counsel was based on a "cultural component" requesting that 20 acres be set aside for a historical and cultural museum for the Homesteader peoples -- a proposal which Congress ultimately rejected.  TR 30-31, 84-85.  At the hearing, Gallegos and Gross stated that they were not aware of any proposed legislative bills drafted by Former Counsel.  TR 220.

Gallogos testified that McCallion had suggested to him at some point that $6.7 was inadequate and that the amount should be enhanced.  However, Gallegos recognized that whatever figure was inserted in the bill needed to be rationally supported and that they "couldn't pluck a figure out of the air because we like 8 million or 10 million."  TR 240.  Further, the dollar figure was not the deal breaker for the passage of the legislation.   Funding of the bill was separate from the legislation itself: the legislation was included in the Defense Authorization Act, and then reenacted in the omnibus appropriation bill and signed by President Bush.  TR. 225.

Former Counsel stresses the importance of the Stan Smith report in arriving at the $10 million amount. The Smith appraisal came in at $58 million, based on a concept of expanded rental value calculation. This damage amount was rejected by Senators Domenici and Bingaman. The Smith appraisal was afforded little regard by the Senators and their staffs, and was not relied on at all in the legislative proposals. At the hearing, Gallegos referred to the report as a "joke." TR 225. Utter stated that he had spent time reviewing the report "trying to make it work in some fashion" only because their clients had spent $3,500.00 of their money for the report. TR. 94.

Yet Class Counsel did find some use for the Smith report. Gallegos admitted that he was interested in the acreage number Smith used in the appraisal calculations. The different acreage figure upgraded the $6.7 million amount to over $8 million, which then justified Class Counsel requesting that the bill should be for $10 million. TR. 224-25.

Under the eighth Johnson factor, I conclude that Former Counsel were not directly responsible for advancing the legislation, and that the legislative process was delayed while they represented the Association. However, I also find that the delay and lack of success was partially due to dissension, friction and lack of agreement among the Plaintiffs themselves. I find that it would be unfair to characterize Former Counsel's work as totally worthless when KMK's timesheets include entries for considerable time spent meeting with and discussing the case with McCallion and Mackell, and reviewing boxes of documents which McCallion and Mackell transferred to KMK's offices. Utter Aff., Ex. C: e.g., entries for 11/26/02, 12/10/02, 12/11/02, 12/12/02, 12/17/02, 12/18/02, 12/26/02, 12/27/02 & 2/06/03.[14]   It is not plausible to expect that

---

[14]  Attaching a dollar value to the timesheet entries is not possible, since the entries relating to the Stan Smith report (and entries involving review of documents sent to KMK by Former Counsel) are combined with other tasks completed by KMK.

KMK derived no benefit at all from the discussions and meetings with Former Counsel – if nothing else, KMK could approach the Association members with the benefit of Former Counsel's hindsight.

Similarly, Utter and Buck spent considerable time in review and discussion of the Smith report (including discussions with Stan Smith, <u>see</u>, Utter Aff., Ex. 1, e.g., entries for 1/29/03, 2/04/03, 2/06/03, 2/07/03, 2/19/03, 2/20/03, 2/26/03, 3/05/03, 3/06/03 [two entries, a review and telephone conference], 3/20/03, 3/25/03).  The same report which Class Counsel describes as ineffective and worthless apparently continued to be a point of discussion and consideration as late as January 21, 2004, according to KMK's timesheets.  Utter Aff., Ex. C, Parts I & II.  The record indicates that it was of some use, certainly having a role in developing the final acreage number for Plaintiffs' claims, which in turn supported a larger appropriation amount.  However, I do believe that Smith's $58 million appraisal based on some concept of expanded rental value is essentially a "pie in the sky" damage claim that did little to impress the Senators and members of their staffs.

I conclude that McCallion and Mackell did make some contribution to the passage of the bill.  They shared with Class Counsel the results of a two-year effort trying to bring together splintered factions of the Association and its members, while trying to pursue the legislation route separately – although not successfully.  They generated the Smith report, which contributed to the specific acreage amount which was reflected in the increase to the final appropriation amount for the Act. McCallion and Mackell should be partially reimbursed to reflect these contributions.

H.       <u>Tenth Johnson Factor - Undesirability of the Case</u>

Although nothing specific is presented by McCallion or Mackell on this <u>Johnson</u> factor,

35

the Court is aware of the personalities and disagreements causing dissension among the Association and its members and difficulty in moving the case to resolution, on either the litigation or legislative courses -- as evidenced by the withdrawals of both Gallegos and Gross early on, and later, by McCallion and Mackell.  This factor weighs in Former Counsel's favor.

I.     Twelfth Johnson Factor - Award in Similar Cases

Former counsel have not apprised the Court of information relating to this factor, and thus, it will not be considered.

**II.     Attorney Fee Request of Beidscheid**

Beidscheid requests $17,415.00 for 126.80 hours of legal services, at an hourly rate of $137.34 and $240.20 in expenses, excluding gross receipts tax on fees and expenses. Beidscheid's firm was retained as local counsel by McCallion and Mackell on a contingent fee basis.  The agreement was that compensation between the attorneys would be divided on a pro rata basis based upon the number of hours worked by each firm which would also receive reimbursement for costs and expenses.

