IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSE E. GONZALES, PETER E. GOMEZ,
EMELINA GRANT, TERESITA GARCIA
MARTINEZ and MARIA ERNESTINA
MONTOYA,

        Plaintiffs,

                                No. 00-CV-60 WPJ/RS ACE

      v.

UNITED STATES OF AMERICA, and BILL
RICHARDSON, Secretary of the
DEPARTMENT OF ENERGY,

        Defendants.

_____

PAJARITO PLATEAU HOMESTEADERS, INC.,

        Plaintiffs,

                               No. 01-CV-588 MCA/RLP ACE

      v.

UNITED STATES OF AMERICA, et al.

        Defendants.

SPECIAL MASTER'S  INITIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Claims Resolution Procedure approved by the Court in the

Statement of Terms and Conditions of Voluntary Dismissal, and consistent with the

Pajarito Plateau Homesteaders Compensation Act (Public Law 108-375, Sec. 3147),

hereinafter, "The Legislation"), the Special Master hereby submits his Initial Findings of

Fact and Conclusions of Law for the Court's approval.

## I. PRELIMINARY CONCLUSIONS ABOUT THE APPLICATION OF ORDERS OF THE COURT OR THE LEGISLATION IN THIS SETTLEMENT PROCEDURE

### A.  FUND AMOUNTS AVAILABLE FOR PAYMENT

The Fund created by the legislation consists of ten million dollars ($10,000,000.00), reserving therefrom, the amount of two million dollars ($2,000,000.00), representing the percentage set aside for the payment of any possible attorney's fees (20%). An additional two per cent (2%) was reserved for any possible attorney's expenses in the case.  The Special Master's fees and expenses are to be paid from the remainder of the fund, and the remainder is available for distribution. During the period from the fund's creation, the fund has earned interest, which, by the legislation is available to increase all of the fund for payment of fees, expenses and for distribution calculations.  The Special Master is to determine the amount available from which the distribution formula could be calculated, based upon his estimation of the time and expense required to completely resolve this case.   In determining the amount to designate, the following factors were considered:

**1)  Claims procedure-**  The claims procedure provided for two payments.   In order to expidite payments, the first award would be made to all undisputed tracts based upon a calculation by the Special Master of funds available for distribution giving due regard for a reserve required to meet any fees or expenses which may be due.  A second would be made at the close of the case, when all fees and expenses are determined, all litigation is finalized, and all of the interest earned is calculated.  This procedure provides that the first distribution would be the substantially the entire award to be received by the claimants, for which they would file a Release and Disclaimer of any claims against the United States Government for the taking of property acquired during World War II.

**2) Attorney's fees and expenses-** The Legislation provided that the amounts calculated for distribution could not awarded until attorney's fees and expenses were determined.   Since all of the attorney's fees and expenses could not be calculated until all of the cases were resolved, and since most of the cases were undisputed, this language has been interpreted to mean that initial award amounts could not be determined until the amount of attorney's fees to be awarded to past legal

representatives was determined, at which time an initial award would be made to all undisputed tract claimants, reserving the totality of attorney's fees and expenses for present class counsel until such time as all cases were resolved.

In a previous order, the Court had awarded the amount of $1,000,000.00 to present Class Counsel as a partial award of Attorney's fees.  On March 13, 2006, the Court entered its order resolving the issue of attorney's fees for past legal representatives, providing for an award from the fund to past counsel of a total of $100,000.00, and further providing that any charging liens under private contract by past counsel would be resolved by a special procedure, assigning a Magistrate for the resolution of any private claims. Since the total amount of attorney's fees is limited to twenty per cent of the fund and expenses to an additional two per cent of the fund, providing for a reserve available to satisfy any attorney's charging lean in this case will allow the first payment to be made directly to the claimants without restriction.  The second and final payment may be subject to a lien, in the event that it is asserted.  Only the past legal representatives, and not present class counsel have claimed the right to assert a charging lien.

3) **Status of the claims procedure for determining Special Master's fees and expenses-**At the time of making these Findings and Conclusions, the Special Master has conducted hearings in all of the cases which were claimed as disputed.  At the time that the hearings began, of the thirty-three tracts involved in this case, sixteen were undisputed and seventeen were disputed, according to the responses received by the Special Master during the dispute period.

4) The hearings resolved any disputed issues as to all but four of these tracts, Tract A13, B18, E9 and E24.  All of the remaining cases are undisputed. Approximately three quarters of all work and expense required by the Special Master in this case has been concluded at the time of making these findings.

Based upon these factors, the Special Master designates an amount of seven million eight hundred thousand dollars ($7,800,000.00) out of which all undisputed claims are to be paid in an initial payment at the time that the court's orders adopting these findings become final as to those tracts.   A second payment, exhausting the fund will be made to all successful claimants once all claims are finalized during any appeals process, all attorney's fees and expenses, special master's fees and expenses, and total interest earned are calculated.

3

**B.  FORMULA FOR PAYMENT**

The formula used for payment is:

The value of the award (V) equals the amount that the fraction that an individual claimant's share represents of the total number of existing shares for each tract based upon the Succession laws of the State of New Mexico (S) of the amount available for distribution (F)  divided by  the total amount of acreage (T) times the amount of acreage for the individual tract (A).  $V = F / T \times A / S$   (the symbol / means divided by).

In the event an eligible claimant does not file a claim, this is considered to be a relinquishment of any claim for compensation.  The shares will be adjusted as the succession laws would provide in the event of such a relinquishment.

As an example, if the amount available for distribution (F) is $7,800,000.00, and the total acres (T) is 2,541.87 acres, the value per acre is $3,068.61. If a tract contains 100 acres (A), the amount to be provided for that tract is $306,861.00. If the original claimant and his spouse are deceased, and left three children, two of whom are living, and one of whom is deceased with no spouse and two living children, the second generation children would receive one third ($102,287.00) each, and the two children of the third generation would receive one half of one third (one sixth), or $51,143.50 each.

Following that example, if one of the third generation children did not file a claim, the third generation child who did file a claim would receive the full one-third share of $102,287.00.

## II.  GENERAL FINDINGS  OF FACT

**A. ELIGIBLE TRACTS**

**1.  Tracts and Acreages**

a) Under section  h3A of the legislation, "…The term 'eligible Tract' means private real property located on the Pajarito Plateau of what is now Los Alamos County, New Mexico, that was acquired by the United States during World War II for use in the Manhattan Project and which is the subject of the consolidated lawsuits."  The most specific reference to determine these tracts and acreages is the Real Estate Los

Alamos Demolition Range Map prepared by the Zia Company for the Atomic Energy Commission, and dated September 9, 1943, known through this litigation as "The Map".

b) This map was used to determine tracts and acreages during the three condemnation lawsuits begun during World War II, and while the legislation resolving these cases was being drafted and enacted.  Therefore it is the primary document for the determination of the tracts and acreages involved in these consolidated cases (with two exceptions discussed below).  This map has been noticed judicially as the basis for determination of tracts, and it is referred to throughout all of the proceedings as "The Map".

c. The outboundaries of the Map were understood to be the limits of the property taken in the three condemnation lawsuits and the limits of the military enclave created by the taking of land for the Manhattan project.  All of the land shown on The Map was located in what was then within Sandoval County, and the area ended on its east side at the Santa Fe County line, which was also the East boundary of the National Forest, when the national forest designation was withdrawn during World War II and the property transferred to the War Department (See references on The Map).

d) Three of the condemnation lawsuits forming the basis of these consolidated cases were filed in 1943, and were:  1. Cause 552, filed May 10, 1943, involving Area A and Grazing Permit leases on Forest Service Land also taken as part of the Zia Project; 2.  Cause 566, filed June 15, 1943;  and 3. Cause 640, filed December 15, 1943.  Declarations of taking and fee simple awards by court order to the United States Government were filed in all of these cases during World War II as to all of the tracts

involved in these cases except one, which was the subject of a fourth condemnation case.

e) The fourth case, Civil Cause 1399, was filed on October 7, 1948, and involved two tracts, Tract I, of 18.63 acres, more or less, and Tract II, of 35.70 acres, more or less, totaling 54.33 acres.  For reasons set forth in specific findings and conclusions below as to these tracts, these acreages should be considered to have been acquired by the United States Government during World War II, and therefore are included in the total acreage for which the award calculations are to be made.

e) There is also one claim made in the consolidated cases for compensation for the relinquishment of a leasehold grazing permit at (GP7) issued by the United States Forest Service land. The acreage of this grazing permit, for reasons set forth in findings and conclusions specific to that tract, are not included in the acreage calculations in this case.

f) Although The Map was used as a primary document to determine tracts, acreages and owners during the legislative process leading to the Legislation, the specific language of the legislation does not limit any final award to the tracts and acreage on The Map, but to any acreage located "…on the Pajarito Plateau in what is now Los Alamos County acquired by the United States Government during World War II".

g) According to The Map, the total acreage shown is 3,599.70 acres shown on The Map. Tracts totaling 1,112.16 acres are specifically excluded from compensation by The Legislation (the Los Alamos Ranch School's A11A and A11B and Ross Estate's Anchor Ranch Tract B-16). The total acreage available for an award is 2,487.54 acres.

Adding the 54.33 acres from cause 1399, the total acreage upon which calculations would be based is 2,541.87 acres.

 h) Of the acres shown on The Map, Tracts B19A and B19B, totaling sixty acres and adjudicated to Walter V. Grottenthaler in Cause 566, had no claimants at all during this process.

**2. Value per acre-** Dividing the initial award amount of $7,800,000.00 by 2,541.87 acres, the value per acre is $3,068.61, which will be used as the value per acre for this initial award.  Adjustments to this acreage calculation may be made before the second and final payment at the close of this case, if deemed appropriate by the Court.

**3.  Claimants-** The Legislation provides that an eligible claimant is a class member determined by the Court "…by a preponderance of evidence, to be a person or entity who held a fee simple ownership in an eligible tract at the time of its acquisition by the United States during World War II for use in the Manhattan Project, or the heir, successor in interest, assignee, or beneficiary of such a person or entity" (Section 8D). Since none of the original claimants are living any longer, their successors in interest, assignees or beneficiaries who prove their claim by a preponderance of evidence are entitled to an award in this case (Section d).

**5. Applicable laws**  The Legislation provides that the law to be applied will be "…the laws of the State of New Mexico, including the descent and distribution law of the State of New Mexico." (Section d1&2).  New Mexico Succession Law is contained in  Section 45-1-101 *Et. Seq.*, NMSA 1978 Comp.     The Law to be applied to determine the original ownership is New Mexico Property Law, section 47-1-1NMSA 1978 Comp.

**6.  When the right vests -** None of the original landowners are still living.  The descendants of the original owners, by intestate succession or devisees by will of the living original descendants have a right to acquire property as set forth in the succession laws of the State.  This right vests in any such successor in interest at the time the award is to be paid.  It is not the right of a deceased person.   However, to determine a successor, the right must be determined as if the award were available to his or her predecessor at the time of their death.

**7. Filing of claims**  In determining eligible claimants, in the event of a question about whether a claim has been properly or timely filed, leeway has been given in favor of inclusion, rather than exclusion of a claim, so that all legitimate claims can be forever resolved.  There were eligible claimants who, after diligent search could not be located, and did not file claims.  Because the formulas for distribution have already been applied, the time for filing any new claims in this case is closed.

### III. GENERAL CONCLUSIONS AS TO APPLICABLE NEW MEXICO LAW

**A. SUBSTANTIVE LAW**

Having made those conclusions about the law based upon the Litigation, the Legislation and the Claims Procedure adopted, and the general findings as to all cases, there are certain conclusions to be reached about the applicability of New Mexico law which are general to all cases.  They are:

1) Intestate Succession Law controls the determination of heirship of a deceased person who held a right of succession at the time of his or her death, unless a Last Will and Testament exists which changes that result.  Wills which change the result to be reached by the application of intestate succession law and are valid under New Mexico Law will be considered, since this would determine "beneficiaries or successors".  Only Wills or Codicils to Wills to be considered in this case are those that have been submitted for probate within the time limits of Section 45-3-108

NMSA 2005 Comp.   If a will has been submitted to probate and there is a final resolution of that probate, the final order concluding the probate is conclusive as to distribution.  If a will has not been probated within that three year period and that period has passed, the Will is not given any consideration;

B) If a person's death has occurred and the three years provided to probate his or her estate have passed, their heirs or successors in interest who requested an award and who have proved their right to succeed have been listed as awardees. However, if, before the conclusion of this award process the Special Master has received notice of a determination of heirship proceeding filed in a court having jurisdiction over those proceedings, the award will be made to the personal representative of the estate being probated; c)  If a person's death has occurred within three years from the date of the award, the  probate of that person's estate should be initiated in order to determine heirs and the award will be made to the personal representative of the estate of that person;

c)  Claims by spouses of the original landowner's successors who are entitled to an award and who are still living have been excluded entirely, since any right to inherit acquired is a separate property claim, subject to the heirs' decision about distribution;

d)  Children of living parents who are the actual successors in interest to the original landowners have filed claims.  In every one of these many instances, the claims of these children are excluded, since they do not yet have the right to any award;

e)  The rights to succession are the separate (as against community) property of an heir, absent some document modifying the nature of that right (there were none in this case).  If an heir by intestate succession had a living spouse, if that heir predeceased the person in the preceding generation from which he would have received his separate property claim, the spouse is not entitled to any award, all of it going to the children of the deceased heir, absent a will which changed that result.  If the heir survived the person in the preceding generation from whom he or she would have received his separate property claim, but then died, the living spouse (assuming that they are still married), receives one fourth (1/4), and the children divide three fourths (3/4) of the deceased heir's interest.  Divorced ex-spouses at the time of the heir's death are not entitled to any award;

f)  If an heir predeceased the person in the preceding generation from which he would have received his claim, his or her share would be combined with those of all of his or her siblings who also predeceased that person, and then distributed equally among them, proportional to the shares of the siblings who survived that person.  If an heir survived the person in the preceding generation from which he would have received his claim, and then died, all of his or her share is be divided equally among his children unless a spouse should have a right as set forth above;

9

h) There are some quitclaim deeds given after the property had been sold to the United States' Government, which claimants used as the basis for their claim. A quitclaim deed only conveys any interest a person has. Since the grantors had no interest, there was nothing to convey. The purpose of this award is to compensate the original owners or their heirs who claim that they were underpaid in that original taking, not to pay persons who thought they were buying land the seller did not own. All of these claims were excluded.

i) With the exception of a dispute for Tract 18 involving a will contest, the preliminary findings involving the above applications of New Mexico Law have been accepted, and there are no other claimants who have disputed these findings at the close of the dispute notification process. A statement of reasoning in more detail is provided in the findings and conclusions for that particular tract.

j) Issues of ownership at the time of the acquisition only arise in disputed cases, when claimants do not agree about who owned the property at the time of the acquisition by the United States Government. (the others were shown on the Map, in court documents, or ownership was not disputed or was stipulated to). Those principles are discussed in the specific disputed tract findings.

## B.  PROCEDURAL LAW

### 1.  Burden of proof

Both the Legislation (Sec. 8d) and New Mexico Probate and General Civil Law require proof of a fact to be proven by a preponderance of evidence in order for it to be established as a fact. This means that the fact must be found to be more likely true than not true. (N.M. U.J.I. Civ. 13-304).

### 2.  Procedure followed in disputed cases

Section D1. of the claims procedure provides that evidence in disputed cases should be taken "in a manner designed to provide due process to all parties and the presentation of evidence presented…"

The Special Master's charge under the Claims Settlement Procedure does not require the formality of the Federal Rules of Procedure to be followed, but contemplates

a proceeding that, because of the significant number of claims and claimants, will

expedite the case but provide due and fair process to the claimants.  The Special

Master considers that the determination of proof would also not require that the New

Mexico Rules of Procedure be followed.

A great deal of informality was given in the presentation of evidence both before and

during the hearings, with due regard to a claimants' right to prepare and respond to a

case.  This included leaving room to supplement the record when it appeared a

document might provide some insight, with appropriate notice to the opponent and an

opportunity to respond.   The procedure was:

a)  Preliminary findings and conclusions were completed by the Special Master on September 25, 2006.  They were mailed by the Special Master to all claimants, with instructions to notify him that they either a) agreed to the findings and conclusions; b) agreed but a correction was required; or c. disagreed.  All required corrections were made.  All persons disagreeing were notified and the disagreement was resolved, or the eligibility to receive an award for a tract was found to be in dispute;

b) At the close of the period for notifying the Special Master of disputes on January 23, 2006, Notice was sent to the claimants who were involved in those disputed tracts, requiring them to designate representatives at hearings, with a calendar of dates for hearings as to those disputed tracts;

c) Representatives were designated by all disputants, and these representatives were charged with the responsibility or presenting evidence and argument at the hearings, subject to the Special Master's authority to take Judicial Notice of Documents to provide a complete record in the case.  The time for supplementing the record is now closed, except in three cases, A13, E9 and E24, which may require supplemental information and further hearing;

d) At the close of the hearings, under section D4 of the Claims Procedure, the parties had fifteen days in which to file proposed Findings of Fact and Conclusions of Law.  This time period having closed on April 3, 2006 as to the Tracts reported in this document and no proposed findings having been  submitted, these findings and conclusions are submitted within the thirty days required by the procedure as to the those tracts included herein.

**C. EVIDENCE**

The Legislation provides that an original eligible claimant is one who can prove

"…fee simple ownership in an eligible tract…".  It does not restrict the determination

of fee title to the findings in the original condemnation cases.  However, doctrines of

*Res Judicata* or Collateral Estoppel  were considered, and applied where

appropriate. The reasons for doing so are discussed as to each disputed tract in

which that is an issue.

The evidence considered was:

**1.  Testimony-** Ultimately, the New Mexico Rules of Evidence (NMRE 11-101 et seq)

will control the determinations of fact in this case.  However, there are so few persons

living who have a recollection of important events to establish facts in this case, that

statements and documents including substantial hearsay were admitted.  This does not

mean that the hearsay will be ultimately considered as evidence which would not meet

the standards of Article 8 of the rules of evidence, but, for the purpose of these informal

hearings, the presentation of information was substantially relaxed to provide an

understanding of events occurring so long ago.  This testimony was preserved as part of

the record.

**2.  Exhibits-**There were certain exhibits used for every case. Additionally, the claimants

had the opportunity to present documents which they believed would shed light on the

issues.  These exhibits are also part of the record and include those required to

determine:

**a.  Eligible Tracts and acreage:**  Exhibit 1 to the August 31, 2001 hearing, known
throughout these findings as "The Map" was used throughout as the primary
document to determine tracts and acreages in undisputed and disputed cases, and
to establish a basis for initial findings about ownership.  The only deviation from the

use of The Map to determine tracts or acreages involved Tracts I and II of Cause 1399, Tract I being the part of the total acreage included in Tract B1 of Cause 552 as discussed above.

**b. Original Owners:** The Map and the Court documents in the condemnation lawsuits themselves (552, 566, 640 and 1399) were used as evidence of ownership in this case, subject to rebuttal by other instruments demonstrating adverse ownership.  The primary document used to establish court documents in the various condemnation proceedings was the judicially noticed **Special Master's Exhibit (SM Exhibit 1),** which was a large volume of documents provided by the United States Attorney's Office and Class Counsel.  This volume had been prepared by the United States Attorney for earlier dismissal motions in this case, and included the documents from the archives as to all of the cases.  In a few cases, documents were provided by claimants which appeared to be documents that were part of a condemnation lawsuit, but did not appear in SM Exhibit 1.  In all of those cases, the documents were admitted as if they were part of that lawsuit, when it appeared that they had relevance to a finding.

 **c.  Genealogy** As the primary aid to determine genealogy, the Special Master has Exhibit 2 to the August 31, 2005 hearing, known as **"The Genealogy Report"**. This report is the genealogy report submitted by the testimony of Ms. Judy Espinosa, the President of the Pajarito Plateau Homesteader's Association at that hearing, with corrections based upon information available since that time. Documents submitted by claimants in their claim forms, or those numerous documents, emails and telephone calls provided in response to the Preliminary Findings of Fact which shed light on that genealogy, updating it or amplifying it, were also used considered.   All of this has been a continuing process, and updates have been made until the time that these Findings of Fact and Conclusions of law are filed.  This effort has resulted in the resolution of all disputes involving the right to inherit as an heir, successor or beneficiary of an original claimant, with the exception of one existing claim in the case of Tract B22.

**d. Documents submitted before hearings**  All of the original documents submitted by individual claimants either with the original claim forms, in response to the Preliminary Findings or provided by individual email, fax or telephone contact with claimants was considered in undisputed cases.  In disputed cases, all of the written information provided during the claims period was made available at the hearings.  In the event a claimant wished to use any such document, it was marked as an exhibit for that case record.

## D. PRESENTATION AT HEARINGS.

There are factors which make the acquisition of documents difficult for many

claimants.  The first is the passage of more than sixty years since the original taking.

Next, the extreme need for secrecy which existed for the Manhattan Project meant that Information about ownership was not acquired by the normal channels existing at the time.  "…Many of the transactions were carried on orally to insure secrecy, and thus no written record was preserved".  **(SM Exhibit IV, Manhattan District History, Vol.1, p. F1)**.  Further, many records in the Sandoval County courthouse, the county in which all but one complete tract and part of another were located (those being in what was then Santa Fe County), have been the subject of some damage and destruction.

Therefore, many documents have not, or perhaps cannot be provided by claimants because they no longer exist or cannot be located, even after diligent search.  Substantial leeway has been given to the claimants to find or produce any relevant documents they may need to establish or refute a claim, or provide alternative information which can substantiate their claim.

At the Special Master's request, all disputants designated a representative or representatives who were charged with the responsibility of presenting evidence and arguments at the hearings.  Although some of these representatives were attorneys, the majority were not.  All of these representatives presented documents and testimony relevant to their case, subject to the ability of the Special Master to also take Judicial Notice of documents having a bearing on the ultimate issues when appropriate as the finder of fact.

The Special Master notes the diligence of the representatives in finding and presenting a substantial amount of information.  Their efforts on behalf of their respective claims and claimants are to be congratulated.

14

## IV.  FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR UNDISPUTED TRACTS

Having made those determinations about the application of Court Orders, The Legislation and New Mexico Law, the Special Master hereby makes Findings of Fact and Conclusions of Law as to each and all of the 31 Tracts of Land and claimants to compensation for the tracts contained in Exhibit 1, The Map, and those in Cause 1399 (No claims were filed to two tracts, B19A and B19B, belonging to Walter Grottenthaler). These findings as to the disputed and undisputed tracts are set forth below, with specific references to, in the case of undisputed tracts, Exhibit 1, Initial Awards Findings for Undisputed Tracts, and, in the case of disputed tracts, Exhibit II Initial Award Findings for Disputed Tracts.

## A.  FINDINGS AS TO UNDISPUTED TRACTS

Based upon the documents and information submitted, the following facts are found to have been proven by a preponderance of the evidence:

1. Tracts shown on The Map as A7A, A7B, A7C, A10, A12, A14, A15, B2, B12, B17, B20, B21, B23, E3, E4, E6A, E6B, E7, E8A, E8B, E8C, E25, E28 and E29 are of the acreage indicated in Exhibit 1 to these findings and conclusions, were all located on the Pajarito Plateau within what is now known as Los Alamos County, and were all acquired by the United States Government for the Manhattan Project during World War II;

2.  The persons named in Exhibit 1 to these Findings and Conclusions as original owners of those tracts were the owners and occupiers of those tracts at the time of the acquisition of those tracts by the United States Government;

3.  All of those original claimants are deceased, and the persons named in Exhibit 1 to these findings and conclusions are their heirs, successors in interest, assignees or beneficiaries to any right to an award in this case, based upon the award formula;

4.  . The awards set out in Exhibit 1 substantially constitute payment to each of the claimants receiving the award according to the formula for payment, it being understood that a second payment at the end of this proceeding will result in a final, minimal payment after adjustment of all fees, expenses and interest earned once all claims are brought to a final resolution;

**B. CONCLUSIONS AS TO UNDISPUTED TRACTS**

Based upon the foregoing facts, these conclusions of law are reached as to the undisputed tracts:

1.  All Tracts listed in Exhibit 1 to these findings and conclusions are eligible tracts under the Legislation;

2.  All of owners named in Exhibit 1 were eligible to receive an award in this case had they been living at the time of this settlement procedure.  Therefore, their successors shown in Exhibit 1 to these findings are eligible to receive their  award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

3.  As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

**V.  FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR DISPUTED TRACTS**

At the close of the claims procedure, claims of the right to an award were disputed for these tracts shown on The Map:  Tracts  B1 and B2 (with Tracts not shown on The Map, Tracts I and II of cause 1399; Both Tracts A13A and A13B as well as E9; Tract B17; B18A and B18B with Tract B22, Tracts B20 and B21;  Tracts A8B, A8C, E8B, E8C, B18 and B22; Tract  E5 together with a Grazing Rights Claim; and Tracts E24, E25, E28 and E29.

Hearings were held during February and March as to each of these disputes, and all issues were resolved as to all of those tracts except: Tract B1 and 1399 Tracts I (part of B1) and II; Tracts A13A, A13 B and E9; Tract B22; Tract E5 with a Grazing Right

Claim; and Tract E24.   Findings and conclusions as to those tracts for which a resolution was reached are included in the undisputed claims findings above.

Upon a review of the record of hearings in these cases, the Special Master has determined that for cause A 13 and E9, the parties did not have a sufficient opportunity to respond to information that was provided at the time of hearing, and therefore a rehearing, with the record open to supply supplemental information should be provided. In the case of Tract A 24, the Special Master has determined that, although he understood that some persons entitled to representation were represented at the hearings, in fact, they may not have been, and the notices sent by him may not have adequately apprised them of their necessity for representation. For those reasons, findings as to those tracts are not presented at this time, but will be submitted as soon as those re-hearings are conducted.

As a matter of convenience, the pages of the findings and conclusions below are separated by tract, so that the findings for one tract can be copied or downloaded without the others.

**SPECIAL MASTER'S INITIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW IN DISPUTED CASES**

**TRACT B-1 OF CAUSE 556 AND TRACTS 1 AND II OF CAUSE 1399 AND TRACTS I AND II OF CAUSE 1399.**

**A.  FINDINGS OF FACT**

There are essentially four disputes involved as to these tracts, brought by or between the heirs of Senaida Vigil Archuleta, represented by Mr. Amarente Ben Maestas, the heirs of Anastacio Vigil, represented by Mr. Joe Gutierrez, and the heirs of Tomas Gonzales, represented by Pedro Gonzales.  Testimony and exhibits were presented by all of these claimants at a hearing held on March 16, 2006.   Findings of fact are made as to each of these claims, based upon that evidence.

**Claim Number 1** The heirs of Senaida Vigil Archuleta claim that Tract B1 of Cause 566 constitutes a total of 52.7 acres, instead of the 34.07 acres shown on The Map. As to that claim, the following findings are found to have been proved by a preponderance of the evidence:

1.  Condemnation Cause 1399 was filed on October 7, 1948, and two tracts:  Tract I (already adjudicated to the United States Government in cause 566 with a Declaration of taking in 1943); and Tract II, (not yet adjudicated).   The Declaration of Taking and Fee Title to the United States Government in Cause 1399 was filed on November 2, 1948.   Final judgment was entered granting fee title to the United States Government on April 11, 1950.  (SM Exhibit 1, pp 001, 012  and 018);

2.  The 52.7 acres comprising tract B-1 were granted by the United States Government to Locadio Archuleta in 1921 by patent number 801627.  This land, described by metes and bounds description, is located in "…a portion of Section twenty-four in Township nineteen north of range six, and…Section nineteen in Township nineteen north of Range seven east of the New Mexico Principal Meridian…"  (Maestas Exhibit A);

3.  The Declaration of taking of Tract B1 in Cause 566 was filed on June 18, 1943, in condemnation cause 566 and the Final Judgment finding that Senaida Vigil Archuleta was the owner of said 52.7 acre tract and adjudicating it to the United

States Government was entered in 1945 for the entire 52.7 acres, and she was paid for that claim (SM Exhibit 2, Page B 131);

4.      The Map shows 34.07 acres for Tract B1, although the Cause 566 judgment entered was for a condemnation of the entire 52.7 acres.   The reason for the difference is that the boundary for the Forest Service land shown on The Map, and therefore the land shown to have been taken for the Los Alamos Demolition Range for the Manhattan project ended at the Sandoval County Border at the end of World War II (annotations on The Map to a Memorandum of understanding between the secretaries of the Department of Agriculture and the War Department dated May 10 and May 15, 1943 which effectively transferred title from the former to the latter). This boundary is also the boundary between Sandoval and Santa Fe counties at the time;

5.  All of the Tract B1 property located within Township 14 N Range 6 E of the NMPM was located within those boundaries and within Sandoval County, and all of the Township 19 and 30 N, Range 7 East were located in Santa Fe County, outside of those boundaries;

6.  Tract I of Cause 1399 is the same as the 18.63 acres of Tract B1 missing from The Map, even though it was included within the outboundaries of the survey description of the declaration of taking and the judgment previously entered in cause 566.  Further, it is the portion of  the 52.7 acre tract originally patented to Locadio Archuleta located in section nineteen of range 7 East of the NMPM (Map of Tract B1, SM Exhibit 1, p, 013), and is entirely situate within what were the boundaries of Santa Fe county at the time;

7.  In 1949, Los Alamos County was created, taking from Sandoval County and from Santa Fe County areas of land earlier belonging to these counties (Section 41-15-1 NMSA 1978 Comp.).  All of the tracts involved in the consolidated cases, including Tracts I and II of Cause 1399, are now part of Los Alamos County.

**Claim Number 2.** The second claim is that of the heirs of Anastacio Vigil, who assert

that Tract II of cause 1399, made up of 35.70 acres, is the same as the remainder of

Tract B1 of Cause 566, excluding the 18.63 acres of Tract I, and  that it belonged to

Anastacio Vigil and not Senaida Vigil Archuleta. Originally, the claim also  involved tract

B2 adjudicated in cause 566 as belonging to Fermin and Adelaida M. Vigil to the United

States Government (SM Exhibit 1, page B 124).  When it was determined that tract B2

was entirely located within T 24 N R 6 E, NMPM. And that Tract II was located in Range

7E, that claim was abandoned by the representative for the Anastacio Vigil family on the record.  As to the Anastacio Vigil continuing claim to Tract B1, in addition to the facts found above for the first claim, the following facts are found to have been proved by a preponderance of the evidence:

> 1.The 35.70 acre tract of land described as Tract II of cause 1399, was originally patented to Anastacio Vigil in Patent no.  961379.  It begins at the quarter corner of "…Sections 19,24, 25 and 30, T 19 N, R 6 and 7 E, and is  totally located  "…in approximate unsurveyed sections 19 and 30, T 19 N Range 7 E  of the NMPM"(SM exhibit 1, PP D 001, property description and 010, tract map).    In other words, it is not the same property belonging to Senaida Archuleta (Tract B1) or to Fermin and Adelaida Vigil (Tract B2), but is near or contiguous to them and totally located within Range 7 E. NMPM;

> 2. All of the Range 7E properties, including Tract II, are entirely situate inside what was then Santa Fe County, and outside of the outboundaries of the National Forest Service lands that were acquired by the War department for the Manhattan project.

**3.  Claim Number 3.**  This is a claim by the heirs of Tomas Gonzales that approximately ten acres of  Tract II  of cause 1399 actually belonged to Tomas Gonzales, and not Anastacio Vigil at the time of their acquisition by the Government.  As to that claim, in addition to those facts found above, the following facts are found to have been proved by a preponderance of the evidence:

> 1.  There is a Spanish Warranty Deed from Anastacio and Sofia Vigil to Tomas Gonzales, dated March 15, 1930, filed of record in Sandoval County which grants a 350 by 140 yard strip of land described as within the outboundaries of the patent to Anastacio Vigil. (Gonzales Exhibit 1).  A strip of land that size equals exactly ten (10.12)  acres

> 2. The boundaries of the property in the deed, translated into English are:  On the North, by property of the sellers; On the East, by property of the sellers; on the South (could be West, because the document is blurred and very illegible), with property known as the Ramon Vigil Grant; and on the West (Could be South, because the document is blurred and very illegible), by property of the Forest Service);

> 3.  The Tract Map for the 1399 condemnation of Tract II (SM Exhibit p. B 010) show the Forest boundary on the West, and the Ramon Vigil Grant on the South, and is

the only possible location of the land deeded.  The 10.12 acre strip is located within the outboundaries of Tract II of 1399;

4.  Although apparently the 10.12 acres was sold to the State of New Mexico for nonpayment of taxes by Sandoval County in 1937, it was redeemed by Tomas Gonzales in a tax deed in June of 1943 (Gonzales Exhibit 4);

5. There is no explanation on the record or in testimony about why, if Tomas Gonzalez' heirs are claiming a portion of Tract II, which is entirely situate in the Santa Fe County boundaries at the time, and their deed locates their property within that county, any of their documents of record appear in Sandoval County.  Perhaps Tomas Gonzales and the sellers, and even Sandoval County officials and military surveyors believed the property to be located in Sandoval County, but, if they did, they were mistaken.

**Claim number 4.**  This is a claim by all of the claimants in this case that, even though the condemnation action Cause 1399 occurred after World War II, Tract I and II of 1399 are eligible tracts for an award under the legislation.  In addition to the facts found above, the following facts are found to have been proved by a preponderance of the evidence:

1.  The boundary of the Los Alamos Demolition Range shown on the maps used to locate Tract II show the western boundary of the tract to be the same boundary described above for the Forest Service, the Los Alamos Demolition Range and Sandoval County at the close of World II.  (SM Exhibit 1, p D 010).  This would place the tract outside of the those boundaries, and inside of Santa Fe County;

2. Nevertheless, according to the testimony of all of the persons in all of the cases, all of the settlers and their families, including those of Senaida Vigil Archuleta, Anastacio Vigil and Tomas Gonzales were moved off of the Plateau in 1942 and no right of re-occupancy or re-possession was granted to them by the Government during World War II;

3. Whatever the actual boundary of the military enclave might have actually been, In the case of Zenaida Vigil Archuleta's and Anastacio Vigil's families, they were never allowed access to those properties after 1942.  After apparently persistent claims by Tomas Gonzales to be either compensated or given a right to return to his land, a right to occupy his claimed ten acres was granted in writing to him by the commanding officer after the war, in July, 1946 for a two year period until the filing of Cause 1399. (Gonzales Exhibit 5);

4.  The text of that letter grants Mr. Gonzales access to his property "…which is his personal possession, regardless of whether it may be inside the boundary posted by the U.S. Government."  The boundaries of the property described are: N. and E., A. Vigil; S., Ramon Vigil Grant; W. Forest Service, so it gives written permission to access the ten acres included as part of Tract II.  All of this letter implies that, even though the map limitations by the government ended at what used to be the Forest Service line and Santa Fe County, access in the area of Tract II, during and after the war, was subject to the control of the commanding officer of the post;

5.  The value determined in Cause 1399 for Tract I was $100.00 ($5.37 per acre), and for Tract II, $350.00 ($9.80 per acre).  This value per acre is still exceedingly less that the value per acre ascribed to the AIIA, AIIB and B16 tracts in causes 552 and 556.  Whether there was service by more than publication is not shown in the 1399 files available to the Special Master, SM Exhibit 1.  The money was deposited in the Court registry, but was never redeemed by any of the owners, and was eventually returned to the Treasury;

6. Tomas Gonzales persisted throughout several years in a claim that he was entitled to either return of his property or compensation for it (Gonzales Exhibits 5-9). Whether he knew of the actual taking or not, he clearly understood that, except for that limited period after the war, he had no access to it.

## CONCLUSIONS OF LAW

### Reasons for the conclusions of Law

Having made these findings, the conclusions of law to be reached require a statement of the reasoning from which the conclusions are derived.   The conclusions are set forth after these reasons are presented.

The legislation provides that an eligible tract is "…private real property located on the Pajarito Plateau of what is now Los Alamos County, New Mexico, that was acquired by the United States during World War II for use in the Manhattan Project and which is the subject of the consolidated lawsuits" (Sec 3A).

As to Tract I of 1399, which was already acquired as part of Tract B1 of Cause 566,  this tract is one of those existing in the consolidated lawsuits, is located on the Pajarito Plateau, is within what is now Los Alamos County, and was acquired during

22

World War II by any definition of the word "acquired".  Therefore, this acreage should be included as part of Tract B1, to be adjudicated to the heirs of Zenaida Vigil Lujan.

As to Tract II, this tract is more problematical.  What the word "acquired" means is not set forth in the legislation, and merits some discussion.  The legislation does not say "acquired fee title", but merely "acquired".  An argument can certainly be made that the most common understanding of the word "acquired" is "the moment of conveyance to the new owner".  <u>Helvering v. San Joaquin Fruit & Inv. Co., 297 U.S. 496</u>.  Acquisition in condemnation cases is considered to be at the time of a declaration of taking, at which time fee title vests in the condemnor.  (40 USC Sec. 258).  This did not occur until November 2, 1948.

However, for the purpose of a settlement as to this tract, a more liberal construction of the word "acquired" should be applied, given:  1)  the history of this tract, in which the government unquestionably occupied the tract and moved the families off of it during the war;  The fact that the Government did take title to it later under some somewhat confusing circumstances about the boundary location; and 3) the fact that this  legislation is provided in a settlement of claims in these consolidated lawsuits.

Therefore, for the purpose of providing a settlement of this claim and only as to this tract, the word "acquired" in the legislation should be construed to mean "occupied, depriving the owner of use or benefit, subject to later condemnation".   This is especially true considering the facts that the valuation per acre was lower for any of these properties than those made during any of the earlier lawsuits started in World War II, and that the families may actually not have known of the lawsuit and did not redeem any payment.

23

**Conclusions reached:**

Based upon the facts found and that reasoning, the following conclusions of law

are reached as to the Tracts in Cause 1399:

**1.  As to Tract I of Cause 1399:**

a.  Because this 18.63 acre tract has been already included in the award for the 52.7 acres of Tract B1 in Exhibit II to these Findings and Conclusions, the heirs of Senaida Vigil Archuleta are not entitled to any additional award for this tract.

**2.  As to Tract II of Cause 1399:**

a.  Tract II of Cause 1399 was located on the Pajarito Plateau in what is now known as Los Alamos County, and was acquired by the United States Government for the Manhattan Project during World War II and therefore is an eligible tract under the Legislation.

b.  Anastacio and Sofia Vigil were the fee simple owners of 25.58 acres of that tract at the time of its Acquisition;

c.  Tomas Gonzales was the fee simple owner of 10.12 acres of Tract II of Cause 1399 at the time of its acquisition;

d.  The persons set forth in Exhibit II to these Findings and Conclusions are the respective heirs, successors or beneficiaries to these original claimants, and their respective shares and awards based upon the formula are all set forth in that exhibit and are eligible to receive their  award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

e.  As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

f.   To the extent that it appears that payments offered for the acquisition of the Tracts in Cause 1399 were never redeemed by the owners, the owners have lost their right to the original payment in ($100.00 in the case of Tract I and $250.00 in the case of Tract II).  The right to appeal the reverter to the Treasury in those cases lapsed many years ago, and no such right is provided for in the Legislation.

**SPECIAL MASTER'S INITIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN DISPUTED CASES**

**TRACTS B18A AND B18B.**

**FINDINGS OF FACT**

A hearing was held on March 2, 2006.   There were originally three claims in this case.  One of them, by Ida Roybal Montoya was withdrawn at the hearing.  The other disputed claims are those of the heirs of Espiridion Montoya, one of the sons of Jose Elfego Montoya.   Appearing in representation of those heirs was Karen Kilgore, of the White, Koch, Kelly and McCarthy law firm.  Appearing in representation of the heirs of all of the children of Jose Elfego Montoya was Jose Manuel Montoya.  At that hearing, testimony was taken and exhibits were presented.  Based upon that evidence, findings of fact are made as to each of the claims.

**Claim Number 1**  Espiridion Montoya's heirs claim that their Grandfather, Jose Elfego Montoya gave Esperidion Montoya and their Mother Rufina,  all of his property, including the rest, residue and remainder of his estate, by will, and that none of the other children of Jose Elfego Montoya are entitled to any of the award for this tract.  As to that claim, the following facts are found to have been proved by a preponderance of the evidence:

1.  A patent for 160 acres was issued by the United States Government to Miguel Sanchez, Grandfather to Jose Elfego Montoya and Jose Albino Montoya Great Grandfather to Jose Patricio Montoya in 1904.  The property description fixes the property on the Pajarito Plateau in what is now Los Alamos County, and is exactly that used by the United States Government in describing Tract B18 during taking of properties during World War II for the Manhattan Project in their Declaration of taking

of Cause 566 and Order Confirming Fee Title to the United States Government in November, 1943 (Montoya Exhibit 1, SM Exhibit 1 pp A 025);

2.  The children of Esperidion Montoya and Rufina Montoya are Arabelle, Marie Tiburcia, Fred, Paul,  Robert and Gilbert Montoya.  Marie Tiburcia testified (Transcript pp 73-78) that she was asked by her grandfather, Jose Elfego Montoya, in 1953 to type a warranty deed in Spanish.  In it, Jose Elfego left all of the property on which he lived at that time located within the San Ildefonso Pueblo to Esperidion and Rufina, that it was notarized and she recorded it the next day.  This recorded deed was produced (Esperidion exhibit 2), and does in fact grant that property to Esperidion and Rufina;

3.  She also testified that he had her type a will, leaving everything else to them, because they were the only ones of the family who would take care of him, and that this will was notarized by a notary Herminio Sandoval.  According to her testimony, the will gave three rooms of the house he had just deeded to her mother and father to her brother Fred, and also provided for a payment of one dollar to all of the other children of Elfego Gomez.  She Further testified that Jose Patricio, his son  was present and gave his consent (Transcript Pages 77-78);

4.  Marie Tiburcia's brother Paul also testified that he was present, and had seen the will over the years, notably when he believes he gave it to Attorney Phil Ashby, during a later time when Mr. Ashby was representing the San Ildefonso Pueblo and the land was subsequently incorporated into Pueblo lands.  Whether the document he remembers is the will or the deed mentioned above is a question, since the will, if it existed,  would have had no effect, the deed having already been recorded during Elfego's lifetime;

5.  Her brother Fred also testified that he was present at the time these documents were signed.  His understanding is that the house and land was given to his parents by the will, along with his three rooms, which he gave back to his Father when he died. (transcript pages 35 lines 18-25, an 36 lines 1-25). Despite his understanding, the property had been deeded to his parents on that same day;

6.  Jose Elfego Montoya had four children, Jose Patricio, Jose Maria, Antonio and Esperidion who survived him.   No mention is made of the presence of any of his other children other than Patricio at that meeting;

7.  None of the children of Jose Elfego are living at this time, so the testimony of the three who claim to have been at the family meeting when they say a will was prepared, can no longer be refuted by any living person;

8.  Jose Elfego Montoya died in 1974;

9.  No written last will and testament of Jose Elfego Montoya was ever produced, nor any probate of any purported will was ever undertaken, nor any personal

representative appointed, and substantially more than three years have passed since his death.  These facts are conceded by Esperidion's heirs.

**Claim number 2**  The heirs of Esperidion Montoya claim that Jose Patricio Montoya was never the owner of 80 acres of Tract 18, and that, therefore, the heirs of Jose Elfego Montoya are entitled to receive any of that award.  Combined with Claim 1, this would entitle the heirs of Esperidion Montoya to all of any award for the 160 acres of Tract 18. As to this claim, in addition to those facts found above, the following facts are found to have been proved by a preponderance of the evidence:

1.  Miguel Sanchez sold 80 acres each of the land patented to him, to Jose Elfego Montoya and Jose Albino Montoya. This fact is uncontested by Esperidion's heirs;

2.  Jose Albino Montoya sold his 80 acres in a Spanish Warranty Deed to Jose Herculeano and Aurora M. Garcia (Aurora was a sister to Jose Albino and Jose Elfego).  This fact is uncontested by Esperidion's heirs;

3.  Jose Patricio Montoya received a Spanish Warranty Deed on January 25, 1926, from Jose Herculeano and Aurora M. Garcia, for 80 acres of land.  This land is described as being, "…on the West by lands of Jose Elfego Montoya, and on the North, South and East by the Forest Service, always as set forth in the Patent given by the Government to the Parties of the first part, who were the original patentees to that property by the United States Government, and the grandparents of Jose Patricio Montoya".  Aurora M. Garcia was a daughter to Jose Crestino Montoya, a granddaughter to Miguel Sanchez, and Jose Patricio's paternal aunt. (JP Montoya Exhibit 3);

4.  The description of the property places the 80 acres of land as that next to the 80 acres owned by Jose Elfego Montoya, and is included in the 160 acres originally patented to Miguel Sanchez.

5.  Both men paid taxes according to an assessment for 80 acres each to Sandoval County (Exhibit 6).

6.  The declaration of taking, and the order conveying fee simple title to the United States Government as to all of tract B18, was filed September 18, 1943, and includes the exact description of the original patent (SM Exhibit 1 p. B 025). The judgment finding that Jose Elfego Montoya and his wife Maria Tiburcia Serna Montoya, and Jose Patricio Montoya and Maria T. Montoya were the fee simple owners of Tract B18 was paid was entered in November,1944  and they were paid

on December 1, 1944, for the taking of Tract B18 by letter of December 1, 1944 (SM Exhibit 1 pp B 034).

7.  Although Fred Montoya made a reference to his belief that Aurora Montoya may never have been paid by Jose Patricio, no proof of any kind of this claim of a failure of consideration was ever produced at trial, the rest being hearsay.  (transcript page 86-87).

## CONCLUSIONS OF LAW

**Statement of reasoning to reach the conclusions of law.**

Having made these findings, the conclusions of law in these claims to be reached require a statement of the reasoning of the Special Master in making them.

**Claim 1.**  The Legislation provides that a claimant who is an "…heir, successor, assignee or beneficiary of an original claimant…is entitled to an award."  (Section H). The fact that no will was ever produced, nor was any probate ever had is conclusive under New Mexico law.  Espiridion's heirs are entitled to receive their benefit only as the surviving children of Jose Elfego Montoya, along with the rest, and not because of any purported will.

In New Mexico, "…Any part of a decedent's estate not effectively disposed of by will passes by intestate succession to the decedent's heirs as prescribed in the Uniform Probate Code 45-1-101 NMSA1978…, except as modified by the decedent's will." § 45-2-101.

Section  45-3-102 requires that:  "..Except as provided in (Sections none of which have any applicability here), to be effective to prove the transfer of any property or to nominate a personal representative, a will must be declared to be valid by an order of informal probate by the probate court or an adjudication of probate by the district court.

Section 45-3-108. Provides for the ultimate time limit for bringing such a proceeding.  It requires:

"A. No informal probate or appointment proceeding or formal testacy or appointment proceeding, other than a proceeding to probate a will previously probated at the testator's domicile or appointment proceedings relating to an estate in which there has been a prior appointment, may be commenced more than three years after the decedent's death…".  (There are exceptions, but, again, none that have any application to the facts in this case).

For a will altering intestate succession to be valid, a probate proceeding must be initiated within three years from the date of death of a decedent, and an administrator be appointed to administer the estate.   This of course assumes that a written will, meeting the formalities of the will statute is the document presented for probate. There has never been a case in which an attempt to reconstruct a will from oral testimony alone has succeeded, and these are certainly not the circumstances to consider that unlikely possibility.   For reasons succinctly demonstrated in this case, the right to present even an otherwise valid will is extinguished forever after the three year period. After that, the risk exists that, as here, time has passed so that witnesses will have forgotten important information or are now dead and silenced forever.

Apparently, Esperidion's heirs believe that the fact that testimony exists that a will was made, that formalities were followed and that all of Jose Elfego's children agreed, alters that intestate succession law and allows for some equitable relief.  A reference was made in oral argument that the reasons for providing that testimony were based upon Section 45-3-912, which deals with private agreements among successors to a decedent.

That statute requires the personal representative of an estate to honor agreements by claimants to succession in a case which would change the way in which the estate

29

would be otherwise distributed.   This section has absolutely nothing to do with the facts in this case.  Even if the events would have occurred as Espiridion's heirs have testified, that event occurred while Jose Elfego Montoya was alive.  There was no decedent, not to mention the facts (which bear repeating one more time) that no such will was ever produced, there was no probate and no personal representative was ever appointed who would have been bound by that statute.

Insofar as an equitable argument, if the equities were to be balanced in this case, they would tip the other way.  The equitable doctrine of laches should apply to any case in which a claim was not timely made.   They could have initiated a probate proceeding, or a lawsuit against Jose Elfego's estate for Esperidion's and Rufina's care, or other remedy which would have been available years ago when there were witnesses on both sides.   Waiting until all of the persons who could refute a claim are dead to then raise it does not show clean hands which would entitle a person to relief as a matter of equity.

In New Mexico, the doctrine of laches would not apply, since the statute of limitations has run and there is no need for its application  In re Estate of Gaines, 113 NM 652, (1982), in which the Court of Appeals found that "the statute of limitations under the Probate Code is three years.  The statute (45-3-108) having run, the court need not consider laches.

Therefore, to the extent that a determination of equitable principles requires balancing the good faith of family members, whether living or dead in this case, no finding is made at this time about the bad faith of any person.   This is not a case to air dirty laundry, but to determine eligible claimants to an award.  No action of bad faith by any person was proven which would have any relevant effect on the claims in this case

about the successors in interest to the Tract B18 fee simple owners in 1943 when the land was acquired by the United States Government.

**Claim Number 2.**  The Legislation provides that an eligible claimant for the purpose of this settlement is one who is found to have owned "fee simple title in an eligible tract" (Section 8 h).   It does not say that an eligible claimant is one found to have had fee simple title in the condemnation actions by the government in World War II.  What does this mean some 60 years later?   Are the findings of the federal court in causes 552, in the case binding at this time?   If they are not binding by the language of the legislation, are they binding by any other doctrine?   In other words, do the doctrines of *res judicata* or collateral estoppel apply in either of these instances?

> "***Res judicata*** in its proper application operates where there are identical parties, causes of action, subject matter, and capacities in the two cases; **collateral estoppel** by judgment arises where the causes of action are different but some ultimate facts or issues may necessarily have been decided in the previous case. Where the causes of action in the cases are identical in all respects, the first judgment is a conclusive bar upon the parties and their privies as to every issue which either was or properly could have been litigated in the previous case. But absent the identity of causes of action, the parties are precluded from relitigating only those ultimate issues and facts shown to have been actually and necessarily determined in the previous litigation."  Santa Fe v. Velarde, 90 N.M. 444

One can argue that the causes of action are the same in this case as those condemnation cases,  i.e: Who was the owner who is going to get paid by the Federal Government for the taking of land?  However, the causes are essentially not the same, the former actions being condemnation actions, and the latter a lawsuit against the government for an unfair taking.   Therefore, if any of these bars apply, the bar would be collateral estoppel.  When does it apply?

> The doctrine of collateral estoppel, similar to res judicata, is a measure grounded upon enforcement of judicial economy and designed to bar relitigation of ultimate facts or issues actually and necessarily decided in a prior suit in which the decision is final.

In order to invoke collateral estoppel a party must establish the existence of four elements: (1) the parties are the same or in privity with the parties in the original action; (2) the subject matter or cause of action in the two suits are different; (3) the ultimate facts or issues were actually litigated; and (4) the issue was necessarily determined. Reeves v. Wimberly, 107 N.M. 231.

There are, however limitations on its application which may apply in disputes for some tracts.  Notably, a limitation on collateral estoppel exists "…where the party against whom collateral estoppel has been asserted has not been found to have had a full and fair opportunity to litigate the issue in the first action…" Lawlor v. National Screen Service Corp., 349 U.S. 322.

In someof the contested tracts in these consolidated lawsuits the doctrines of Res Judicata and Collateral Estoppel cannot be raised because of notice issues (not that notice was not given, but the archives don't seem to include the detail of service of process) or concerns about whether there was full litigation,  In this case there is no issue about either one.

Jose Elfego Montoya knew without any doubt that his son Jose Patricio Montoya was found to be the owner of 80 acres of tract B18, and that he was the owner of the other 80 acres.  They received a judgment to that effect together, and were even paid together.  Therefore, all of the heirs of Jose Elfego Montoya are bound by the judgment in favor of both of these men, the case having already been decided in a court of competent jurisdiction, under the doctrine of collateral estoppel.

Beyond these doctrines, the proof presented at these hearings is conclusive that, at the time of the acquisition of Tract B18, 80 acres of that tract, situated on the Pajarito Plateau in what is now Los Alamos County, belonged to Jose Patricio Montoya. He and his wife were found to be the owners of the property in Cause 566, and were paid for it.

The presumption in favor of a finding of fee simple ownership by Jose Patricio Montoya

for tract B18B is un-rebutted.

**Conclusions reached**

Based upon the findings and that reasoning, the following conclusions of law are

reached as to both claims I and II:

1. Tract B18, consisting of 80 acres, was located on the Pajarito Plateau in what is now known as Los Alamos County, and was acquired by the United States Government for the Manhattan Project during World War II, and therefore is an eligible tract under the legislation.

2. Elfego Montoya and his wife Maria T. Serna Montoya were the fee simple owners of 80 acres of Tract B18, and Jose Patricio Montoya and Maria E. Montoya were fee simple owners of the other 80 acres of that tract at the time it was acquired. None of these owners are still living. For the purpose of an award in this case, the Tract is now divided into Tract B18A, belonging to Jose Elfego and Maria T., and B18B, belonging to Jose Patricio and Maria E. Montoya.

3. No will issued by either of these men ever having been probated and the time for doing so long since having passed, the property will pass to their heirs according to intestate succession.

4. The persons set forth in Exhibit II to these Findings and Conclusions are the respective heirs, successors or beneficiaries to these original claimants, their respective shares and awards based upon the formula are all set forth in that exhibit and they are eligible to receive their award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

6.     As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

**SPECIAL MASTER'S INITIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW IN DISPUTED CASES**

**TRACT B22.**

**FINDINGS OF FACT**

The claim in this case involves the claims of Ida Roybal Montoya that she and her brothers and sisters and their children are descendants of Juan Crestino Montoya, son of Jose Albino Roybal, the original owner of Tract B22.  Originally, she claimed to have an interest in several other tracts through that lineage, including tracts A7B, A7C, B 18, E8A and E8B, as well as Tract B22.

A hearing was held on March 2, 2006, involving those claims, at which Ms Ida Montoya represented her family's claims. At the outset, Ms. Ida Montoya abandoned any claim as to all tracts except Tract B22, and the various representatives of those tracts were excused, there being no other dispute about those tracts.  Ben and Ruth Montoya represented the claims of the other B22 claimants as heirs of Jose Albino Montoya, and there is no dispute among them about heirship.  As to Ida Montoya's claim, testimony was taken and exhibits were introduced.

Ms Ida Montoya was also given an opportunity to supplement the record until March 16, 2006, because the New Mexico Archives Office was closed.  All of the information she has provided since is incorporated for the purpose of findings in this case.   Based upon that evidence, the following findings of fact are found to have been proved by a preponderance of the evidence:

1.  A Patent was issued in 1915 to Jose Albino Montoya by the United States Government to 90 acres of land, by a description which places it on the Pajarito Plateau in what is now known as Los Alamos County (This fact is uncontested);

2.  Jose Albino died in 1927. He had numerous children, including two sons, Luis and Abel, who died before him without issue, and 12 others who survived him. During the taking period, because there were so many possible heirs, the Army representatives agreed that the property should be awarded in the names of his four living sons, Adolfo, Juan Crestino, Abel and Candelario designated on The Map, as The Montoya Brothers.  All of the potential heirs of Jose Albino agreed that these sons were, in fact, family representatives, and that all of his children are entitled to share in the award for this tract.  Therefore, it is undisputed that, at the time of the taking by the United States Government, the other seven living children who were the owners of the property as Jose Albino's children were Juan Crestino, Ursinia, Adolfo, Leandra, Candelario, Lucrecia, Elisaida, Lorencita, Pablita, Josefina and Florinda.  None of these persons are now living;

3.  By that same description, the property was listed on The Map as Tract B22 in Cause 566, and a Declaration of Taking, with an order Adjudicating Title to the four Montoya brothers was entered on September 13, 1943 as part of the Manhattan Project. (SM Exhibit I, p. B 025).  A Judgment and Stipulation adjudication that property was entered in 1945 (SM Exhibit B 119);

4.  Ida Montoya's claim is that she is descended from Simona Roybal, who she believes to be Juan Crestino, son of Jose Albino Montoya's daughter, and the mother of her mother, Adelina R. Roybal.  She has presented a sworn statement from Aaron Roybal, who is 98 years old and too infirm to testify.  In that statement he affirms that Simona was "born from Christino Montoya who had a Ranch in Los Alamos".  He further affirms that Simona was Adelina Montoya, Ida Romero's mother, and that he (Aaron) was married to "…Veronico Roybal's (sic) sister to Ricardo Roybal family of Christino Montoya owner of the Ranch in Los Alamos. (Ida Montoya Exhibit 1);

5.  Ida Montoya also presented census records, claiming that they established her lineage to Juan Crestino, son of Jose Albino.  A close reading of those records, as well as the Aaron Roybal affidavit, show that she is mistaken by two generations.  First, Aaron Roybal does not say it is "Juan Crestino", but only "Christino".  It is undisputed that Jose Albino Montoya's Father was named Jose Crestino Montoya, and it is in that confusion that the error on Ms. Montoya's part was made;

6.  She first presents an 1880 census record (Ida Montoya Exhibit 3), which, surprisingly, can be read but only under extreme magnification. In it, neither the name "Juan Crestino" nor "Jose Crestino" appears, but only "Montoya, Cristino".  According to that record, this Cristino Montoya was 47 years old, had a wife (name not very legible, appears to be "Sonia", his occupation is listed as a lawyer, and at that time he had several children.  Included among those were  Jose Albino, Jose

35

Elfego, Adalaida, and others who, along with their brother Jose Albino also owned property which was located on the Pajarito Plateau and taken in World War II  for the Manhattan Project.  According to that information, this Cristino Montoya would have been 110 years old in 1943;

7.  According to the death certificate of Juan Crestino, son of Jose Albino, he was born in 1891, and died in 1976.  According To the death certificate of Adelina Roybal, Ida Montoya's Grand Mother, she was born in 1871, twenty years before Juan Crestino's birth, her husband was Veronico Roybal and her Mother Simona Roybal (which makes the tie to Aaron Roybal's affidavit).  The original Jose Crestino by that time of death  would have been 143 years old, a gereatrical impossibility;

8 In short, Ms. Ida Roybal Montoya has established that she is probably related through Jose Crestino Montoya to the Jose Albino Montoya family as a distant half cousin, but has failed to provide any fact that would support her claim that she or her family members have an interest in Tract B22 by lineage deriving from Jose Albino or his son, Juan Crestino Montoya.

## CONCLUSIONS OF LAW

Based upon those facts, the following conclusions of law are reached:

1.  That Tract B22 is an eligible tract under the legislation, and that the twelve children of Jose Albino Montoya,  Adolfo,  Abel, Candelario, Juan Crestino, Ursinia, Adolfo, Leandra, Candelario, Lucrecia, Elisaida, Lorencita, Pablita, Josefina and Florinda, under the designation "Montoya Brothers" were the fee simple owners of that property at the time of the taking by the United States Government in World War II for the Manhattan Project;

2.   That none of the other heirs of Jose Crestino Montoya except his son Jose Albino Roybal and his heirs, are eligible claimants in this case;

3. The persons set forth in Exhibit II to these Findings and Conclusions are the respective heirs, successors or beneficiaries to these original claimants, and their respective shares and awards based upon the formula are all set forth in that exhibit and are eligible to receive their  award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

4.  As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

**SPECIAL MASTER'S INITIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW IN DISPUTED CASES**

**TRACT E5 AND FOREST SERVICE GRAZING PERMIT (GP7)**

**FINDINGS OF FACT**

The dispute in this case involves the heir of Marcos and Manuelita Trujillo, Jeremias Trujillo and his brother Marcos P. Trujillo.  At a hearing conducted on February 28, 2006, the Trujillo claimants were represented by Marcos P. Trujillo, and the heirs of Norberto and Sofia Roybal were represented by Shirley Roybal.  There were essentially two claims made by the Trujillo's heirs.  Testimony was taken and Exhibits introduced relating to two claims.

**Claim 1.**  The Marcos Trujillo heirs, through testimony of Marcos P. Trujillo, claim that twenty acres of Tract E5 were sold by Norberto Roybal to Antonio Valencia, and thence to Marcos and Manuelita Trujillo.  As to that claim, the following facts are found to have been proved by a preponderance of the evidence:

1.  Although the actual patent was not produced, a Final Proof of Homestead with approval from the United States Forest Service by Norberto Roybal for two parcels of land totaling 125 acres and filed on June 3, 1920, was presented as an original claim document.  This claim of original ownership is not disputed by Marcos Trujillo;

2.  This acreage is identical to Tract E5, consisting of 125 acres, which is one of the tracts involved in the consolidated cases and  was located on the Pajarito Plateau in what is now known as Los Alamos County;

3. It was acquired in cause 640, by a Declaration of Taking and Fee Simple Award to the United States Government in 1943.  In 1945, a judgment was entered which found Norberto and Sofia Roybal to have been the fee simple Owners of the entire tract, the tract was adjudicated to the United States, and the Roybals were paid SM Exhibit 1, p. E 034) ;

4.  Marcos P Trujillo's claim of ownership to twenty acres of this tract is based upon information provided by his father, who is no longer living.  This information consists of Marcos P Trujillo's statement that his Father told him that Norberto Roybal transferred ownership of twenty acres of land to Antonio Valencia, who then transferred land to Marcos and Manuelita Trujillo;

5.  No deed or document was produced by Trujillo which shows either conveyance. The only document produced by Trujillo about ownership was a tax record with the handwritten number "1943", showing Antonio Valencia as the owner of 20 acres of real estate with boundaries: N, Forest; S, Forest and C. Gonzales; E, N. Roybal. (Trujillo Exhibit 1).  Since these lands were already taken by the United States in 1943, this document, rather than tending to show any ownership by Marcos or Manuelita Trujillo, would refute that claim.

6.  No claim was made to any of Tract E5 by Antonio Valencia or any heirs of that person during this claims procedure.

**Claim 2.**  The second claim made by Trujillo is that the heirs of Marcos Trujillo are entitled to an award in this case because he relinquished a grazing permit on Forest Service land to the United States Government in cause 552.  As to that claim, in addition to those facts found above, the following findings of facts are found to have been proved by a preponderance of the evidence:

1.  Marcos Trujillo was listed as an original Defendant in Cause 552 (SM Exhibit 1, pp 001). This lawsuit dealt with lands in area "A" and the relinquishment of Forest Service grazing permits. Most, although not all of these persons were owners of fee simple land also taken in these condemnation actions.  No other reference to Marcos Trujillo is found in SM Exhibit 1;

2.  Marcos P. Trujillo and Manuelita has produced a stipulation and judgement involving a a relinquishment of a Forest Service Grazing Permit Leasehold Number GP 7 for taken by the military when the Department of the Interior retired their Natural Forest ownership in favor of the War Department in 1943, and were paid for that relinquishment.  (Trujillo Exhibit II);

3.  This relinquishment and the final order as to Grazing permit GP 7 was not located in SM Exhibit 1, but, giving the proponent the benefit of the doubt, the Special Master finds that the document was one of the documents of record for cause 552, for the purpose of this finding and the legal conclusions  reached based upon it).

38

**CONCLUSIONS OF LAW**

**Reasons for the conclusions of law**

Having made these findings, the conclusions of law in these claims to be reached, in which the heirs of Marcos Trujillo are not eligible claimants for the purposes of this award, require a statement of the reasoning of the Special Master in making them.

**Claim 1.** The heirs of Marcos Trujillo have failed to provide any documentary evidence showing ownership of any land on the Pajarito Plateau, including any ownership in Tract E5. Although the assertions of ownership seem heartfelt and genuine, as things reported from one's predecessors often do, no proof at all was provided upon which a finding could be made based upon a preponderance of the evidence that such ownership actually existed.

On the other hand, Norbert and Sofia Roybal have provided original ownership claims documents, and were found to be the owners of the property and were paid for it in cause 640. The presumption in favor of their ownership is un-rebutted.

**Claim II.** Trujillo argues that the grazing permits have an assignable value, especially when attached to fee simple ownership of other lands. There is no doubt that grazing permits have a value, and grazing permits were assigned a value in Cause 552. Virtually every fee simple landowner in this case (as well as some who were not) had a grazing permit on the Forest Service Lands acquired by the Military from the Department of Agriculture to create the Manhattan project, and were compensated for relinquishing their leasehold in Cause 552.

A special Act of Congress provided by Mr Trujillo, 43 USC Sec. 315 q. (SM Exhibit IV, added to the record *sua sponte* by the Special Master after the hearing), was enacted in July of 1942, specifically authorizing such payments.  He next argues that grazing permit owners should be compensated in this case, and provides in support of that argument, excerpts from the John Blatnik and Associates study (for the purpose of these hearings designated as Special Master's Exhibit III), prepared for the assistance of class counsel during the preparation of this case, and considered during the legislative process. In that study, grazing permits were also assigned a present day value in excess of the $40.00 per animal unit value assigned in cause 552 as the basis for payment to the Los Alamos Ranch School and the Anchor Ranch (Trujillo Exhibit 3 and 4).

However, this argument entirely misses the point, which is that the Legislation does not include compensation for grazing permits.  An eligible tract is limited to "private real property" (Sec 3A), and an eligible class member must be a person or the heir of a person holding a "…fee simple ownership in an eligible tract…" (Section 4 A and B).

At the time the legislation was passed, the legislators were certainly aware of the Blatnik study, and therefore the possibility of assigning eligibility for an award in settlement for compensation for grazing permits.  Their choice not to provide any present day award for Forest Service grazing permit relinquishments greater than that paid in Cause 552 is not unreasonable.

The 1942 Chapter 43 USC Section 315q itself specifically provides for the determination of a "…fair and reasonable payment, deemed  payment in full for such losses".   The $40.00 per animal unit proportional to acreage provided to the Anchor

40

Ranch payments (Trujillo Exhibit Number 4) set the standard.  If the payment for grazing permit relinquishments attached to all other fee simple claimants did not meet this standard, (and they don't), this is precisely the reason for the Legislation in this case: to adjust any such fee simple ownership payments finally and forever, including any adjustments required for attached grazing permits.   The Blatnik study's determination of present day value for a grazing permit is irrelevant to this settlement procedure, based upon the language of the legislation.

In any event, based upon the findings and conclusions about Trujillo's first claim, he has failed to provide proof by a preponderance of evidence of a fee simple ownership in any eligible tract, and therefore, as applied to this claim, his argument as to valuation of fee simple land no merit whatsoever.  He asserts an alternative argument that the standard should not be just fee simple title, but the fact that a person was "impacted by the taking", and therefore entitled to compensation.  This is not the standard for compensation provided in the legislation.

**Conclusions reached:**

Based upon the findings and reasoning set forth above, the Special Master makes the following Conclusions of Law:

1.  Tract E5 was located on the Pajarito Plateau in what is now Los Alamos County, and was acquired by the United States Government during World War II for the Manhattan Project, and is an eligible Tract under the Legislation;

2.  Norberto and Sofia Roybal were the fee simple owners of Tract E5 at the time of its acquisition by the Federal Government, and, if they were still living, would be entitled to an award based upon the formula for payment in this case;

3. The persons shown in Exhibit II to these findings are the heirs, successors or beneficiaries of Norberto and Sofia Roybal, and they are entitled to receive an award in accordance with the award formula as  set forth in that Exhibit;

4.  The heirs of Marcos an Manuelita Trujillo are not eligible claimants for an award for any acreage in this case, based upon the fact that they have failed to show any such ownership of any acreage in this tract by a preponderance of evidence;

5.  The heirs of Marcos and Manuelita Trujillo are not eligible claimants for any award for relinquishment of a Forest Service Grazing Permit, since such an award is excluded from any award by the language of the Legislation;

6. The persons set forth in Exhibit II to these Findings and Conclusions are the respective heirs, successors or beneficiaries to these original claimants, and their respective shares and awards based upon the formula are all set forth in that exhibit and are eligible to receive their  award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

6.  As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

**OTHER MATTERS**

**Motions for extensions of time, assistance and production of records.**

A few other issues need to be addressed, involving Mr. Trujillo's requests for Orders to Produce Records, for assistance and for extensions of time.  In his brief filed at the Special Master's request to address legal issues, he has asked for:

1.  An order for the John Blatnik and Associates, Estancia, New Mexico, to assist him in compiling a claim for compensation for the taking of GP 7, and access to their records; 2  An extension of time to obtain the necessary supporting evidence and an order providing access to the Corps of Engineers, Mobile Alabama Division Office for access to records; and 3.  Assistance of the offices of Senators Pete Dominici and Jeff Bingaman who were the sponsors of the legislation.

For the reasons of relevancy set forth above, the uselessness of any further delay to allow a record search after sixty-four years have already passed in which to locate relevant records, and the clear language of the legislation, these requests are denied. Motions may properly be directed towards the District Judge during the thirty days Mr. Trujillo has to object to the Special Master's findings and conclusions, if Mr. Trujillo should see any merit in so doing.

In reference to the request for an order of assistance by the offices of Senators Dominici and Bingaman, the fact that they belong to the legislative branch of government raises issues of separation of powers which would preclude the court from ordering their assistance in any event.  Mr. Trujillo can seek their assistance for legislation providing for grazing permit compensation on his own.

43

## VI. SUBMITTAL STATEMENT FOR THESE FINDINGS AND CONCLUSIONS

Upon  the filing of these Findings of Fact and Conclusions of Law, any disputing claimant who disagrees with these findings has, under section D4 of the Procedure, thirty days to object to these Findings and Conclusions.  If no objection is made, upon the Court's order approving the findings, these tracts will be submitted for payment with all the rest.  In the event objections are made, the Court can provide the relief to claimants he deems proper for a final resolution of the dispute.  The Special Master is available to respond to any order the Court should make at that time.

Respectfully Submitted:

_____
JOSEPH E. CALDWELL
SPECIAL MASTER

HCR 74 PO Box 20512
El Prado, NM, 87529
505 758 4308
jecons@taosnet.com