**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JOSE E. GONZALES, PETER E. GOMEZ,
EMELINA GRANT, TERESITA GARCIA
MARTINEZ and MARIA ERNESTINA
MONTOYA,

        Plaintiffs,

                                          No. 00-CV-60 WPJ/RS ACE

    v.

UNITED STATES OF AMERICA, and BILL
RICHARDSON, Secretary of the
DEPARTMENT OF ENERGY,

        Defendants.

_____

PAJARITO PLATEAU HOMESTEADERS, INC.,

        Plaintiffs,

.                                     No. 01-CV-588 MCA/RLP ACE
    v.

UNITED STATES OF AMERICA, et al.

        Defendants.

**SPECIAL MASTER'S INITIAL FINDINGS OF FACT AND CONCLUSIONS OF**
**LAW AS TO TRACTS A13 and E9**

**GENERAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      All of the general findings and conclusions set forth in the Special Master's

Initial Findings of Fact and Conclusions of Law file on April 14, 2006 are

incorporated by reference herein as if fully set forth.  Based upon those general

findings, what follows are the findings and conclusions specific to the remaining

tracts in litigation, Tracts A13 and E9.  The Findings and Conclusions for the one

remaining Tract, E24, will be filed separately.

## TRACTS A13

As to this Tract, the following claims were made:

**FIRST CLAIM**: Manuel Lujan Sr.'s heirs claim that he was the fee simple owner of the entire 150 acres of Tract A13 at the time of is taking for the Manhattan project;

SECOND CLAIM:  The heirs of David Quintana's son, Victoriano claim that Roberto, Victoriano, Cleofes Quintana and Candelaria Quintana Gomez and/or her husband Elfego Gomez , all children of David Quintana, were the fee simple owners of one half  (75 acres) of the 150 acres of Tract A13 at the time of the taking.  They further allege that the only heirs remaining who would be entitled to an award now would be those of Victoriano and Candelaria Quintana Gomez, in this case also the heirs of her husband Elfego Gomez.

**THIRD CLAIM:**  Elfego Gomez' heirs claim  was that he was the fee simple owner of 75 of the 150 acres of the tract, Manuel Lujan Sr. owning the other 75 acres at the time of the taking.  Their claim was that Elfego Gomez had acquired a full fee simple interest in this one half of the property either directly from David Quintana, or from his heirs.

Alternatively, Elfego Gomez' heirs claimed that, if they were not able to establish any title as claimed above, Candelaria Quintana Gomez, his wife was a daughter and heir of David Quintana, and was a tenant in common with the remainder of the heirs of David Quintana, who owned ½ of an undivided interest in 150 acres, the other ½ belonging to Manuel Lujan Sr.

**FOURTH CLAIM:**  The heirs of Candida Gomez Quintana, Elfego Gomez' sister, also known as Mrs. Daniel Quintana, claimed that she was the fee simple owner of the 75 acres claimed by David Quintana's heirs and Elfego Gomez' heirs, at the time of the taking by the U.S. Government.

Hearings were held on March 6 and 7, 2006, at which hearings Eduardo Lujan appeared in representation of the Lujan heirs, Bryan Rogers appeared on behalf of the heirs of Elfego Gomez, William Winter appeared on behalf of the heirs of  Victoriano Quintana and Joe Gutierrez appeared in representation of the heirs of Candida Gomez Quintana..

At the onset of those hearings, the fourth claim, of the heirs of Candida Gomez Quintana was abandoned by stipulation of all parties, and therefore dismissed.  Next, the heirs of Victoriano Quintana, and the heirs of Elfego Gomez, by stipulation agreed that  the heirs of Victoriano Quintana would be entitled to a  ½ of any award for ½  (seventy-five acres) of Tract A13, and that Elfego Gomez' heirs would be entitled to the other ½  of the award for those 75 acres, Manuel Lujan Sr.'s heirs being entitled to the award for the remaining 75 acres.

Evidence, testimony and argument  was then taken on the remaining adverse claims.  The first claim, of the heirs of Manuel Lujan remained the same. The second one, now that David Quintana and Elfego Gomez heirs had stipulated, became a claim by the heirs of Victoriano Quintana and Elfego Gomez,  that they were the only remaining heirs of  the fee simple owners of  one half of Tract A13, and were therefore entitled to equally divide the interest in this half among them.  This stipulation was not binding on the Lujan family.

On April 14, 2006, the Special Master's Initial Findings of Fact and Conclusions of law were filed.   Some of those findings (page 32) concerned the weight that the original findings and conclusions in the 1943 condemnation lawsuits should be given.  The Lujans had, during the March 6 and 7 hearings provided no evidence of title  beyond the judgment in Cause 552.  For that reason, at a May 4, 2006 telephone conference, they were given additional time to provide further proof that the doctrine of *collateral estoppel* would apply in this case, and any further evidence of title.  The Quintana and Gomez families were

also given time to provide any rebuttal evidence to any additional proof provided by the Lujan family.  Edward Lujan asked for an additional hearing, where the family could be represented by counsel, and a hearing was set on August 18, 2006, to present additional proof and hear additional arguments.   At that hearing, Edward Lujan and Manuel Lujan Jr. appeared, without counsel, on behalf of the Lujan family.  Bryan Rogers appeared on behalf of the heirs of Elfego Gomez, and William Winter appeared on behalf of the heirs of  Victoriano Quintana.

**FINDINGS OF FACT**

Based upon the testimony and exhibits presented during these hearings, the following facts are found to have been proved by a preponderance of the evidence to be true.

1.   David Quintana acquired two patents in his own name under the May 20, 1862 Homesteader's Act in his name from the United States Government in 1913.  he was married to Eutimia Garcia de Quintana.  The first, Patent Number 351634 (Exhibit BB), was for 52.50 acres, and the second (Exhibit AA)  Patent number 351630,  was for 97.50 acres.  The combined total of these two parcels is 150 acres.

2.  This land is located in Sandoval County, in Area "A" of The Map, in what is now Los Alamos County, and is Tract A13 in Area A of Exhibit 1 (The Map), taken by the United States Government for the Manhattan project during World War II in Federal District Court Cause 552.

3.  David Quintana died sometime between the acquisition of his patents and March 28, 1916 (the exact date of his death is not in the record in this case).  It is unknown whether he left a will.   Eutimia survived David.  Together they had the following living children: Isabel; Magdalena; Patricinia; Desiderio; Victoriano; Roberto; Candelaria (sometimes known as Candelarita) Quintana.  He also had another daughter by an earlier union named Cleofes Quintana, all of whom survived him..

4.  Eutimia, Isabel, Magdalena and Desiderio  Quintana, for consideration of "….$50.00, etc", subscribed a warranty deed to the land patented in David Quintana's name to Manuel Lujan on March 28,  1916.  Patricinia, named in the deed, did not convey her interest, nor did anyone with authority to do so on her behalf (ML Exhibit 5, document 7).  The deed was recorded in the Sandoval County Clerk's Office on May 21, 1917.

5.  At the time that Manuel Lujan acquired this deed, he was married to Lorencita Lujan.

6.  Victoriano, Roberto, Candelaria and Cleofes Quintana do not appear on that deed.  Therefore, they retained their undivided fee simple interest as  tenant- in- common owners with Manuel Lujan Sr. when Tract A13 was taken by the United States Government for the Manhattan Project during World War II.

7.  The combined undivided interest held by Eutimia, Isabel, Magdalena and Desiderio Quintana at the time of the March 18, 1916 deed was 76.5265% of the 100% interest for what became Tract A13.  The combined undivided interest of Patricinia, Victoriano, Roberto, Candelaria and Cleofes Quintana at the time of the deed was 23.44% of the total.

8.  Elfego Gomez was the husband of Candelaria Gomez.  He predeceased her, dying after the taking for the Manhattan Project  (although the date of his death was never presented as part of this record, he was alive during Cause 552, and Candelaria's 1972 will acknowledges that she is his widow).

9.  At the time of this award, Manuel Lujan Sr. and Lorencita Lujan are deceased.  There is no dispute among their heirs about who, among them is entitled to a distribution of any award.

10.  Eutimia is deceased.  All of the children of David Quintana are deceased.  Although diligent search by both family members and the Pajarito Plateau Homesteader's Association was made to find heirs of Patricinia, Roberto or Cleofes, they could not be located, and, so far as can be ascertained, they died without issue.  None of the heirs of  Isabel, Magdalena, Desiderio, Patricinia, Roberto or Cleofes Quintana have filed any claim in this case, and the time for filing any such claim has passed.

11.  Victoriano and Candelaria are also both deceased, and their issue are the last known survivors of any of David's children.  There is no dispute among those heirs about who, among them, is entitled to a distribution of any award.

12.  The Sandoval County Courthouse burned in 1922.  All of the records were lost.  From 1923, when records began after the courthouse fire, and until 1943, Manuel Lujan was assessed by, and paid taxes to Sandoval County, in some years for 142.5, and others for 143 acres.  The assessment description for his

taxes is, for some years, 142.50 acres, and other years, 143 acres.  This acreage is located within Tract A13 of The Map. (Pages 8 and 9, Western American Insurance Company report (ML Exhibit 5. pp 8-12).

13.  From 1923 until 1943, Elfego Gomez was assessed by, and paid taxes to Sandoval County on a diminishing area of acres over the years, from 128 to 88 acres.   From 1923 until 1926, by its description, from 120 down to 80 of those acres were assessed for property in Section 4, Township 19, Range 6 East, described as coming from Pedro Gomez y Gonzales (Elfego's Father), with boundaries:  N, S and W, Forest, E B. Roybal.  This assessment is for what became Tract E9 in Cause 552 and on The Map.

14. From 1927 on, eight more acres were added to Elfego Gomez' assessment, and from 1929, a description of lands bounded "…N and W National Forest, East and South, M. Lujan"… was added, and this description continues until 1943.  (E. Gomez Exhibit E, Western American abstract pp 1-7).  None of the Lujan family owned  any land in the E Tracts of The Map.  Martin Lujan (Manuel's brother) owned the land South of Tract A13, and Manuel Lujan claimed Tract A13, part of which was also claimed by Elfego Gomez.

15.  The Declaration of Taking in cause 533 was filed on September 13, 1943. (SM Exhibit 2, p. 007). The Declaration names Manuel Lujan, Elfego Gomez and the "unknown heirs of David Quintana…" as the purported owners. The description given is the description of the combined property patented to David Quintana (SM Exhibit 2, p. 008). The composite tract map filed at the time, and used to create The Map shows Tract A13 to belong to Elfego Gomez and Manuel Lujan. (Exhibit CC).

16.  An individual  tract map located in SM Exhibit 2 (p.015), in apparent discrepancy with the Declaration of Taking and the composite maps, names only Manuel Lujan as the owner.

17.  From the time of the Declaration of Taking, Elfego Gomez and David Quintana's heirs are no longer mentioned in cause 552.   The final judgment in the case finds that Manuel Lujan was the fee simple owner of the property, and provides for payment to him of the entire $4,500.00 ($30.00/acre) provided for that tract. (SM Exhibit 2, pp. 094 and 099).

18.  SM Exhibit 2 contains many documents from the file of that and the other condemnation lawsuits, but it does not contain all of them.   Many times during these proceedings documents were provided which were more likely filed than not filed, even though they do not appear within that Exhibit.  One of these, (ML Exhibit 3) is a pleading by an attorney, Manuel A. Sanchez, in representation of Manuel Lujan Sr., with a file stamp of May 7, 1945 in Cause 552.  This document was not located in SM Exhibit 2, but, for the purposes of the findings in this case, it will be considered as having been filed in Cause 552 as a proven fact.

19.  Manuel Sanchez' pleading  is not a document of title.    But it does explain that Manuel Lujan's ownership to the property was based upon his claim that:

> by) …"a deed of April 15, 1916 an interest  equivalent to 1/4 of said land was c(onveyed by some of the heirs of David Quintana to this claimant, meaning Manuel Lujan, and that by deed dated March 28, 1916 an interest equivalent to seven tenths was conveyed to this Claimant by other heirs of said David Quintana making a   total of 19/20th of interest in said land..  the document further states that Elfego Gomez' interest was a …"1/20 interest in said land."

20.  In 1943, Elfego Gomez claimed approximately half of Tract A13.  He was a named party in the Cause 552, (ML exhibit 5 docket sheet), and knew of the existence of the lawsuit and was at least involved in it.  (SM Exhibit IV, Manhattan District History, Vol.1, p. F. p. 3).  He was most likely making such a claim on behalf of his wife Candelaria and the other heirs of David Quintana.

21.  The Lujan, on the one side, and the Gomez and Quintana claims on the other, were adverse to each other.   No quiet title suit was ever brought by either Manuel Lujan Sr., Elfego Gomez or the heirs of David Quintana against the others before Cause 552 was filed.

22.  SM Exhibit 2 does not reveal, for Cause 552, any notices of hearings to Elfego Gomez or the heirs of David Quintana, nor any transcripts, exhibits, or other documents showing that the parties were able to present or contradict evidence at a trial, nor was any such evidence provided by any party.  Further, Neither SM Exhibit 2 nor any evidence provided shows any stipulations or disclaimers by Elfego Gomez or the heirs of David Quintana to the claim of title by the Lujan family.

## CONCLUSIONS OF LAW

### 1.  Statement of reasoning for the conclusions reached

### A.  collateral estoppel

The Special Master's April 14th Conclusions of Law determined the binding

effect of the original condemnation actions (in this case, Cause 552). and the

application of the doctrines of *res judicata*  and *collateral estoppel*. These

conclusions, (found on page 32 of that document, in their entirety), briefly

summarized, are that:

1. The standard to determine an eligible claimant in the legislation was not that a person had been found to be a fee simple owner in the condemnation action, but that a person was a fee simple owner at the time of the acquisition by the United States Government.
2. The doctrine of *res judicata* did not apply in this case, since the lawsuits are not the same (the former were for condemnation, this one is a civil rights violation claim);
3. The doctrine of  collateral estoppel does apply, because ownership must have been necessarily determined in both of them.  Therefore, the determination of fee title cannot be relitigated when a party has been found to have had a full and fair opportunity to litigate the issue.
4. In the event of a failure of proof that a full and fair opportunity to litigate the issues occurred, then the original condemnation judgment would constitute a rebuttable presumption.  In other words, the person challenging that judgment must provide better proof of title, or the original finding in the condemnation action would stand.

Presenting evidence at a trial which takes place some ninety years after a

fact, (the March 28th, 1916 deed) is, at best, an illusory experience, and neither

side can be faulted for failing to produce title evidence which might be

enlightening, especially since Sandoval County records before 1923 were

destroyed by fire.

The Manuel Sanchez pleading makes Manuel Lujan Sr's theory of

ownership in 1943 clear. He claimed that his client had acquired two deeds, one

dated March 28, 1916, and one in April of 1916, which would have established

an undivided 19/20th interest in the property.  The judgment in Cause 552 found

that he was the sole owner of Tract A13.  Is this decision binding upon the

Quintana and Gomez families under the doctrine of *collateral estoppel*?

Only the March 28, 1916 deed has been located.  Beyond that, there is nothing to show upon what evidence the Cause 552 Court concluded that he was the sole owner of the property.  Relevant facts may have occurred for which proof may have existed which could have been presented then, but there is nothing to show whether any such proof was, or was not presented, or whether any opportunity to do so was given. .

Did the other deed Manuel Sanchez referred to in his pleading exist?  Was it recorded? Who signed it?  What interest did it convey if it existed?  What consideration, if any was given?   What challenges to its validity might have been made?  Did Elfego Gomez also have a deed from David or his heirs?  Did all of the Quintanas know of this lawsuit?  Was Elfego Gomez acting in their representation? Were the Quintana adverse claims based upon their father's patent presented?  Were any of these issues fully litigated, or litigated at all?  If not, did Manuel Lujan and Elfego Gomez come to some agreement?  Were there stipulations or disclaimers either informally entered into, or filed?

Nothing in SM Exhibit 2, nor anything presented by the parties can answer any of these questions now.  Absent the ability to answer them, collateral estoppel does not apply.  Title in this case will be decided based upon those facts which are now proven by a preponderance of the evidence to have existed.

## B.  Fee Simple Ownership

**Record title from the original owner**

Record title is an unbroken chain of title from the original owners of a property. If a party can prove a clear record title, there is no need to prove title by

adverse possession  Rael v. Cisneros, 82 N.M. 705, (1971). The only documents of title provided in this case were the two patents described above, and a copy of a March 28, 1916 deed was recorded in the office of the Sandoval County Clerk on May 21st, 1917.  These documents establish record title as to all parties in this case.

**Title created by the patents**

The patents were introduced by all parties, and their validity uncontested. Therefore, on their face, David Quintana was the original patentee for the lands in Tract A13.   There is, though, one remaining question about his ownership which is important to the resolution of the lawsuit.  This is….Was his patent held as his separate property, or in community with Eutimia?

No marriage certificate was introduced, the fact that David Gonzalez and Eutimia Garcia were married and had seven children at the time of both the patents and the March 28th, 1916 deed is uncontested, and obvious.   The census records (Quintana Exhibit CC show that, as of the 1900 census, they were married and all seven of their children were born).

Although New Mexico became the forty-seventh State of the United States in 1912, its first Code was not enacted until 1915.  The 1897 Compilation of Territorial Laws governed all matters until that time.  This Code, following the requirements of Article IX of the 1848 Treaty of Guadalupe Hidalgo, incorporated Spanish concepts of community property law into it.

The Quintana and Gomez families have argued here that the existence of this deed creates a tenancy in common, in which the original claimants would still

retain a one-half interest in the property.  This would be true if the property had been David Quintana's separate property, in which case slightly over 53% of the undivided interests as tenants in common would have been owned by the Lujan family, and slightly under 47% by the Quintana-Gomez families. These families produced absolutely no evidence to establish that this claim of separate ownership was true.  In fact, all of the evidence produced except the fact that only his name appears on the patent is to the contrary.

Under the 1897 Compilation, property that was acquired during the marriage was presumed to be community property.  Both Article 2029 Section 3 of the 1897 Compilation (and Section 2764 of the 1915 Code, as well) provided  that …"all property acquired after marriage by either husband or wife or both shall be community property unless the same was acquired by gift, bequest, devise, or descent."

There was, then, a presumption that, unless shown otherwise, property acquired during the marriage was community property. Barnett vs. Wedgewood, 28 NM 312, 1922, interpreting Section 2764).  Property acquired under the Homestead Act from the United States government is not from a bequest, a devise or descent.  The placement of David Quintana's name on the patent claims and the patents themselves is not enough to rebut the presumption of community ownership.  He was presumed to have done so for the community. No more evidence exists to rebut that presumption. The parcels patented were owned in fee simple as community property by David and Eutimia Quintana.

**Title created by The March 28, 1916 Deed.**

The March 28 deed copy was located  during a title search done for the Lujan Family  by Albuquerque Title Company, (ML Exhibit 5), and was also found as part of an abstract  prepared by Western American Insurance Company for the United States Government contemporaneously with Cause 552, included as part of that title search.  (ML Exhibit 5).

Although objected to by the Quintana and Gomez families for lack of authentication, the March 28, 1916 deed is found to be an authentic copy.  There are three reasons for this finding.   First, it exists, and no other deed does.  Second, it is the only document which explains the history since that time.  Specifically, the tax assessment history (discussed below) and the adverse claims of Elfego Gomez and the Quintanas presume the existence of the deed.  Third, its existence also explains the position that Manuel Sanchez took about it in 1943, understanding that his position is only a lawyer's argument, and not necessarily a correct interpretation of the law.  In fact, his claim that the deed conveyed seventy per cent of the interest in the property is not correct.  It conveys more.

An acknowledged deed conveying sufficiently described property and delivered to a bona fide purchaser for value is a valid deed Garcia vs. Cisneros, Supra.  A deed, valid on its face, delivered to the grantee, raises a presumption that the grantor intended to part with the property. Garcia, Supra, & Waters v. Blocksom, 57 N.M. 368.  Although deeds may be attacked by extrinsic evidence, evidence of invalidity must be clear, convincing, cogent and indubitable. Gutierrez v. Gianini, 64 N.M. 64,  (1924).

On the face of the March 28, 1928 deed, the following appear;

    1.  It was a warranty deed, for consideration of…"$50.00, etc;";
    2.  The deed clearly describes the property patented to David  Quintana;
    3.  The Notary acknowledging the deed was  Edward  P. Davies;
    4.  The subscriptions of Eutimia (by her mark), Isabel, Magdalena and
    Desiderio (by their signatures), were acknowledged;
    5. The deed was recorded.

As to the subscriptions, Eutimia signed by placing her mark.  Marks could be accepted as valid, and the presence of a notary created the presumption of validity in 1916 <u>Garcia V. Leal, 30 NM 249</u> (1924).  In that case, the Court interpreted section  4760 of the 1915 Code, which  provided that …."All conveyances of real estate shall be subscribed by the person transferring his title or interest in said real estate, or by his legal agent or attorney."  That court concluded that "…A certificate of acknowledgment made by an officer authorized to take acknowledgments is only prima facie evidence of the execution of the instrument, and, while it is entitled to a strong presumption in favor of its truth, it may be impeached by parol testimony."

This deed, then, meets all of the requirements of a valid deed, at least as to those grantors, and therefore its validity is presumed.  No parol testimony challenging Eutimia's mark or the other acknowledged signatures is at all possible any more, all persons present having died.  Therefore, her mark will be accepted as valid.  So will the signatures of the remainder of the persons whose names appear in the acknowledgement by the notary.

There is, though, one issue which appears on the face of the deed, which does effect the amount of interest conveyed.  This is the interest belonging to Patricinia.

It is clear that she, personally, did not sign the deed.  Her seal contains the annotation "by D.Q". The acknowledgement of Edward P Davies does not mention her at all.  Under what authority "D.Q" signed for her is entirely unknown. Presumably, D.Q. would stand for Desiderio, the only given name in the deed beginning with the  letter  "D", and mentioned in the acknowledgement.   No power of attorney, guardianship or other authority for him to convey Patricinia's interest in the property was produced  during these hearings, nor has any document in Cause 552 been revealed to demonstrate that any existed.

If the unchallenged census figures (Exhibit Quintana CC) were correct, she was born in 1891, and therefore was 25 years old when that deed was executed. She was not a minor, (a deed signed by a minor was voidable, and could be ratified later on Sisneros v. Garcia, 94 NM 490).  Nothing exists on the record to show that she was otherwise incapacitated, or required a guardian.  In fact, whether she was even present cannot now be ascertained.  In any event, no record appears that she ratified the deed during the twenty-one years between 1916 and 1943, and that lapse of time was  insufficient to dissolve her co-tenancy alone In Re: Estate of Gurule, 61 NM 490.  There being no conveyance by her in that deed, the conclusion now is that no conveyance by her ever occurred.  "D.Q";s attempt  to convey her interest is entirely void.

Upon David's death, Eutimia's undivided one half community property interest in the patented land, after the payment of all community debt, belonged to her.  (Section 2030, 1897 Comp.)  As to the other half, under the 1897

Compilation and all New Mexico codes up until 1975, will or no will, the property passed directly to the heirs, without the requirement of a probate. {Re Estate of Baca 95 N.M 294, 296, (1980) Section 31-7-2, not repealed until 1975}.

What was the distribution of David's half?  It was subject to the distribution by will of the decedent.  No will was ever presented here.  Absent other distribution by will,  the other half was distributed one quarter to the surviving spouse, with three quarters to be divided among the children  (Article 2031 1897 Comp).  This intestate distribution was not changed until, also in 1975, the decedent's half of the community property passed entirely to the surviving spouse if no other disposition by will took place. (History, Section 45-2-102 NMSA 1978).   The interest held by the heirs was as tenants in common (See History, 47-1-15 NMSA 1978 Comp., 1915 Code).  Whatever interest they held was transferred to Manuel Lujan, but no more.

Manuel Lujan's acquisition of that property by that warranty deed, for the same reasons, was a community purchase, for both Lorencita and himself.  It was, on its face, a purchase for consideration, and not acquired as a gift, bequest, devise or descent.  The effect of that deed is that he was not the sole owner of the property.  His wife held an interest as a tenant by the community, and the Quintana heirs who had not deeded the property to him held an interest as tenants in common with them.

Calculating those interests transferred in the March 28, 1916 deed, Eutimia held 62.50%; Isabel, Magdalena and Deciderio transferred 4.6875%

each (1/8 of 37.50% each).  The total transferred by all of them to Manuel Lujan Sr. and Lorencita, and the total held by them in 1943 is 76.56%.

The conclusion to be reached is that all parties In this case can trace a clean record title to Tract A13 to the extent of the undivided interests conveyed or this deed, or retained by those that did not sign it.  This is a good thing, since none of the parties are able to prove title by adverse possession as against the other.

Adverse possession in New Mexico requires color of title acquired in good faith, payment of taxes for more than ten years, and continuous adverse possession for more than ten years  Marquez vs. Padilla, 77 NM 620 , 1967, Section 37-1-22 NMSA 1978 Comp.  A party asserting adverse possession must prevail on the strength of his title, not the weakness of the other party's title. Rock Island Oil &  Refining Co. v. Simmons, 73 NM 142.

In this case, neither party would be able to establish title by adverse possession as against the other.  An analysis of the above requirements of adverse possession show why this is so.

**Color of title in good faith-** Title conveyed by those co-tenants does not convey the title of others Apodaca vs Tome Land & Improvement Co., 91 NM 596.  In the Lujan's case, the only good faith color of title existing is, on the face of the deed, the extent of the undivided Quintana co-tenancy interest acquired in this deed.   As for the Quintana and Gomez interests not conveyed, they can only prove title to what remains, based upon their inherited interest in David and Eutimia's land.

**Payment of Taxes** - At least from 1923, and probably from the date of recording of the March 28, 1916 deed in 1917, Manuel Lujan did pay taxes on approximately 142.5 or 143 acres of what was Tract A13.  Elfego Gomez paid on 8 acres.

This could be admittedly  important evidence to show that the Lujan claim that Gomez owned 1/20 (7.5 acres) of the 150 acres was correct, and that both of the deeds alluded to in Manuel Sanchez' pleading existed.   However, without seeing the other deed and having the ability to examine it, it is really not possible to arrive at any valid conclusion about it.  The more compelling conclusion based upon the evidence that was presented is that the March 28, 1916 deed establishes Manuel Lujan and his wife as co-tenants in common with David Quintana's children who did not sign the deed.  Persons acquiring a joint interest with other tenants in common hold that interest in trust for the others.

Seen in that light, payment by either Manuel Lujan Sr. or Elfego Gomez of taxes was done for the benefit of all of the tenants, subject to a right of reimbursement   <u>Smith v. Borradaile, et al. 30 NM 62,</u> <u>Bradford vs, Armijo 28 NM 288.</u>  Since the amount of taxes paid is not known, there is nothing to reimburse.


**Continuous adverse possession-**Edward Lujan's testimony was that his older sister Teresa, who was, at the time of the hearing 86 years old,  told him that "…she had always heard from both my father and my mother that my father had  bought that piece of property from a Mr. Quintana.  And  that's the belief…. (Tr p. 40 lines 2-7).   He also testified that his brother Manuel Jr. told him that he

would bring horses with his father down from that land (Tr P. 52 lines 19-22).

Erlene Eden testified that she remembered her mother and father telling her that they owned two pieces of property, one from her grandfather and one from her grandmother, ad that the family would go up and work both of those lands (Tr PP. 108 L. 22 and 109 Lines 1-20).   Ms. Eden's grandfather was Elfego Gomez, and his land is traceable to the acquisition of E9 from his father). Her grandmother was Candelaria Quintana Gomez, and her only  tract would have been within A13.

All of this testimony is hearsay, if it is considered to prove the truth of what is claimed, and inadmissable for that purpose(NMRE Rules  11-801-C  and 802). Even so, if one were to distort the rules of evidence to permit any of this testimony for its truth, it is not enough to show that the use of this property was adverse to anyone else.  Because of the passage of time and he death or inability of any principal witnesses to demonstrate possession in the period 1915-1943, any possibility of proving adverse possession as against the others is lost to everyone.

The Lujan family has been able to demonstrate superior title to 76.56% of the undivided 100% interest in this case.   The Quintana and Gomez families have successfully rebutted the presumption of ownership by the Lujan family of the remaining 23.44%, and have demonstrated superior ownership to it.

## 2. Conclusions reached

Based upon the findings and that reasoning, the following conclusions of law are reached as to both claims I and II.

1.  Tract A13 is an eligible tract under The Legislation in this case;

2.  Until his death, David Quintana And Eutimia Quintana were the fee simple owners of a ½ undivided community property interest each in 150 acres of land in what is now Los Alamos County, New Mexico, which later became Tract A13 on The Map, acquired by the United States Government for the Manhattan Project during World War II.

3.  After David Quintana's death and until March 28, 1916, Eutimia Garcia de Quintana owned a 62.50% undivided fee simple  interest, and David's children, Isabel, Magdalena, Patricinia, Desiderio, Victoriano, Roberto, Cleofes and Candelaria Quintana owned a 1/8 undivided interest (4.6875% each) in the remaining ¾  (37.50%) interest.  All of these interests were held as tenants in common.

4.  Manuel Lujan Sr. acquired the interest of Eutimia, Isabel, Magdalena and Desiderio Quintana by a March 28, 1916 Warranty Deed.  He was the fee simple owner of 76.56% of the total undivided interest in the property.at the time of the acquisition of  Tract A13 by the United States Government for the Manhattan project during World War II.   If he were still living, he would be therefore an eligible claimant under The Legislation for an award according to the award formula corresponding to that interest. .

5.  Manuel Sr. held this interest as a tenant in common with the children of David Quintana who did not sign the deed.  His payment of taxes was done in trust for them, subject to reimbursement by them.  The amount of taxes paid by him over those years is not known, and therefore does not need to be repaid.

6.  The fee simple interest of Patricinia, Victoriano, Roberto, Cleofes Quintana and Candelaria Quintana Gomez, as tenants in common in Tract A13 at the time of its acquisition for the Manhattan Project was 23.44%.  If they were still living, they would be eligible claimants under The Legislation for an award according to the award formula for that interest.

7.  Because Patricinia, Roberto and Cleofes died without issue, or they cannot be located, their ownership interest passed to the heirs of the two remaining children, Victoriano and Candelaria.

8.  The amount available for Tract A13 under the formula is $460,291.50 ($3068.61 x 150 acres).  The amount available for Manuel Lujan's heirs is $352,399.17 (76.56% of that amount).  The amount available for heirs of the co-tenant children of David Quintana is $107,892.33 (23.44% of that amount).

9.  Candelaria's heirs are also Elfego Gomez' heirs.  No evidence of the probate of either his or her will providing for a different result than intestate succession.

There is no dispute among them about this distribution, so the award will be provided according to intestate succession.

10.  The persons set forth in Exhibit 3 to these Findings and Conclusions are the known heirs, successors or beneficiaries to these original claimants. Their respective shares and awards based upon the formula are all set forth in that exhibit and they are eligible to receive their  award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

11.  As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

## TRACT E9

**CLAIM 1:** The family of Elfego Gomez claimed that he had acquired the property from his father,  Pedro Gomez y Gonzales, and that he was the sole owner of the 120 acres became Tract E9 on The Map at the time of the acquisition by the United States Government in World War II.

**CLAIM 2:**  The family of Candida Gomez Quintana, Elfego Gomez' sister, was that Elfego Gomez at some point, in order to honor her right of inheritance, had deeded 40 acres of the tract to her, so she was the sole owner of 40 acres of the 120 acres, Elfego Gomez owning the remaining 80 acres.

On August 18, 2006, the parties stipulated to claim number 2, resolving all issues between the parties.  There is no dispute in either the Elfego Gomez family, or the Candida Gomez Quintana family, about the right to inherit those interests, or the share or the amount of the award to any of them.

**FINDINGS OF FACT**

Based upon the stipulation entered, the following facts are proven, by a

preponderance of the evidence, to be true:

1. Elfego Gomez was the owner of 80 acres of land in Sandoval County, now located in Los Alamos County, designated as Tract E9  when it was acquired by the United States Government for the Manhattan project during World War II.

2. Candida Gomez Quintana was the owner of 40 acres of land in Sandoval County, now located in Los Alamos County, designated as Tract E9 when it was acquired by the United States Government for the Manhattan project during World War II.

3. Both of them are deceased, and there is no dispute among their respective descendants about either the persons or shares of the award to which they would be entitled.

4. Diligent search was made by both family members and the Pajarito Plateau Homesteader's Association to locate family members.  Those members shown in Exhibit 3, attached hereto, are those that could be located.  No claim by any other family member has been made in this case except for those persons, and the time for filing any such claim has passed.

**CONCLUSIONS OF LAW**

Based upon those findings of fact, the following conclusions of law are reached:

1. Tract A13 is an eligible tract under The Legislation in this case;

2. Elfego Gomes, if he were still living, would be an eligible claimant to receive an award in this case for 80 acres of Tract E9, based upon the formula for payment;

3. Candida Gomez Quintana, if she were still living, would be an eligible claimant to receive an award in this case for 80 acres of Tract E9, based upon the formula for payment;

4. The persons set forth in Exhibit 3 to these Findings and Conclusions are the respective heirs, successors or beneficiaries to these original claimants, their respective shares and awards based upon the formula are all set forth in that exhibit and they are eligible to receive their award according to the payment formula, as full, fair and just payment for dismissal of any claim against the Defendants in this case, and a release of any further claim against those Defendants, pursuant to section (e) of the Legislation;

5. As a condition precedent to payment, once the approval of these Findings of Fact and Conclusions of Law by the Court becomes final, each claimant designated to receive an award in this case must execute a release of the defendants in the consolidated lawsuits with respect to such eligible claimant, in full satisfaction of any and all claims of such eligible claimant against the United States arising out of the acts described in the lawsuit.

## VI. SUBMITTAL STATEMENT FOR THESE FINDINGS AND CONCLUSIONS

Upon the filing of these Findings of Fact and Conclusions of Law, any disputing claimant who disagrees with these findings has, under section D4 of the Procedure, thirty days to object to these Findings and Conclusions. If no objection is made, upon the Court's order approving the findings, these tracts will be submitted for payment with all the rest. In the event objections are made, the Court can provide the relief to claimants he deems proper for a final resolution of

the dispute.  The Special Master is available to respond to any order the Court

should make at that time.

Respectfully Submitted:




S/ _____
                JOSEPH E. CALDWELL
                SPECIAL MASTER


        HCR 74 PO Box 20512
        El Prado, NM, 87529
        505 758 4308
        jecons@taosnet.com