Beidscheid has submitted time sheets, see Doc. 269, Ex. A, but does not include an analysis of the Johnson factors in support of his firm's request for a fee award, in any of the pleadings submitted to the Court:  Docs. 269 (Application and Claim for Award of Attorney Fees and Reimbursement of Costs), Doc. 297 (Requested Findings of Fact and Conclusions of Law), Doc. 302 (Closing Memorandum).   The Court will therefore consider the only Johnson factors which relate to the content of Beidscheid's pleading -- the first and eighth Johnson factors: time and labor involved, and the amount involved and results obtained.

Although Beidscheid entered appearances in both 01-CV-588 and 01-CV-1166 (the

"slavery case"), his work focused mostly on 01-CV-1166.   Both cases were already filed when he

entered the cases.   At the hearing, Beidscheid stated that the sixteen depositions taken were

noticed in 01-CV-1166, which he contends had common issues of fact with the takings claims in

01-CV-588 and 00-CV-60.   Beidscheid actually took only two depositions for 00-CV-60, and

defended the remaining fourteen.[15]

Beidscheid believes that his time and labor connected with the two cases made Plaintiffs

more amenable to the prospect of a legislative resolution and to Class Counsel's advice.   TR. 141.

His timesheets reflect active cooperation with co-counsel Mackell and McCallion, and efforts to

move the case toward settlement.   Doc. 269, Ex. A (e.g., entries for 8/9/02, 8/15/02, 8/26/02).

Although there is no way to be certain how his participation in the cases led to Plaintiffs'

willingness to reach a settlement, the Court is satisfied that Beidscheid's efforts played a small

part in the final legislative result.

## III.    Awards for Fees and Expenses

The Court's award of fees are based on the above findings and conclusions.   As stated

above, Mackell requests a total award of $283,838.34 ($264,497 plus $19,341.34 gross receipts

tax), McCallion requests an award of $51,534.50 and Beidscheid requests an award of

$17,415.00, plus $240.20 in expenses.   Given the value and results obtained by McCallion, the

Court will award him the bulk of his requested fees.   Given the Court's analysis regarding the

work performed by Mackell and the results obtained, Mackel's award will be substantially less.

Beidscheid's award will reflect the fact that his representation concerned mainly 01-CV-1166.

---

[15]   The minutes to the hearing indicate that Beidscheid testified that he defended *twelve*
depositions and took two, but his closing memorandum states that sixteen depositions were taken
in all.   Doc. 300 at 6; Doc. 302, ¶ 6.

Utilizing the percentage fee method based on the <u>Johnson</u> factors and the law applicable to the Common Fund Doctrine, I find and conclude that Former Counsel and Beidsheid are entitled to 5% of the $2 million which Congress has set aside for attorney fees, as follows:

(1)     Mackell is entitled to **$55,000** as a fee award;

(2)     McCallion is entitled to **$40,000** as a fee award; and

(3)     Beidscheid is entitled to **$5,000** as a fee award.

To the extent that any of the fee awards to Former Counsel and Beidsheid are subject to New Mexico gross receipts tax or any other type of tax, such taxes shall be paid by Former Counsel and Beidsheid out of the fee awards authorized by the Court.  Any requested expenses shall likewise be paid out of the fee awards.

## III.     PROCESS FOR EXECUTION OF CHARGING LIENS

As a result of the Court's findings and conclusions on the issue of attorney fee awards, Former Counsel will not be receiving Court authorization for full reimbursement of fees, expenses and costs from the Fund.

However, McCallion and Mackell have filed with the Court a Notice of a Charging Lien against the funds recovered by Plaintiffs pursuant to the Act.  Doc. 296.[16]  The Court's findings and conclusions regarding an award of fees to Former Counsel from the Fund does not affect any

---

[16]  Gallegos and Gross had initially asserted a charging lien after withdrawal from representation of the Association, but withdrew the lien when they reentered the case representing individual plaintiffs.  Ex. 3.  It appears that KMK has expressly waived any right to recover an award of fees, expenses or costs other than that which the Court awards KMK from the Common Fund ("Any fees and reimbursement of expenses will be limited to such amounts as may be awarded by this Court").  Doc. 248, Utter Aff., ¶ 12.  Beidscheid stated on behalf of his firm that he was not asserting a charging lien outside of any award the Court would authorize from the Fund.  TR. 128.

private contract rights Former Counsel has with their former clients, nor do these private contract rights have any affect on Plaintiffs who were not clients of McCallion and Mackell.

At present, the Special Master assigned to the case, the Honorable Joseph E. Caldwell, is initiating the claims procedure which will govern the process of distributing the funds set aside in the Act to the Plaintiffs, and which has been filed with the Court.  Doc. 271, Exs. 1 & 2.

The Court sets out the following procedure specifically related to the existence of charging liens in this case, in order to allow for the efficient disbursement of proceeds from the Common Fund while at the same time providing a reserve so that Former Counsel who wish to assert the liens against funds going to former clients may do so.

(1)     Former Counsel shall inform the Special Master within thirty days from the date of entry of this Memorandum Opinion and Order whether they desire to proceed with executing a charging lien against a former client(s);

(2)     Former Counsel wishing to proceed on a charging lien must also provide the Special Master with a copy of the fee agreement which forms the basis for the charging lien;

(3)     On disbursement, the Special Master has options he may follow: (a) to distribute to those Plaintiffs against whom a charging lien is filed, all but 30% of the funds allocated to those plaintiffs, which 30% shall be reserved in the Court Registry or other suitable account designated for that purpose;

(4)     In order to more efficiently proceed with the general disbursements, a Magistrate Judge will be assigned to coordinate with the Special Master this disbursement procedure for those Plaintiffs against whom charging liens have been asserted and who wish to contest the validity of any claimed charging liens.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE